FILED
2016 Jul-29  PM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT D

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE U.S. ENVIRONMENTAL PROTECTION
AGENCY AND 3M COMPANY AND DYNEON LLC FOR
A PERFLUOROOCTANOIC ACID (PFOA) SITE-RELATED
ENVIRONMENTAL ASSESSMENT PROGRAM**

# TABLE OF CONTENTS

Page

I.    SIGNATORIES, SCOPE AND PURPOSE ................................................... 1

II.   EFFECTIVE DATE ................................................................................... 2

III.  LEGAL EFFECT ...................................................................................... 2

IV.   PERTINENT BACKGROUND .................................................................. 3

V.    PFOA SITE-RELATED ENVIRONMENTAL ASSESSMENT PROGRAM ........... 5

      A.   Program Scope ........................................................................... 5

      B.   Program Work Plan Commitments ............................................ 6

           1.   Phases I and II Commitments ............................................ 6

           2.   Phase III Commitment ...................................................... 7

           3.   Status Reports ................................................................. 8

      C.   Data Quality ............................................................................... 8

      D.   Assessments ............................................................................... 9

           1.   Assessment Commitment ................................................. 9

           2.   Data Assessment ............................................................. 9

           3.   Screening Level Exposure Assessment ............................. 9

           4.   Future Data Needs Assessment ...................................... 10

      E.   Peer Consultation ..................................................................... 10

           1.   Peer Consultation Commitment ..................................... 10

           2.   Peer Consultation Process .............................................. 11

      F.   Post-Peer Consultation Commitments ..................................... 16

           1.   Future Work Plan ........................................................... 16

           2.   Status Reports ............................................................... 16

       **3.**    **Revised Final Amended Screening Level Exposure Assessment** ................................................................. 16

**VI.**    **MISCELLANEOUS PROVISIONS** ................................................. 16

    **A.**    **Public Record** ................................................................... 17

    **B.**    **Modifications, Work Plan Adjustments And Schedule Changes** ....... 17

        **1.**    **Modifications To MOU** ................................................. 17

        **2.**    **Adjustments To The Work Plan And Schedule Changes** ........ 17

    **C.**    **Technical Consultation** ....................................................... 19

    **D.**    **Principal Contacts** ............................................................ 20

    **E.**    **Submissions To EPA** ........................................................ 20

    **F.**    **Reservation of Rights** ........................................................ 23

**VII.**    **SIGNATURES** ......................................................................... 23

**APPENDIX A** ................................................................................. 27

**APPENDIX B** ................................................................................. 29

## I.    SIGNATORIES, SCOPE AND PURPOSE

A.    The United States Environmental Protection Agency (EPA or the Agency), 3M Company (3M) and Dyneon, LLC (Dyneon) are the signatories to this Memorandum of Understanding (MOU).  Hereinafter, the term "the Companies" will be used when referring collectively to 3M and Dyneon.

B.    Under this MOU, the Companies commit to provide EPA with certain data and information on perfluorooctanoic acid and its salts (PFOA) through a PFOA Site-Related Environmental Assessment Program.  To memorialize such commitment, this MOU utilizes the following structure:

1.    Section II establishes the Effective Date for this MOU.

2.    Section III addresses the legal effect of this MOU.

3.    Section IV describes the pertinent background that has culminated in the signing of this MOU by EPA and the Companies.

4.    Section V sets forth the Companies' specific obligations under this MOU for the PFOA Site-Related Environmental Assessment Program, which include the following:

a.    The gathering of data and information by the Companies through phased activities referred to as "Phases I and II".  These Phases I and II activities consist of environmental monitoring and other data and information collection activities pursuant to a Letter of Intent (LOI) developed on a voluntary basis by the Companies and to a Work Plan developed subsequent to the LOI by the Companies in consultation with EPA and contained in Appendix B to the MOU.  This Work Plan will be implemented in accordance with one or more Quality Assurance Project Plans developed by the Companies to address data quality assurance and quality control for the data and information collection and analysis activities specified in such Work Plan;

b.    The use of the Phases I and II data and information, along with other relevant data and information, by the Companies to prepare a Data Assessment, a Screening Level Exposure Assessment and a Future Data Needs Assessment;

c.    The funding and participation by the Companies in a Peer Consultation Process administered by an Independent Third Party.  This process will entail input by a group of experts, the public and EPA on the adequacy and sufficiency of the Assessments;

d.    The gathering of further data and information by the Companies through a Phase III of environmental monitoring and other data and information collection activities pursuant to a Work Plan and one or more Quality Assurance Project Plans that will be developed based on the input received through the Peer Consultation Process and in consultation with EPA; and

1

e.     The preparation by the Companies of a revised Screening Level Exposure Assessment which incorporates the additional data and information obtained through Phase III.

5.     Section VI contains other miscellaneous obligations under the Program, which include the establishment of a publicly-accessible record of all data, reports, assessments and other documents prepared in connection with this MOU and the obligation for the Companies to inform EPA of any modifications, adjustments and schedule changes in the Work Plan for environmental monitoring under the Program and to engage in technical consultations with EPA prior to any major such modifications, adjustments and schedule changes.

6.     Appendix A identifies the specific Site covered by the Program, along with certain parameters and limitations.

7.     Appendix B contains the Work Plan for environmental monitoring under the Program.

C.     As specified in Section V.A.1. of this MOU, the goal of the PFOA Site-Related Environmental Assessment Program is to gather data and other information that will address fully the question referred to as "the Charge" regarding PFOA environmental releases and sources of those environmental releases from the Site. EPA and the Companies have agreed to additional language set forth in Section V.A.2. of this MOU that both governs interpretation of the Charge and establishes the scope of the Program.

## II.    EFFECTIVE DATE

A.     This MOU becomes effective on the date signed by both the Companies and EPA.

B.     It should be recognized, as described in Sections IV. and V.B. of this MOU, that certain PFOA Site-Related Environmental Assessment Program activities have been completed and others have been initiated prior to this Effective Date.

## III.    LEGAL EFFECT

A.     This MOU does not supersede any current law, establish any additional legal requirements or contain any admissions by the Companies.

B.     This MOU is a voluntary agreement between the parties and is not an enforceable consent agreement or order under 40 C.F.R. Part 790.  This MOU is not enforceable under 15 U.S.C. § 2603 (TSCA § 4), 15 U.S.C. § 2614 (TSCA § 15), 15 U.S.C. § 2615 (TSCA § 16), or any other provision of TSCA or other federal or state statute.

C.     All commitments made by EPA in this MOU are subject to the availability of appropriated funds.  Nothing in this MOU, in and of itself, obligates EPA to expend appropriations or to enter into any contract, assistance agreement, interagency agreement, or to incur other financial obligations.  The Companies agree not to submit a claim for compensation for services rendered to EPA or to any other Federal agency based on activities the Companies have undertaken in furtherance of this MOU.

D.     The Companies understand that EPA may not endorse the purchase or sale of products and services provided by the Companies.

E.     This MOU does not create any right of benefit, substantive or procedural, enforceable by law or equity against the Companies or EPA, their officers or employees, or any other person.  This MOU does not direct or apply to any person outside the Companies and EPA, except that as addressed in Section V.E. of this MOU, the Independent Third Party shall be required, through contractual arrangements with the Companies for the funding of the Peer Consultation Process, to administer such Process consistent with this MOU.  The contractual arrangements between the Companies and the Independent Third Party will expressly provide that the Companies are responsible for financing and administering the contract and that the Independent Third Party will have no recourse to EPA or any agency of the Federal government relating to the contract with the Companies.

F.     The Companies and EPA recognize in connection with any activities and/or commitments under the MOU, the Companies shall not be responsible for any failure to perform that is caused by circumstances beyond their control which the Companies could not have prevented through the exercise of due diligence.

## IV.    PERTINENT BACKGROUND

A.     On April 16, 2003, EPA issued a Federal Register Notice "concerning PFOA and fluorinated telomers which may metabolize or degrade to PFOA".[1]  The Federal Register Notice requested public comment and solicited interested party participation in an enforceable consent agreement (ECA) development process under Section 4 of the Toxic Substances Control Act (TSCA), 15 U.S.C § 2105, for the purpose of obtaining "additional information [that] could be very helpful in allowing the Agency to develop a more accurate assessment of the potential risks posed by PFOA and other compounds addressed in this Notice, and to identify what voluntary or regulatory mitigation or other actions, if any, would be appropriate".  68 Fed. Reg. 18,628.

---

[1]     Perfluorooctanoic Acid (PFOA), Fluorinated Telomers; Request for Comment, Solicitation of Interested Parties for Enforceable Consent Agreement Development, and Notice of Public Meeting, 68 Fed. Reg. 18626 (Apr. 16, 2003) [hereinafter "Federal Register Notice"].

3

B.      The Federal Register Notice recognized that apart from the public comment and ECA process, EPA already had industry commitments that would produce "substantial additional information" through voluntary continuing research and product stewardship activities.  68 Fed. Reg. 18,631.  These commitments, which are memorialized in various Letters of Intent (LOIs) for the industry, include for the Companies an environmental monitoring commitment pertaining to certain current and former manufacturing sites.[2]  As the Federal Register Notice stated, "EPA expects that industry will meet the voluntary testing commitments made in their letters of intent . . . .  Therefore, EPA anticipates that the ECA process will focus generally on testing issues beyond or supplemental to those contained in the industry letters of intent."  68 Fed. Reg. 18,632.

C.      Subsequent to issuance of the Federal Register Notice, EPA has convened a number of meetings among interested parties through the ECA process.  Meeting summaries, presentations and other documentation of these meetings are available at EPA Docket ID number OPPT-2003-0012 , online at http://www.epa.gov/edocket.  As this documentation indicates, the Companies have presented data and information and made submissions to EPA pursuant to their own LOI commitments pertaining to environmental monitoring.  Additional environmental monitoring-related data, information, reports, presentations and submissions by the Companies reflect their activities prior to and separate from the LOI undertaken on a voluntary basis or pursuant to other programs, such as programs developed in cooperation with state agencies.  All such data, information, reports, presentations and submissions by the Companies in existence prior to the Effective Date specified in Section II of this MOU were available at EPA Docket ID number OPPT-2003-0012, online at http://www.epa.gov/edocket, or at EPA Docket ID number Administrative Record (AR)-226.  Pursuant to Section VI.A. of this MOU, EPA has established a separate EPA Docket for all reports, submissions and other documents relating to this MOU at Docket Control Number OPPT 2004-0112, and has included in such separate EPA Docket these data, information, reports, presentations and submissions by the Companies in existence prior to the Effective Date specified in Section II of this MOU.

D.      In the course of the meetings through the ECA process, EPA expressed its desire for the Companies to undertake additional environmental monitoring and other data and information collection activities, particularly in the areas of soil, biota and off-site monitoring, not covered by past efforts or contemplated by current LOI commitments.  The Companies expressed a willingness to do so through a phased approach.  In the Companies' view, a phased approach would be more efficient, given that earlier phases can inform later phases from a scientific standpoint and that data collection can occur in context.  The Companies also expressed a willingness to have this phased approach occur on a transparent basis, with data and information made available to the public and with a peer consultation process.

---

[2]     Letter from Dr. L. Wendling of 3M to EPA Asst. Adm. S. Johnson (Mar. 13, 2003) [hereinafter "3M LOI"]; letter from D. Duncan of the Society of the Plastics (SPI) for the Fluoropolymer Manufacturers Group (FMG) to Asst. Adm. S. Johnson (Mar. 14, 2003) [hereinafter "FMG LOI"].

E.    The Companies suggested, and EPA agreed, to memorialize the additional environmental monitoring and other data and information collection activities in an MOU rather than an ECA due to the complexities of using the ECA legal instrument for phased environmental monitoring activities that may depend, in part, upon the consent of third parties, such as, for example, where the environmental monitoring involves the property or rights of third parties.

F.    After further meetings through the ECA process, which included the opportunity for public comment, EPA and the Companies agreed to sign this MOU.

## V.    PFOA SITE-RELATED ENVIRONMENTAL ASSESSMENT PROGRAM

### A.    Program Scope

1.    EPA and the Companies agree that the goal of the PFOA Site-Related Environmental Assessment Program is to gather data and other information that will address fully the following question, hereinafter referred to as "the Charge":

> Are current PFOA environmental releases and sources of those environmental releases from the Site and the presence of PFOA in environmental media on and around the Site sufficiently understood so that pathways of migration and exposure to PFOA associated with that Site are adequately characterized and assessed on a screening level basis?

2.    EPA and the Companies further agree to the language in Sections V.A.2.a.,b.,c. & d. below with the intention that such language both establishes the general scope of the PFOA Site-Related Environmental Assessment Program and governs interpretation of the Charge set forth in Section V.A.1. of this MOU.

a.    *"Associated With The Site,"* as used in the Charge, includes any current environmental release or presence in Environmental Media of PFOA on and off the site resulting from Current or Past Manufacturing Activities at the site. *"Current or Past Manufacturing Activities"* at the site refers to all activities that may have resulted in the current presence of PFOA in environmental media both on and off the site without regard to distance from the site, including but not limited to waste disposal activities that occurred off-site, such as landfills that received materials from the site; land application materials originating from the site; off-site treatment facilities receiving waste material from the site; and air emissions that may have deposited off the site, except that "Current or Past Manufacturing Activities" does not encompass commercial products manufactured at the site and distributed in commerce.

b.    *"Environmental media,"* as used in the Charge, refers to air, surface water, groundwater, soil, sediment, biota, wastewater, waste streams, landfills, landfarms, water discharges and offsite disposal of all types.

c.      *"Pathways of Migration,"* as used in the Charge, refers to the routes by which PFOA moves from any Current or Past Manufacturing Activity through Environmental Media, and includes but is not limited to, leaching to surface water or groundwater from land-applied materials; discharge from areas with contaminated groundwater to surface waters or wells; releases from landfills to air, groundwater and surface water; and air deposition to soils and migration to groundwater.

d.      *"Exposure to PFOA Associated With The Site,"* as used in the Charge, refers to current exposures and the potential for future exposures from the presence of PFOA in Environmental Media as a result of Current or Past Manufacturing Activities at the site, but does not include an assessment of exposures that may have occurred in the past.  The Screening Level Exposure Assessment of current human Exposure to PFOA Associated With The Site shall include a quantitative assessment for any exposure pathway for which the data allow quantitative assessment, and a qualitative or semi-quantitative description of exposure where the data do not allow quantitative assessment.  The Screening Level Exposure Assessment will be based on data necessary to understand sources of release associated with the site and Pathways of Migration of those releases.  Although the Screening Level Exposure Assessment will focus primarily on human exposure, it will characterize the presence of PFOA in Environmental Media, including biota, on and off the site as a result of Current or Past Manufacturing Activities.

3.      With reference to the provisions in Sections V.A.1. and V.A.2. of this MOU regarding Program scope, Appendix A to this document identifies the specific Site which the Companies have agreed to include under this MOU; Appendix A also sets forth certain parameters as well as certain limitations particular to such Site that will apply under this MOU.

B.      **Program Work Plan Commitments**

1.      **Phases I and II Commitments**

a.      As indicated in Section IV. of this MOU, the Companies memorialized certain environmental monitoring commitments in the various LOIs.  The Companies also have agreed to build upon and augment their current efforts under these LOIs and other related efforts with additional commitments, particularly in the areas of soil, biota and off-site monitoring, through a phased approach.  Appendix B to this MOU contains the Work Plan by which the Companies will implement these LOI and additional commitments as Phases I and II of the PFOA Site-Related Environmental Assessment Program.  As described further in Section V.B.2. of this MOU, the Companies also have committed to performing a Phase III of the PFOA Site-Related Environmental Assessment Program following a Peer Consultation Process, which includes public comment and input by and discussion with EPA.

b.       As indicated in Section IV.C. of this MOU, the LOIs, along with related presentations and submissions to EPA, as well as other data, information, reports, presentations and submissions separate from the LOI commitments regarding the presence of PFOA in environmental media in existence prior to the Effective Date specified in Section II of this MOU, are available in a separate EPA Docket established pursuant to Section VI.A. of this MOU.  The Phases I and II commitments set forth in the Work Plan in Appendix B to this MOU build upon these prior data, information, reports, presentations and submissions.  To the extent relevant, such data, information, reports, presentations and submissions also will be considered as part of the Data Assessment described in Section V.D. of this MOU.

c.       The Companies developed the Work Plan in Appendix B to this MOU in consultation with EPA, but such consultation does not signify that EPA has developed an Agency position or decision regarding the sufficiency of the Work Plan to address fully the Charge set forth in Section V.A. of this MOU.

d.       The Companies will implement the Work Plan in Appendix B to this MOU in accordance with one or more Quality Assurance Project Plans developed by the Companies consistent with EPA's Guidance for Quality Assurance Project Plans (EPA AQ/G-5) to address data quality assurance and quality control for the data and information collection and analysis activities specified in such Work Plan.

2.     **Phase III Commitment**

a.       The Companies commit to undertake a Phase III and to include within a Phase III work that is necessary to address fully the Charge set forth in Section V.A. of this MOU.

b.       The Phase III commitment of the Companies pursuant to Section V.B.2.a. of this MOU will be informed by the following:

(1)     The Assessments required under Section V.D. of this MOU.

(2)     The Peer Consultation Process set forth in Section V.E. of this MOU, including the input from EPA provided under such Process pursuant to Section V.E.2.m. of this MOU.

(3)     Discussions between EPA and the Companies following submission by the Companies of a full Future Work Plan pursuant to V.F.1. of this MOU.

c.       Examples of work that could be necessary to address fully the Charge set forth in Section V.A. of this MOU include, but are not limited to, the following:  additional on-site and off-site soil and groundwater sampling; additional monitoring of off-site waste disposal facilities; and additional surface water and biota monitoring.

3.    **Status Reports**.  The Companies will provide EPA with a Status Report on a quarterly basis.  The first such Status Report is due three (3) months after the Effective Date specified in Section II.A. of this MOU.  Each such Status Report shall contain the following:

a.    A brief description of the implementation status of the Work Plan in Appendix B to this MOU.

b.    A copy of all analytical reports, survey reports and other reports that have been completed and received by the Companies pursuant to the Work Plan in Appendix B to this MOU thirty (30) days prior to the deadline for that Status Report.  For purposes of this Status Report requirement, any raw data and information, including all laboratory analyses, generated pursuant to the Work Plan in Appendix B to this MOU that have undergone quality assurance and quality control as specified in such Work Plan and/or the Quality Assurance Project Plan developed to implement such Work Plan shall be considered a "report".

C.    **Data Quality**

1.    The Companies recognize the importance of EPA's recently-issued guidelines pursuant to the Data Quality Act.  See Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by the Environmental Protection Agency (2002); Public Law 106-554; H.R. 5658, § 515(a) (2001); Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, OMB, 67 Fed. Reg. 8452 (2002); see also EPA Order 5360.1A2 "Policy And Program Requirements For Agency-Wide Quality System" (May 5, 2000); EPA Quality Manual For Environmental Programs, 5360A1 (May 5, 2000).  The Companies also recognize the applicability of EPA's existing guidelines for quality assurance project plans.  See EPA's "Guidance For Quality Assurance Project Plans EPA QA/G-5", EPA/240/R-02/009 (Dec. 2002).

2.    The Companies commit in gathering all data and information under the PFOA Site-Related Environmental Assessment Program to employ scientific practices, protocols and procedures designed to ensure data quality, objectivity, utility and integrity.

3.    Consistent with the foregoing commitments, the Work Plan for the PFOA Site-Related Environmental Assessment Program contained in Appendix B to this MOU includes references to the various protocols, analytical methods and quality assurance measures to be employed under the Program.  These protocols, methods and measures should be contained in a quality assurance project plan consistent with the EPA guidelines document "Guidance For Quality Assurance Project Plans EPA QA/G-5, EPA/240/R-02 (Dec. 2002).  The Companies will submit copies of all such protocols, methods and measures as part of the Data Assessment for the Program described in Section V.D.2. of this MOU.

D.     **Assessments**

1.     **Assessment Commitment**.  Not later than one hundred and eighty (180) days following completion of the Work Plan Commitments set forth in the Work Plan contained in Appendix B to this MOU, the Companies will submit the following three assessments to EPA described more fully in Sections V.D.2., V.D.3. and V.D.4. of this MOU:  a Data Assessment; a Screening Level Exposure Assessment; and a Future Data Needs Assessment.  As described in Section V.E. of this MOU, a Peer Consultation Group also will receive and review such Assessments.

2.     **Data Assessment**.  The Data Assessment shall consist of the following:

a.     A robust summary of all data and information generated under the Work Plan in Appendix B to this MOU and of any other data and information that meet all of the following:  (1) is relevant to the Screening Level Exposure Assessment being prepared pursuant to Section V.D.3. of this MOU; (2) either has been developed by the Companies under the LOI on a voluntary basis or under other programs as described in Section IV.C. of this MOU or is contained in the public record established by EPA as described in Section VI.A. of this MOU; and (3) is data with sufficient quality, objectivity, utility and integrity.

b.     All of the Company-developed raw data and information, including all laboratory analyses, forming the basis for the robust summary prepared pursuant to Section V.D.2.a. of this MOU; and

c.     Any other information pertinent to the Companies' commitment in Section V.C. of this MOU to data quality, objectivity, utility and integrity.

3.     **Screening Level Exposure Assessment**

a.     The Screening Level Exposure Assessment shall characterize exposure and releases associated with the Site in accordance with EPA's "Guidelines for Exposure Assessment", EPA/600/Z-92/001 (May 1992) and using the scenario evaluation approach set forth in these EPA Guidelines at § 2.2.2.

b.     As indicated in Section V.A.2.d. of this MOU, the Screening Level Exposure Assessment for current human exposure will include a quantitative, conservative assessment for any exposure pathway for which the data allow quantitative assessment.  Where the data do not allow such quantitative assessment of an exposure pathway, the Screening Level Exposure Assessment for current human exposure will present a qualitative or semi-quantitative description of exposure.

c.     As further indicated in Section V.A.2.d. of this MOU, although the Screening Level Exposure Assessment will focus primarily on current human exposure, it will characterize the presence of PFOA in environmental media, including biota, on and off the site as a result of current and past manufacturing activities.

4.     **Future Data Needs Assessment**.  The Future Data Needs Assessment shall consist of the following:

a.     A scientifically-based analysis of the Data Assessment and the Screening Level Exposure Assessment prepared pursuant to Sections V.D.2. and V.D.3. of this MOU.  Such scientifically-based analysis shall both (1) assess the sufficiency of the Data Assessment and the Screening Level Exposure Assessment with reference to the Charge set forth in Section V.A. of this MOU and (2) identify additional data and/or other appropriate information necessary to address fully the Charge set forth in Section V.A. of this MOU.

b.     An outline of a Future Work Plan for the gathering of additional data and/or other appropriate information through a Phase III that are necessary to address fully the Charge set forth in Section V.A. of this MOU.

E.     **Peer Consultation**

1.     **Peer Consultation Commitment**.  The Companies commit to fund and participate in and EPA agrees to participate in a Peer Consultation Process that will review the Assessments prepared pursuant to Section V.D. of this MOU.  EPA acknowledges that the Companies will utilize an Independent Third Party to implement and administer the Peer Consultation Process.  The details and timing of the Peer Consultation Process are set forth in Section V.E.2. of this MOU.  In general, such Process will have the following attributes:

a.     The purpose of the Peer Consultation Process is to provide a forum for scientists and relevant experts from various stakeholder groups to exchange views on the Companies' Assessments and in particular on the recommended data needs and to provide these views to a third party contractor.  The Peer Consultation Group will be asked to discuss whether the potential exposures have been adequately evaluated and to provide scientific input on the screening level exposure assessment data needs.   It is not intended to be a consensus-based process, but should identify areas of agreement, disagreement, and the supporting scientific rationale.  The results and comments from the Peer Consultation will be compiled and submitted in a report to the Companies and the EPA.

b.     Because the goal of the Peer Consultation Process is to contribute to the review of a scientific work product – *i.e.*, the Assessments prepared pursuant to Section V.D. of this MOU – the Process should not be conducted as a mechanical evaluation step.  The Process will center around a Peer Consultation Group comprised of scientific experts from various stakeholder groups with extensive and broad experience relevant to the Assessments and the Charge set forth in Section V.A. of this MOU, such that Group members will have sufficient technical expertise to make meaningful contributions to science-based evaluations.  Examples of the types of expertise that likely will be needed for the Group include, but are not limited to, expertise in human exposure assessment, hydrogeology and environmental monitoring.

c.    The Peer Consultation Process will operate under conflict of interest guidelines and with public transparency.  To this end, the Independent Third Party, who will implement and administer the Peer Consultation Process, will be responsible for arranging the Peer Consultation Process meetings, inviting experts from various stakeholder groups to be members of a Peer Consultation Group and facilitating the meetings.  The Companies, EPA and members of the public will be given an opportunity to suggest appropriate experts, but selection of Peer Consultation Group members will be made by the Independent Third Party.

d.    The Peer Consultation Process will provide scientific input on an advisory basis.  To this end, the results of the Peer Consultation Process will be the individual opinions of the members of the Peer Consultation Group regarding the Charge set forth in Section V.A. of this MOU, and in particular, the Future Data Needs Assessment, including the outline of a Future Work Plan.  The Peer Consultation Group will evaluate the Assessments for technical accuracy, proper documentation and satisfaction of established specifications.  The Peer Consultation Group also should determine if the Assessments adequately present assumptions, calculations, supporting documentation, extrapolations, alternative interpretations, methodology, acceptance criteria, as well as other conclusions.

e.    Peer Consultation Group meetings and deliberations will be open to the public.  Interested parties, including those who are not part of the Peer Consultation Group, will have the opportunity to provide written and/or oral comments and information at the appropriate time during the Peer Consultation Group meeting. The results of the Peer Consultation Process will be compiled by the Independent Third Party in a report and distributed to the Peer Consultation Group to check for accuracy. This report, which will include a summary of the significant written and verbal comments from outside parties and any third party comments, will be submitted to the Companies and to EPA.  EPA will place the report in the public record.

2.    **Peer Consultation Process**.  The Companies and EPA agree to execute the Peer Consultation Commitment in Section V.E.1. of this MOU through the measures set forth below.  These measures establish a schedule for the Peer Consultation Process, which is designed to ensure that by the time of Work Plan completion and submission of the Assessments pursuant to Section V.D. of this MOU, the Peer Consultation Group will have been selected and other aspects of the Peer Consultation Process will have been implemented such that the Process will be ready to begin without delay.

a.    No later than one (1) year and thirty (30) days from the Effective Date of this MOU, EPA and interested members of the public may provide the Companies with recommendations for the qualifications of an Independent Third Party to implement and administer the Peer Consultation Process.  EPA will not endorse specific firms, organizations or individuals.

b.      No later than one (1) year and sixty (60) days from the Effective Date of this MOU, the Companies shall notify EPA, in writing, of the identity and qualifications of the Independent Third Party that the Companies intend to contract with to design and administer the Peer Consultation Process.

c.      No later than one (1) year and ninety (90) days from the Effective Date of this MOU, the Companies shall notify EPA, in writing, as to the status of the Companies' efforts to contract with the Independent Third Party identified by the Companies pursuant to Section V.E.2.b. of this MOU to implement and administer the Peer Consultation Process and, if the Companies have executed a contract with such Independent Third Party, shall include a copy of the contract with this notification.  The Companies shall take reasonable measures to ensure and demonstrate to EPA that the Independent Third Party maintains independence from the Companies in all substantive and non-financial respects.

d.      No later than one (1) year and one-hundred and fifty (150) days from the Effective Date of this MOU, the Companies shall take reasonable measures to ensure that EPA receives, in writing, a description of the Peer Consultation Process to be administered by the Independent Third Party and a copy of any procedures that will apply to the Process, including procedures to assure both avoidance of a conflict of interest for Peer Consultation Group members and public access to documents and information pertaining to the Peer Consultation Process.  In developing conflict of interest procedures, the procedures used by Toxicology Excellence for Risk Assessment (TERA) under the Voluntary Children's Chemical Evaluation Program available at http://www.tera.org/peer/VCCEP/VCCEPCOI.html should be consulted.

e.      No later than one (1) year and two hundred and ten (210) days from the Effective Date of this MOU, the Companies and EPA will submit separately, in writing, to the Independent Third Party proposed nominees for the Peer Consultation Group.  Interested members of the public also will have the opportunity to propose nominees for the Peer Consultation Group to the Independent Third Party.  In proposing any nominee, the Companies and EPA will take into account the range of different scientific, technical and other expertise required for the Group both to review the Assessments prepared pursuant to Section V.D. of this MOU and to address the Charge set forth in Section V.A.1. of this MOU.

f.      No later than the date targeted for completion of the Work Plan in Appendix B to this MOU, the Companies shall take reasonable measures to ensure that Peer Consultation Group membership and other aspects of the Peer Consultation Process have been established.  Ultimately, the decision whether to select for Group membership a nominee offered pursuant to Section V.E.2.e. of this MOU or a different individual not nominated will rest with the Independent Third Party.  The selection of the Peer Consultation Group members will:

(1)      provide appropriate stakeholder balance in terms of both necessary expertise and technical perspective and

(2)    adhere to the conflict of interest procedures developed pursuant to Section V.E.2.d. of this MOU that govern Peer Consultation Group membership.

g.    No later than one hundred and eighty (180) days following completion of the Work Plan in Appendix B to this MOU, the Companies will submit the Assessments prepared pursuant to Section V.D. of this MOU, along with a copy of the Work Plan in Appendix B to this MOU and associated Quality Assurance Project Plans, to EPA and to the Independent Third Party.

h.    No later than fifteen (15) days from submission of the Assessments pursuant to Section V.E.2.g. of this MOU, the Independent Third Party will review the Assessments for administrative completeness, which will entail an evaluation of whether the Assessments contain the elements specified in Section V.D. of this MOU.

(1)    If after fifteen (15) days the Independent Third Party does not identify any elements needed for administrative completeness, then the Assessments submitted pursuant to Section V.E.2.g. of this MOU shall become administratively complete.

(2)    If the Independent Third Party identifies elements needed for administrative completeness, then the Independent Third Party will inform the Companies and will consult with the Companies to establish a schedule for the Companies to address such elements and re-submit administratively complete Assessments as soon as practicable.

i.    For the purpose of facilitating and focusing the Peer Consultation Group's discussion, the Independent Third Party may, but shall not be required to, provide technical and scientific questions to the Group that clarify and relate directly to addressing the Charge set forth in Section V.A. of this MOU; provided, however, that such questions must be consistent with the Program scope set forth in Section V.A. of this MOU.  The process set forth below will apply with respect to any such technical and scientific questions.

(1)    To ensure that any such technical and scientific questions are consistent with the Program scope set forth in Section V.A. of this MOU, any such questions shall be made available in draft form to the Companies and EPA no later than thirty (30) days from submission of administratively complete Assessments pursuant to Section V.E.2.h. of this MOU.

(2)    If the Independent Third Party does not issue any questions in draft form as of thirty (30) days from submission of the administratively complete Assessments pursuant to Section V.E.2.h. of this MOU, then within fifteen (15) days thereafter, the steps to provide documents to the Peer Consultation Group set forth in Section V.E.2.j. of this MOU shall be initiated.

13

(3)    If the Independent Third Party does issue questions in draft form pursuant to Section V.E.2.i.(1) of this MOU, then no later than fifteen (15) days after such issuance, the Companies and EPA must submit any objections to the Independent Third Party.

(4)    If neither EPA nor the Companies submit any objections to the Independent Third Party pursuant to Section V.E.2.i.(3) of this MOU, then within fifteen (15) days thereafter the steps shall be initiated to provide documents to the Peer Consultation Group as set forth in Section V.E.2.j. of this MOU.

(5)    If EPA or the Companies submit any objections to the Independent Third Party pursuant to Section V.E.2.i.(3) of this MOU, then no later than fifteen (15) days thereafter, the questions, if any, shall be issued in final form.  The Independent Third Party will exercise its own judgment as to the validity of such objections and revise the questions, or not, depending upon its own judgment.  The final questions, if any, shall be accompanied by a written explanation of the basis for the questions.

j.    No later than fifteen (15) days following issuance of questions in final form pursuant to Section V.E.2.i.(5) of this MOU, or at an earlier time, if applicable, as specified in Sections V.E.2.i.(2) or V.E.2.i.(4) of this MOU, the following documents shall be provided to the Peer Consultation Group:

(1)    A copy of the three (3) Assessments specified in Section V.D. and associated Quality Assurance Project Plans;

(2)    A copy of this MOU and all appendices, which will ensure that the Group then receives both the Charge as well as the provisions on Program scope in Sections V.A. of this MOU that clarify the Charge;

(3)    Any additional clarifying questions developed by the Independent Third Party pursuant to Section V.E.2.i. of this MOU;

(4)    A copy of any documents deemed relevant and informative by the Independent Third Party; and

(5)    A copy of the following EPA guidance documents (and any subsequent amendments thereto) that EPA has requested be sent to the Peer Consultation Group:

(a)    EPA's "Guidelines for Exposure Assessment", EPA/600/Z-92/001 (May 1992);

(b)    Selected sections of EPA's "Science Policy Council Handbook Risk Characterization", EPA 100-B-00-002 (Dec. 2000) relating to exposure assessment; and

(c)    EPA's "Guidance For Quality Assurance Project Plans EPA QA/G-5", EPA/240/R-02/009 (Dec. 2002).

k.    The Companies shall take reasonable measures to ensure that a mechanism is developed to make all documents provided to the Peer Consultation Group pursuant to Section V.E.2.j. of this MOU and all other documents generated as part of the Peer Consultation Process available to the Companies, EPA and the public through electronic means, including via websites.

l.    No later than fifteen (15) days after the completing the steps set forth in Section V.E.2.j. of this MOU to provide documents to the Peer Consultation Group, the Independent Third Party shall prepare a written schedule for the Peer Consultation Group's review of the Assessments that will be submitted to EPA and made available to the public.  Such schedule shall include the following components:

(1)    A meeting at which the Companies will present the Assessments to the Peer Consultation Group and answer any questions from the Group.  Such meeting shall be open to any interested member of the public as an observer, with requirements and limitations similar to other voluntary EPA peer consultation processes (*e.g.*, brief written comments from observers addressing scientific and technical matters submitted two (2) weeks prior to the meeting; oral statements from observers scheduled in advance and limited to 3-5 minutes).

(2)    The release of a Meeting Report prepared by the Independent Third Party that, similar to other voluntary EPA peer consultation processes, summarizes the range of opinions and recommendations expressed by the Group, the areas of agreement and disagreement among the Group's members, the presentations by the Companies, and the comments by any observer.  Written comments from any observer also will be appended to the Meeting Report.  Prior to finalization of the Meeting Report, each Group member will receive a draft of the Meeting Report for comments and concurrence that their position has been accurately represented therein.  The Companies also will review the portions of the draft of the Meeting Report that summarize the Companies' presentations to ensure accuracy.  The final Meeting Report will be made available to the public.

m.    No later than thirty (30) days after the release of the final Meeting Report, unless EPA notifies the Companies and the public of the need for an extension, EPA will make available to the Companies and the public the Agency's input on what additional data and information the Agency believes the Companies should obtain to address fully the Charge set forth in Section V.A. of this MOU.  Such input shall include a supporting rationale indicating the basis for EPA's recommendations to obtain additional data and information.

n.      No later than ninety (90) days after receiving input from EPA pursuant to Section V.E.2.m. of this MOU, the Companies will respond, in writing, to the input from the Peer Consultation Group as summarized in the Meeting Report prepared by the Independent Third Party pursuant to Section V.E.2.l.(2) of this MOU and the input from EPA received by the Companies pursuant to Section V.E.2.m. of this MOU.  Such response by the Companies shall include both a revised version of the outline for a Future Work Plan originally prepared pursuant to Section V.D.4.b. of this MOU and a supporting rationale indicating the basis for the Companies' approach on obtaining additional data and information.  No later than thirty (30) days following such response by the Companies, unless EPA notifies the Companies and the public of the need for an extension, EPA shall provide comments for the record on the revised version of the outline for a Future Work Plan included with such response.

F.      **Post-Peer Consultation Commitments**

1.      **Future Work Plan**:  No later than ninety (90) days from completion of the Peer Consultation Process pursuant to Section V.E.2.n. of this MOU, the Companies shall submit a full Future Work Plan to EPA.  Before the Companies commence such Future Work Plan, the Companies and EPA will convene for discussions, after which the Companies shall implement the Future Work Plan.

2.      **Status Reports**.  The Companies will provide EPA with a Status Report on a quarterly basis.  The first such Status Report is due three (3) months after the Companies submit the Future Work Plan pursuant to Section V.F.1. of this MOU.  Each such Status Report shall contain the following:

a.      A brief description of the implementation status of the Future Work Plan submitted pursuant to Section V.F.1. of this MOU.

b.      A copy of all analytical reports, survey reports and other reports that have been completed and received by the Companies pursuant to the Future Work Plan thirty (30) days prior to the deadline for that Status Report.  For purposes of this Status Report requirement, any raw data and information, including all laboratory analyses, generated pursuant to the Future Work Plan submitted pursuant to Section V.F.1. of this MOU that have undergone quality assurance and quality control as specified in such Future Work Plan and/or the Quality Assurance Project Plan developed to implement such Work Plan shall be considered a "report".

3.      **Revised Final Amended Screening Level Exposure Assessment**:  No later than one hundred and eighty (180) days after completion of the Future Work Plan submitted pursuant to Section V.F.1. of this MOU, the Companies shall complete their obligations under this MOU by submitting to EPA a revised version of the Screening Level Exposure Assessment prepared pursuant to Section V.D.3. of this MOU that incorporates the additional data and information obtained under the Future Work Plan submitted pursuant to Section V.F.1. of this MOU.

# VI.      **MISCELLANEOUS PROVISIONS**

A.    **Public Record**

1.    EPA has established a public record at Docket Control Number OPPT 2004-0112 for this MOU.  EPA has made available an electronic version of the OPPT 2004-0112 public docket at http://www.epa.gov/edocket.  The public also can access the OPPT 2004-0112 docket through the EPA Docket Center, Room B102-Reading Room, EPA West, 1301 Constitution Avenue, N. W., Washington, D. C.

2.    The public record will contain this MOU; all submissions made by the Companies to EPA in fulfilling their commitments under this MOU; and any other reports contemplated by this MOU, subject to the confidentiality provisions of Section 14(b) of TSCA and 40 C.F.R. Part 2 and to the disclosure protection provisions in Section VI.F. of this MOU.

B.    **Modifications, Work Plan Adjustments And Schedule Changes**

1.    **Modifications To MOU**.  Modifications to this MOU, if any, must occur by mutual agreement of all signatories and will result in an amended MOU, which will be placed in the OPPT 2004-0112 public docket for this MOU.  Work Plan Adjustments and Schedule Changes do not constitute modifications to this MOU provided that the Companies comply with Section VI.B.2. of this MOU.

2.    **Adjustments To The Work Plan And Schedule Changes**

a.    **Definitions**

(1)    **Routine Versus Non-Routine Work Plan Adjustments**

(a)    For purposes of this MOU, a Routine Work Plan Adjustment shall be defined as an adjustment to the Work Plan in Appendix B to this MOU made in the normal course of implementing the Work Plan that would not result in a significant, material alteration of the monitoring or other activities conducted under the Work Plan.  Examples of a Routine Work Plan Adjustment would include, but would not be limited to, the following:  Relocation of a sampling point for technical reasons (*e.g.*, field obstructions) to another point within the immediate vicinity (*e.g.*, within 25 feet); or an increase or decrease in the number of samples collected for technical reasons that does not change the total number of samples collected by greater than 10 percent.

(b)    For purposes of this MOU, a Non-Routine Work Plan Adjustment shall be defined as an adjustment from the Work Plan in Appendix B that would result in a significant, material alteration of the monitoring or other activities conducted under the Work Plan.  Examples of a Non-Routine Work Plan Adjustment would include, but would not be limited to, the following:  Elimination of a species from or substitution of a species in the biota monitoring; Modification to the analytical method identified for use in the Work Plan when such modification would reduce method sensitivity by greater than 10 percent; Significant additions to the Work Plan based on sampling data obtained during the earlier part of Phase II, such as, for example, the addition of off-site soil and groundwater monitoring based on results of on-site monitoring obtained during the earlier part of Phase II.

(2)    **Minor Versus Major Schedule Changes**

(a)    For purposes of this MOU, a Minor Schedule Change under this MOU shall include any delay in time schedule that (i) would extend the time schedule specified in the Work Plan in Appendix B by less than sixty (60) days or (ii) would not alter a time schedule expressed as a "no later than" deadline in this MOU by more than thirty (30) days.

(b)    For purposes of this MOU, any change to a time schedule that extends beyond the limits of a Minor Schedule Change as defined in Section VI.B.2.a.(2)(a) of this MOU shall constitute a Major Schedule Change.

b.    **Requirements**

(1)    **Notice**

(a)    The Companies shall provide EPA with advance written notice of, along with an explanation of the reasons for any Non-Routine Work Plan Adjustments and Major Schedule Changes as these terms are defined in Section VI.B.2.a. of this MOU.

(b)    To the extent practicable, the Companies shall provide EPA with advance written notice of, along with an explanation of the reasons for, any Routine Work Plan Adjustments and Minor Schedule Changes as these terms are defined in Section VI.B.2.a. of this MOU.  Where advance notice is not practicable, the Companies shall provide written notice at the earliest opportunity, but no later than fifteen (15) days after any such Routine Work Plan Adjustments or Minor Schedule Changes.

(2)     **Implementation of Work Plan Adjustments And Schedule Changes**

(a)     **Non-Routine Work Plan Adjustments And Major Schedule Changes**.  The Companies may not undertake a Non-Routine Work Plan Adjustment or a Major Schedule Change absent a Technical Consultation pursuant to Section VI.C. of this MOU.  Where the Companies believe that an action constitutes a Non-Routine Work Plan Adjustment or a Major Schedule Change, the Companies must identify the action as such in their notice submitted pursuant to Section VI.B.2.b.(1)(a) of this MOU and must propose the matters to be addressed by the Technical Consultation, including, in the case of a Major Schedule Change, a new time schedule that is reasonable.

(b)     **Routine Work Plan Adjustments or Minor Schedule Changes**.  Where the Companies believe that an action constitutes a Routine Work Plan Adjustment or a Minor Schedule Change, the Companies may undertake such action within seven (7) days after submission of the notice pursuant to Section VI.B.2.b.(1)(b) of this MOU or sooner where necessary to respond to special circumstances or to preserve the validity of on-going research, unless EPA has informed the Companies in writing that the Agency regards the action as a Non-Routine Work Plan Adjustment or a Major Schedule Change and initiates a technical consultation pursuant to Section VI.C. of this MOU.

C.     **Technical Consultation**

1.     A Technical Consultation will occur between the Companies and EPA under any of the following circumstances:

a.     The Companies have been unable to obtain a contract with the Independent Third Party identified pursuant to Section V.E.2.b. of this MOU within the period specified in Section V.E.2.c. of this MOU.

b.     The Companies propose to undertake a Non-Routine Work Plan Adjustment as defined in Section VI.B.2.a.(1)(b).

c.     The Companies propose to undertake a Major Schedule Change as defined in Section VI.B.2.a.(2)(b).

d.     EPA has informed the Companies in writing pursuant to Section VI.B.2.b.(2)(b) that the Agency regards an action as a Non-Routine Work Plan Adjustment or a Major Schedule Change.

2.     The Technical Consultation shall consist of discussions by telephone or in person between responsible technical representatives of the Companies and EPA for the purpose of reaching agreement between the Companies and EPA on mutually acceptable Non-Routine Work Plan Adjustments or Major Schedule Changes.

3.       EPA shall place in the public record at Docket Control Number OPPT 2004-0112 a summary of any Technical Consultation that describes any agreement reached and the resulting Non-Routine Work Plan Adjustments or Major Schedule Changes and the supporting rationale therefor.

D.    **Principal Contacts**

1.       All inquiries by the Companies to EPA under this MOU and all concurrent submissions by the Companies as specified in Sections VI.E.2.c. and V.E.3.b. of this MOU shall be made to:

Director, Chemical Control Division (7405M)
Room 4146 EPA EAST
U.S. Environmental Protection Agency
1201 Constitution Avenue, NW
Washington, DC  20004
202-564-4760

2.       All notices and inquiries by EPA to the Companies under this MOU shall be directed to:

Michael A. Santoro
Director, Specialty Materials EHS&R
3M Company
3M Center Building, 236-1B-10
St. Paul, MN  55144-1000
651-733-6374

E.    **Submissions To EPA**

1.       All notices, reports, assessments and other documents required by this MOU shall be submitted by the Companies to EPA by the dates specified in this MOU.

2.    **Reports And Assessments**

a.       When submitting any reports that have been completed and received by the Companies pursuant to the Work Plan in Appendix B of this MOU and any of the Assessments required pursuant to Section V.D. of this MOU, the Companies shall utilize commercial courier service or hand delivery in accordance with the procedures set forth in Section VI.E.4. of this MOU.

b.    The Companies shall submit four (4) paper copies and two (2) digital copies (in text-searchable PDF format on magnetic media or CD ROM), for each version (public or CBI, and labeled as CBI where appropriate) of all reports that have been completed and received by the Companies pursuant to the Work Plan in Appendix B of this MOU and any of the Assessments required pursuant to Section V.D. of this MOU, except that the Companies may submit two (2) paper copies and two (2) digital copies of reports which consist largely of raw data.

c.    To ensure timely processing for the reports and Assessments being submitted pursuant to Section VI.E.2.b. of this MOU, the Companies shall transmit one (1) paper copy and one (1) digital copy of all such reports and Assessments to the EPA Docket in accordance with the procedures specified in Section VI.E.4. of this MOU.   The remaining copies specified in Section VI.E.2.b. of this MOU shall be transmitted directly by commercial courier or hand delivery to the EPA Principal Contact identified in Section VI.D of this MOU.

3.    **Other Submissions**

a.    When making any submissions in connection with this MOU other than the reports and Assessments specified in Section VI.E.2.b. of this MOU, the Companies may utilize U.S. mail, commercial courier service, hand delivery or electronic means at their election, provided that the Companies adhere to the procedures for each method of submission set forth in Section VI.E.4. below.

b.    For all such other submissions specified in Section VI.E.3.a. of this MOU, the Companies shall transmit one (1) paper copy and one (1) digital copy to the EPA Docket if utilizing U.S. mail, commercial courier service or hand delivery.  If utilizing electronic means, then the Companies shall transmit one PDF format version as specified Section VI.E.4.d. of this MOU.  To ensure timely processing, the Companies also shall transmit three (3) copies of all such other submissions specified in Section VI.E.3.a. simultaneously to the EPA Principal Contact identified in Section VI.D. of this MOU.

4.    **Submission Procedures**

a.    **Docket Identification**.  All notices, reports, assessments and other documents submitted to the EPA Docket pursuant to this MOU shall be identified by the EPA Docket ID Number OPPT 2004-0112 and the name:  PFOA Site-Related Environmental Assessment Program.

b.    **U.S. Mail**.  Submissions to the EPA Docket made by U.S. mail should be sent to:  Document Control Office (7407M), Office of Pollution Prevention and Toxics (OPPT), Environmental Protection Agency, 1200 Pennsylvania Avenue, NW, Washington, DC 20460-0001.  For submissions by U.S. mail containing Confidential Business Information (CBI), the Companies shall follow the procedures specified in Section VI.E.4.f. of this MOU.

c.      **Hand Delivery or Commercial Courier**.  Submissions to the EPA Docket made by hand delivery or commercial courier should be delivered to: OPPT Document Control Office (DCO) in the EPA East Building, Room 6428, 1201 Constitution Avenue, NW, Washington, DC and marked Attention:  EPA Docket ID Number OPPT 2004-0112.  The DCO is open from 8 a.m. to 4 p.m., Monday through Friday, excluding legal holidays.  The telephone number for the DCO is (202) 564-8930. For submissions by hand delivery or commercial courier containing Confidential Business Information (CBI), the Companies shall follow the procedures specified in Section VI.E.4.f. of this MOU.

d.      **Electronic Means**.  Submissions made electronically to the EPA Docket (via e-mail) should be sent to:  OPPT Document Control Office at oppt.ncic@epa.gov.  The subject field of the e-mail should read:  Attention: EPA Docket OPPT 2004-0112.  Digital submissions for all reporting required by this MOU that are transmitted electronically must be submitted as attachments to the e-mail and must be in text-searchable, PDF format.  The e-mail transmitting any report required by this MOU and all digital attachments will be included as part of the submission.  E-mail addresses are automatically captured by the EPA e-mail system and become part of the submission that is placed in the official public docket, and will be made available in the EPA electronic public docket.  Upon receipt of the electronic submission, a "receipt date" will be entered into the metadata for that submission to signify the date the document(s) submitted by the Company(ies) was received by EPA.  EPA is not responsible for failure to meet a date of submission obligation if the EPA fire wall rejects an electronic submission containing a virus or other adverse electronic coding.  It is the obligation of the submitter to confirm that: 1) electronic submissions are received by EPA on the date of transmission, 2) the electronic submission and all attachments are legible, and 3) the electronic submission and all attachments meet the electronic format requirements of the EPA Document Control Office.  Electronic submission shall not be used for any document containing Confidential Business Information (CBI).

e.      **Proof of Submission**.  Materials (paper or digital media) shall be deemed submitted when they are either postmarked or placed in the hands of a commercial courier service for overnight delivery to EPA at the appropriate address specified in Section VI.E.4.b. (for U.S. mail) or Section VI.E.4.c. (for commercial courier) of this MOU.  Hand-delivered materials are deemed submitted upon receipt at the appropriate address specified in Part VI.E.4.c. of this MOU.  Electronically-transmitted documents are deemed delivered upon transmission and must follow the procedures for electronic submissions specified in Part VI.E.4.d. of this MOU.  Under any of the above circumstances, it is the responsibility of the Companies to maintain appropriate documentation for proof of transmittal for all submissions made pursuant to this MOU.

f.    **Confidential Business Information (CBI)**

(1)    Any document submitted to EPA that contains data or information for which a Signatory Company makes a claim of CBI must be submitted as two separate versions. One version must be complete, with the information being claimed as confidential marked in the manner described under 40 CFR 790.7. The other public version must be identical in all respects except that all of the information claimed as confidential shall be redacted.  EPA will place the public version in the Agency's docket. The complete version will be treated in accordance with EPA confidentiality regulations in 40 CFR part 2 and 40 CFR 790.7.

(2)    Data or other information that are considered to be CBI must not be submitted to EPA by e-mail.  Any part or all of data or other information claimed as CBI must be so marked clearly. If the CBI submission is on diskette or CD ROM, label the outside of the diskette or CD ROM to indicate that it contains CBI, identify by appropriate file naming those files that contain CBI and within each such file clearly identify the specific information that is CBI.  Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 CFR part 2 ).

(3)    Any claims of confidentiality for information submitted under this MOU will be made under the terms of 40 CFR 790.7. If no claim of confidentiality is made by the submitter of the information at the time of submission, the information will be deemed by EPA, in accordance with 40 CFR 790.7, to be public, and may be made available to the public without further notice to the submitter.  Information claimed as confidential will be treated in accordance with the procedures in 40 CFR part 2 and to section 14 of TSCA, 15 U.S.C. 2613.

F.    **Reservation of Rights**:  By signing this MOU, the Companies are not admitting that TSCA Section 4 gives EPA the authority to promulgate a test rule requiring generation of the data and information that the Companies will gather through the PFOA Site-Related Environmental Assessment Program; nor are the Companies admitting that the TSCA Section 4 requirements for promulgating such a test rule have been satisfied by the Agency.  The Companies believe that documents generated under the PFOA Site-Related Environmental Assessment Program do not constitute studies subject to disclosure under 15 U.S.C. § 2613(a); therefore, such documents may be protected from disclosure under various laws, including under 5 U.S.C. § 552(b)(4) and 15 U.S.C. § 2613(b), except to the extent such documents fall within the public disclosure provisions in Section VI.A.2. of this MOU.

## VII.    SIGNATURES

This MOU is agreed to by 3M, Dyneon and EPA as follows:

**For 3M Company**

_____ on 1 day of Oct 2004
Dr. Larry A. Wendling
Staff Vice President
Corporate Research Laboratory
3M Company
3M Center, Building 220-7E-06
St. Paul, Minnesota  55144-1000

**For Dyneon, LLC**


_William Myers_   on _13_ day of _October_ 2004
Mr. William R. Myers
President
Dyneon, LLC
6744 33rd Street
Oakdale, MN  55128

**For the U.S. Environmental Protection Agency**

_____ on 25th day of October 2004
Charles M. Auer, Director
Office of Pollution Prevention and Toxics
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N. W.
Washington, D.C.  20460

26

# APPENDIX A –
# SITE COVERED BY THIS MOU AND PARAMETERS AND LIMITATIONS PARTICULAR TO SUCH SITE

1.      The "Site" subject to the PFOA Site-Related Environmental Assessment Program is the 3M Property located in Decatur, Alabama shown on the map attached to this Appendix A [hereinafter "3M Decatur Site Property" or "the Property"].

2.      As specified in Section V.A.1. of this MOU, the Companies commit to address fully the Charge question as such question applies to the 3M Decatur Site Property and subject to the language governing interpretation of the Charge set forth in Section V.A.2. of this MOU, except, as recognized in Section V.A.3 of this MOU, this Appendix A establishes the following parameters and limitations on such commitment:

a.      Daikin America owns and operates a manufacturing site in Decatur, Alabama.  Due to the close proximity of Daikin's fluoropolymer manufacturing and telomer manufacturing operations at its Decatur, Alabama site to the 3M Decatur Site Property, PFOA emissions and releases from the Daikin operations have and will contribute to PFOA presence in environmental media on and around the 3M Decatur Site Property.  The commitment by the Companies to address fully the Charge question as to the 3M Decatur Site Property does not require the Companies to assess, predict or apportion the original source of PFOA on and around the 3M Decatur Site Property as between Daikin America and the Companies.

b.      3M formerly owned the land on which Daikin now has its Decatur, Alabama site with fluoropolymer manufacturing and telomer manufacturing operations.  The commitment by the Companies to address fully the Charge question as to the 3M Decatur Site Property:

(1)      Does not require the Companies to perform environmental monitoring or other on-site data and information collection activities on the Daikin Decatur, Alabama site;

(2)      Does not require the Companies to characterize or assess the PFOA currently present in environmental media on the Daikin Decatur, Alabama site or to characterize or assess the pathways of migration of such PFOA present in environmental media on the Daikin Decatur, Alabama site; and

(3)      Does not require the Companies to investigate, evaluate, analyze or assess exposures to PFOA that may have occurred in the past, that are now occurring or that may occur in the future as a result of activities by Daikin.





**3M DECATUR SITE PROPERTY**

# APPENDIX B –  WORK PLAN



3M Company
St. Paul, Minnesota

# Phase 2 Work Plan for Sampling Environmental Media

# 3M Company
## Decatur, Alabama Plant

October 2004



04P-1398



# PHASE 2 WORK PLAN FOR
# SAMPLING ENVIRONMENTAL MEDIA FOR PFOA AT THE
# 3M DECATUR, AL PLANT

## VOLUME 1 OF 3

## OCTOBER 2004

Prepared for

## 3M COMPANY
## ST. PAUL, MN  55133

Prepared by

## WESTON SOLUTIONS, INC.
## West Chester, Pennsylvania 19380

W.O. NO. 02181.129.081.0001



# TABLE OF CONTENTS

**Section**                                                                                                    **Page**

EXECUTIVE SUMMARY                                                                                          **ES-1**

1.      INTRODUCTION.......................................................................................**1-1**

1.1     BACKGROUND ....................................................................................... 1-1

1.2     APPROACH TO PROGRAM DEVELOPMENT .............................................. 1-1

1.3     ORGANIZATION OF THIS DOCUMENT .................................................... 1-6

2.      ENVIRONMENTAL SETTING ....................................................................**2-1**

2.1     LAND USE .................................................................................................. 2-1

2.2     TOPOGRAPHY AND DRAINAGE .............................................................. 2-1

2.3     GEOLOGY .................................................................................................. 2-3
        2.3.1   Regional Geology ......................................................................... 2-3
        2.3.2   Site Geology ................................................................................. 2-5

2.4     HYDROGEOLOGY ...................................................................................... 2-6
        2.4.1   Regional Hydrogeology ................................................................ 2-6
        2.4.2   Site Hydrogeology ....................................................................... 2-7

2.5     ECOLOGICAL SETTING ............................................................................. 2-9
        2.5.1   Habitat Identification & Ecological Resources in the
                Sludge Incorporation Area ............................................................ 2-9
                2.5.1.1      Terrestrial Habitat .............................................. 2-9
                2.5.1.2      Ecological Resources ......................................... 2-11

3.      FORMER SLUDGE INCORPORATION AREAS ..........................................**3-1**

3.1     BACKGROUND .......................................................................................... 3-1

3.2     NPDES PERMIT MONITORING REQUIREMENTS...................................... 3-6

4.      SITE CONCEPTUAL EXPOSURE MODEL ................................................**4-1**

5.      PHASE 2 PFOA SAMPLING PROGRAM ..................................................**5-1**

5.1     SOIL SAMPLING PROGRAM ..................................................................... 5-6
        5.1.1   Overview ....................................................................................... 5-6
        5.1.2   Soil Sampling in the Former Sludge Incorporation Area .................... 5-8
        5.1.3   Soil Sampling in the Vicinity of the LOI Wells ................................ 5-10
        5.1.4   Soil Sampling at the Northwestern Corner Control
                Location ....................................................................................... 5-13

5.2     GROUNDWATER SAMPLING PROGRAM ................................................. 5-13



## TABLE OF CONTENTS  (Continued)

**Section**                                                                                            **Page**

5.2.1    Groundwater Sampling in the Former Sludge
Incorporation Area ................................................................. 5-13
5.2.2    Off-Site Groundwater and Soil Sampling............................. 5-14
5.2.3    LOI Wells ............................................................................ 5-15

5.3    BIOTA ASSESSMENT AND SAMPLING................................ 5-15

5.3.1    Vegetation Community Assessment and Sampling............ 5-16
5.3.1.1    Vegetation Community Assessment ............... 5-16
5.3.1.2    Vegetation Sampling....................................... 5-18
5.3.2    Small Mammal Surveys and Sampling ............................. 5-19
5.3.2.1    Small Mammal Survey .................................... 5-19
5.3.2.2    Small Mammal Sampling for PFOA
Analysis........................................................... 5-20

5.4    SEDIMENT SAMPLING .............................................................. 5-21

5.5    SURFACE WATER SAMPLING ................................................. 5-23

5.6    AQUATIC BIOTA SAMPLING ................................................... 5-25

5.6.1    Fish Sampling ................................................................... 5-25
5.6.2    Clam Sampling.................................................................. 5-26

5.7    ADDITIONAL ASSESSMENT OF POSSIBLE ROUTES OF
PFOA EXPOSURE ...................................................................... 5-27

5.7.1    Off-Site Well Inventory ................................................... 5-27
5.7.2    Decatur Municipal Water Supply ..................................... 5-27
5.7.3    Off-Site Waste Disposal Facilities ................................... 5-28

5.8    DEMOGRAPHIC DATA COLLECTION ................................... 5-29

5.9    SUMMARY OF DATA COLLECTION....................................... 5-29

5.10    PROJECT SCHEDULE................................................................. 5-30

**6.    DOCUMENTATION AND REPORTING ................................... 6-1**

**7.    REFERENCES.............................................................................. 7-1**

**APPENDIX A  –  HEALTH AND SAFETY PLAN (HASP)**
**APPENDIX B  –  ANALYTICAL METHODS**
**APPENDIX C  –  STANDARD OPERATING PROCEDURES (SOPs)**



---

## LIST OF FIGURES

**Title**                                                                              **Page**

Figure 2-1      Site Location Map.................................................................... 2-2

Figure 2-2      Generalized Stratigraphic Column........................................... 2-4

Figure 2-3      Residuum Groundwater Potentiometric Surface Map ........................ 2-8

Figure 2-4      Shallow Bedrock Groundwater Potentiometric Surface Map............... 2-10

Figure 3-1      Location of the Sludge Incorporation Area ............................. 3-2

Figure 3-2      Sludge Incorporation Area ....................................................... 3-3

Figure 3-3      Water Table Elevation Sludge Application Fields................................ 3-11

Figure 4-1      Potential Transport Pathway Schematic ................................... 4-2

Figure 5-1      LOI Wells.................................................................................. 5-12

Figure 5-2      Phase 2 Surface Water and Sediment Sampling Location.................... 5-22



---

# LIST OF TABLES

**Title**                       **Page**

Table ES-1 Overview of Phase 1 and 2 PFOA Monitoring ......................................... ES-6

Table ES-2 Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring ........................................................................................ ES-7

Table 3-1 History of Sludge Incorporation Area ........................................................ 3-4

Table 3-2 Summaries of Quantities of Sludge Applied in the Sludge Incorporation Area ............................................................................. 3-5

Table 3-3 Sludge and Groundwater NPDES Permit Monitoring Parameters ............... 3-8

Table 3-4 Stormwater Runoff NPDES Permit Monitoring Parameters ....................... 3-9

Table 3-5 Water Level Monitoring Report July 1998 ................................................ 3-10

Table 5-1 Summary of Phase 1 and 2 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring ........................................................................ 5-2

Table 5-2 Overview of Phase 1 and 2 PFOA Monitoring ......................................... 5-31



# EXECUTIVE SUMMARY

The 3M Company (3M) and the United States Environmental Protection Agency (EPA) have developed of a Memorandum of Understanding (MOU) that memorializes the commitment of 3M and its subsidiary, Dyneon LLC (Dyneon), to provide EPA with information on perfluorooctanoic acid (PFOA) through a PFOA Site-Related Environmental Monitoring and Assessment Program. Additional background information on the development of the MOU is contained in Section IV of the MOU. The objectives of the Program are to address EPA and 3M data needs including: 1) characterizing sources and concentrations of PFOA in various environmental media and migration and extent of PFOA contamination associated with the Decatur facility, 2) identifying actual or potential receptors and exposure pathways, and 3) collecting data necessary to perform a screening level exposure assessment. The Program will be evaluated according to the Charge and clarifying statements as described in the MOU.

3M developed a phased approach to obtain data on the presence of PFOA in various environmental media at the Decatur site. The phased approach has been developed to retain a systematic approach for obtaining data to satisfy EPA's data needs related to release, occurrence, and transport pathways contained in the Preliminary Framework for Enforceable Consent Agreement Data Development for PFOA and Telomers (EPA, 2003a), Item 10:  Monitoring-Fluoropolymers. EPA Data Needs (EPA, 2003b), and the December 9, 2003 "Road Map" (EPA, 2003c), and to provide sufficient data to allow development of a screening level exposure assessment.

The screening level exposure assessment for current human exposure to PFOA will involve the development of quantitative assessments, to the extent possible, for those pathways and receptors applicable to the Decatur site. For those pathways/receptors where a quantitative exposure assessment can not be performed, a semi-quantitative or qualitative exposure assessment will be performed. Although the exposure assessment will focus primarily on human exposure, it will characterize the presence of PFOA in



environmental media, including biota, on and off the site as a result of current and past manufacturing activities.

The field sampling program was revised and enhanced by 3M to meet the objective of obtaining data for performing a quantitative screening level exposure assessment for human receptors. To that end, a preliminary assessment of potential routes of exposure for the PFOA that may be present at the Decatur facility and to the adjacent surroundings and human populations was performed. The preliminary assessment of potential routes of human exposure was based primarily on the knowledge gained from the Resource Conservation and Recovery Act (RCRA) Facility Investigation (RFI) program conducted for nonfluorochemicals at the site which was used to identify potential exposure pathways for general classes of receptors such as on-site grounds maintenance workers and the general public. The potential exposure pathways and receptors knowledge will be updated through tools such as the demographic survey. The resulting preliminary site conceptual exposure model (SCEM) for PFOA (see Section 4) was used in conjunction with the expressed EPA data needs (EPA 2003a, EPA 2003b, and EPA 2003c) to develop the technical approach for the Phase 2 monitoring program. Complete and potentially significant exposure pathways that were identified in the pathways assessment were selected for further evaluation and, where indicated, data collection.

**DESCRIPTION OF THE PHASED APPROACH**

The phased approach presented in this revised Work Plan, as developed by 3M, consists of the following elements:

- **<u>PHASE 1</u>**

    This phase of the PFOA environmental sampling activities consists of those activities that have been completed or are being conducted at the facility under the letter of intent (LOI) submitted by 3M to EPA on March 13, 2003 and further described in a subsequent letter, dated May, 2003. In the LOI, a commitment to monitor both on-site and off-site environmental media was established. On August 1, 2003, the first report of the results of the initial on-site monitoring effort was



submitted to EPA and has been entered into the Docket OPPT- 2003-0012. The information included data on the semi-annual groundwater monitoring, results of the semi-annual wastewater effluent monitoring from the manufacturing plant and environmental monitoring data from sampling in the Tennessee River. The off-site monitoring includes surface water, sediment and biota monitoring in the Tennessee River, a program that had been initiated in the Year 2000. The next sampling event for these media is scheduled for 2004. In January, 2004 the results of the air dispersion modeling were also submitted to the EPA as part of the LOI commitment.

- **PHASE 2**

**Former Sludge Incorporation Area**

In the former sludge incorporation areas, sludge from the facility's wastewater treatment plant was historically land applied. The sampling activities planned for this area of the site include selected soil and groundwater sampling and inventorying of the selected vegetation and small mammal species in the area followed by vegetation and small mammal sampling. The objective of this phase of the sampling program is to provide screening level data to initially assess the nature and extent of PFOA present in the former sludge incorporation area, the occurrence of PFOA in plants/animals and the availability of PFOA for off-site migration from this area. It is anticipated that approximately 140 soil, 24 groundwater, 32 vegetation and 10 mammalian samples (serum and liver tissue) will be collected and analyzed for PFOA. To assess groundwater flow directions, a hydrogeological assessment in the sludge incorporation area is included as part of this phase.

**Other On-site and Off-site Monitoring**

On March 23, 2004, 3M submitted an overview of the pending revisions to the original Work Plan (dated February 16, 2004) in which certain enhancements were described. These enhancements included 1) soil monitoring in the vicinity of the groundwater wells sampled under the LOI, 2) surface water monitoring of on-site

drainage ways and Tennessee River locations, 3) sediment monitoring in on-site drainage ways and in additional locations in the Tennessee River at the northern plant boundary and in a downstream location, and 4) additional aquatic biota sampling.

**Further Enhancements to the Phase 2 Work Plan**

For purposes of developing the quantitative exposure assessment, there are additional areas of interest that will be addressed as part of Phase 2. These include 1) collection of off-site groundwater and soils samples based on the findings of the initial Phase 2 sampling and the conceptual hydrogeological model; 2) an inventory of off-site well locations to validate a previous understanding that groundwater is not used in this general Decatur area for potable or irrigation purposes; 3) periodic monitoring of the Decatur municipal water supply to determine presence of PFOA in that potable water source, 4) collection of demographic data for the Decatur area, and 5) an evaluation of the locations, description, and use history of two off-site waste disposal facilities and the collection of a leachate sample from one of these facilities, the Morgan County landfill.

In addition, as an enhancement of the LOI activities, sampling of clams or mussels and fish in additional locations of the Tennessee River will also be performed. As mentioned previously, the next scheduled sampling in the Tennessee River, defined in the LOI, will be incorporated into the Phase 2 sampling program and will include sampling of sediment and surface water, and the clams or mussels, and fish in the Tennessee River.

Table ES-1 shows an overview of the sampling program that will be undertaken under Phases 1 and 2 of the PFOA monitoring program at the Decatur site. 3M anticipates that the scope of the PFOA characterization program described in the Phase 2 Work Plan will fulfill most of the data needs identified by EPA (EPA, 2003a, 2003b, and 2003c). Table ES-2 contains the detailed list of the elements of the Phase 2 Work Plan, the rationale for data collection, and the intended use of the data relative to EPA's expressed Data Needs



## TABLE ES-1  OVERVIEW OF PHASE 1 AND 2 PFOA MONITORING

| | On-Site | | | Off-Site | | |
|---|---|---|---|---|---|---|
| **Phase 1** | **Media** | **# of Samples** | **Frequency** | **Tennessee River** | **# of Samples** | **Frequency** |
| | Effluent | 1 | Quarterly | Surface water | 5 | Biennially[1] |
| | Groundwater (8 wells) | 8 | Ongoing | Sediment | 5 | Biennially |
| | Air Modeling | N/A | Completed | Fish (2 species) | 3 locations | Biennially |
| **Phase 2** | Soils in vicinity of LOI wells | 40 | Once | **Tennessee River** | **Locations/ # of Samples** | **Frequency** |
| | Soils in former sludge incorporation area and at the NW control location | 140 | Once | Surface water | 18 | Once |
| | | | | Pore water | 12 | Once |
| | Vegetation in vicinity of soils | 27 | Once | Sediments | 30 | Once |
| | Small mammals (serum and liver) | 10 each | Once | Fish (2 species) whole fish and fillets | 120 total; 6 locations[2] | Once |
| | Surface Water | 2 | Once | Lower Order Species (clams/mussels) | 6 composites total; 6 locations[2] | Once |
| | Sediments | 6 | Once | Well survey | 5 mile radius | Once |
| | Groundwater - (8 sets of 3 wells in sludge incorporation area) | 24 | Once | Decatur Water Supply | 6 | Bimonthy |
| | Hydrogeologic assessment in vicinity of wildlife habitat/sludge incorporation area | N/A | Once | Waste Disposal Survey - Landfill leachate and WWTP, and effluent sludge | 1 sample each | Once |
| | | | | Additional soils and groundwater samples | To be determined | Once |

[1] Every 2 years - next scheduled sampling is in 2004 and will be incorporated into the Phase 2 program.

[2] This represents sampling in 3 additional locations form the LOI commitment.



**Table ES-2  - Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring**

| Activity | No. of Samples/Locations/ Descriptions of Activity | Rationale for Collection |
|---|---|---|
| 1. Soil Sampling | a. 5 Samples at varying depths in the vicinity of the 8 LOI groundwater monitoring wells. Total of 40 samples<br><br>b. 18 Soil samples collected from soil borings at various depths from each of 3 sludge incorporation fields and one control field (72 samples). An additional 40 samples will be collected among the sludge incorporation and control fields (10 from each field) from the surface (0-3" depth) and shallow depths (3"-6" depth). Composite soil samples of 5 ft intervals from borings in each of the 3 sludge incorporation fields and the control field to bedrock. Total of approximately 140samples.<br><br>c. 6samples from 6-inch intervals and approximately 7 composite samples from 5-ft intervals at a control location in the northwest corner of the facility.<br><br>d. Off-site soils. Number and depth of soil samples will be based on analyses of initial Phase 2 results from the former sludge incorporation area investigation. | 1) To determine the levels of PFOA in the soil associated with previous activity on-site.<br><br>2) to assess potential human exposure through incidental ingestion of soil, inhalation of dust and dermal contact.<br><br>3) to evaluate the soil to groundwater transport processes. |
| 2. Groundwater Sampling/Evaluation | a. Continue sampling of 8 LOI wells on a biennial frequency<br><br>b. Install 8 sets of 3 nested wells in the above 3 sludge incorporation fields and one control field in the former sludge incorporation area to monitor residuum, epikarst and shallow bedrock zones. Total of 24 groundwater samples (8 wells x 3 samples per well nest).<br><br>c. Collect water level data and perform hydrogeological evaluation of the former sludge incorporation area. Based on this evaluation and soils data, decide on an approach for | 1) To determine the levels of PFOA in groundwater associated with current or past manufacturing activities.<br><br>2) to assess potential human exposure to PFOA through consumption of groundwater or other groundwater uses (e.g. irrigation).<br><br>3) to evaluate the groundwater migration |



**Table ES-2  - Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring**

| | | |
|---|---|---|
| | collecting off-site soils and groundwater data (as part of Phase 2) from areas south and west of the site in concert with EPA.<br><br>d. Install three sets of 3 nested wells off-site. Locations will be based on analyses of initial Phase 2 results from the former sludge incorporation area investigation. Total of 9 samples. | potential from onsite to offsite uses or discharges to surface water. |
| 3. Surface Water Sampling | a. Expand number of sampling locations in the Tennessee River, Bakers Creek, and the on-site Avenue "A" drainage to 8 locations.<br><br>b. Add 12-node grid for surface water sampling (water column) at groundwater/surface water interface adjacent to facility shoreline. Total of 20 surface water samples.<br><br>c. Install peepers (dialysis-type sampling devices) into sediment at 12-node grid for pore water sampling at groundwater/surface water interface adjacent to facility shoreline. Total of 12 pore water samples. | 1)  to determine PFOA levels in the Tennessee River and in on-site surface waters.<br><br>2)   to compare PFOA levels with the results from previous surface water sampling.<br><br>3)  to evaluate the potential sources of PFOA to surface waters.<br><br>4)  to assess potential human exposure to PFOA through direct contact with and incidental ingestion of surface water.<br><br>5)  to provide information on factors associated with uptake of PFOA by aquatic biota and subsequent consumption by humans. |
| 4. Sediment Sampling | a.   Expand number of sampling locations in the Tennessee River, Bakers Creek and A Avenue drainage to 8 locations.<br><br>b.   Add 12-node grid for sampling at groundwater/surface water | 1)   to determine PFOA levels in the Tennessee River and in on-site sediments. |



**Table ES-2  - Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring**

| | | |
|---|---|---|
| | interface adjacent to facility shoreline. Total of 36 samples. | 2)   to compare PFOA levels with the results from previous sediment sampling.<br><br>3)   to evaluate the potential sources of PFOA to sediments.<br><br>4)   to assess potential human exposure to PFOA through direct contact with and incidental ingestion of sediments.<br><br>5) to provide information on factors associated with uptake of PFOA by aquatic biota and subsequent consumption by humans. |
| 5. Terrestrial Biota Sampling | a.  Conduct a vegetation survey in the former sludge incorporation area. Obtain vegetation samples in the vicinity of soil sample locations in the former sludge incorporation area and the northwestern control location. Total of 27 vegetation samples.<br><br>b.  Conduct a small mammal survey in the former sludge incorporation area. Obtain small mammal samples in the vicinity of soil sample locations in the former sludge incorporation area and the northwestern control location. Total of 10 small mammal specimens with analyses of serum and liver samples. | 1)   to determine the levels of PFOA in 3 species of vegetation on the sludge application area.<br><br>2)   to determine the levels of  PFOA in one small mammal species in the sludge application area. |



**Table ES-2 - Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring**

| 6. Fish/Invertebrate Sampling | a. Expand fish sampling in the Tennessee River to 6 locations for two species. Collect whole fish and fillet samples. Total of 120 samples.<br><br>b. Sample lower order species (clams and mussels) at 6 locations in the Tennessee River. Total of 6 composite samples. | 1) to determine PFOA levels in fish and clams/mussels in the Tennessee River and Bakers Creek.<br><br>2) to compare PFOA levels with the results from previous fish and clam/mussel sampling.<br><br>3) to assess potential human exposure to PFOA through ingestion of fish.<br><br>4) to provide information on factors associated with uptake of PFOA by aquatic biota and subsequent consumption by humans. |
|---|---|---|
| 7. Additional Assessment of Possible Routes of PFOA Exposure | a. Perform an off-site well survey.<br><br>b. Collect samples from Decatur municipal water supply on a bimonthly basis. Total of 6 samples.<br><br>c. Collect information on off-site disposal of facility wastes.<br><br>d. Collect samples of effluent and Morgan County landfill leachate and Decatur WWTP effluent and sludge. Total of 3 samples. | 1) to confirm early 1990's findings that Decatur municipal water system, not wells, is the potable water source for the site and its environs.<br><br>2) to determine PFOA levels in the Decatur Municipal Water supply<br><br>3) to assess potential human exposure to PFOA through ingestion of public water.<br><br>4) to assess potential transport and exposure pathways associated with off-site waste disposal. Based on review of data additional sampling around disposal facilities could be performed in Phase 3. |



and the objective of fully addressing the Charge stated in the MOU. The rationale for each of the sampling activities is discussed in more detail in Section 5. Based on the results of the Phase 2 data collection, interpretation, and screening level exposure assessment, additional data will be collected during Phase 3 of the PFOA characterization program to address data needs identified by 3M, EPA, and the Peer Consultation Panel.

**Data Assessment Report, Screening Level Exposure Assessment, and Future Data Needs Assessment Report**

The results from the Phase 1 information and the Phase 2 investigation program will be incorporated into a Data Assessment Report summarizing the methodology and findings of the Phase 1 and Phase 2 investigation including robust summaries (and the analytical data packages) of the results of all soil, groundwater, vegetation, sediment, surface water and biota sampling. The Phase 1 and Phase 2 data contained in the Data Assessment Report will be used to prepare a Screening Level Exposure Assessment performed in accordance with the procedures contained in Guidelines for Exposure Assessment (EPA, 1992) and to inform the scope and magnitude of Phase 3 monitoring. A Future Data Needs Assessment also will be prepared by 3M. The Future Data Needs Assessment shall consist of the following:

(1) A scientifically-based analysis of the Data Assessment and the Screening Level Exposure Assessment prepared pursuant to Sections V.D.2. and V.D.3. of the MOU.

Such scientifically-based analysis shall both assess the sufficiency of the Data Assessment and the Screening Level Exposure Assessment with reference to and identify additional data and/or other appropriate information necessary to address fully the Charge.

(2) An outline of a Future Work Plan for the gathering of additional data and/or other appropriate information that are necessary to address fully the Charge.



**Phase 3**

EPA and 3M agree that additional sampling to further quantify pathways and human exposure, to characterize the presence of PFOA in environmental media  and meet EPA data needs which may not have been fully met in Phase 1 and 2 is required in Phase 3. Additional monitoring will be conducted to provide a more complete understanding of the sources and magnitude and extent of PFOA on and off-site as a result of manufacturing activities at the facility. Phase 3 work will be informed by the results of the Phase 1 and Phase 2 data collection and evaluation.

Examples of work that could be considered as a Phase 3 include, but are not limited to, the following:  additional on-site and off-site soil and groundwater sampling; additional monitoring of off-site waste disposal facilities; and additional surface water and sediment monitoring, air measurements and additional biota sampling.



# 1. INTRODUCTION

## 1.1    BACKGROUND

The 3M Company (3M) is entering into a Memorandum of Understanding (MOU) with the United States Environmental Protection Agency (EPA) that formalizes an environmental monitoring program at its Decatur, Alabama facility. Additional background information on the development of the MOU is contained in Section IV of the MOU.

The objectives of the program are to address EPA and 3M data needs including characterizing sources, concentrations in various environmental media, migration and extent of PFOA associated with the Decatur facility, identifying actual or potential receptors and exposure pathways, and collecting data necessary to perform a screening level exposure assessment. The Program will be evaluated according to the Charge and clarifying comments as described in the MOU.

3M developed a phased approach to obtain data on the presence of PFOA in various environmental media at the Decatur site. The phased approach has been developed to incorporate a systematic approach for obtaining data to satisfy EPA's data needs related to release, occurrence and transport pathways contained in the Preliminary Framework for Enforceable Consent Agreement Data Development for PFOA and Telomers (EPA, 2003a), Item 10:  Monitoring – Fluoropolymers, EPA Data Needs (EPA, 2003b), and the December 9, 2003 "Road Map" (EPA, 2003c) and to provide sufficient data to allow development of a screening level exposure assessment.

## 1.2    APPROACH TO PROGRAM DEVELOPMENT

As described above, a phased approach will be utilized for collecting PFOA data. The media to be sampled in each phase is summarized below:



## PHASE 1

This phase of the PFOA environmental sampling activities consisted of those activities that have been or are being completed at the facility under the letter of intent (LOI) submitted by 3M to EPA on March 13, 2003 and further described in a subsequent letter, dated May, 2003. In the LOI, a commitment to monitor both on-site and off-site environmental media was established. On August 1, 2003, the first report of the results of the initial on-site monitoring effort was submitted to EPA and has been entered into the Docket OPPT-2003-0012. The information included data on the semi-annual groundwater monitoring results of the semi-annual wastewater effluent monitoring from the manufacturing plant and environmental monitoring data from sampling in the Tennessee River. The off-site monitoring includes surface water, sediment and biota monitoring in the Tennessee River, a program that had been initiated in the Year 2000. The next sampling event for these media is scheduled for 2004 and will be performed in conjunction with the Phase 2 field activities. In January, 2004 the results of the air dispersion modeling were also submitted to the EPA as part of the LOI commitment.

## PHASE 2

The experimental design of the proposed Phase 2 sampling effort has been developed by considering the expected use of the data for understanding the presence of PFOA on and around the site, the potential exposure to PFOA in a variety of environmental media, and the transport (migration) pathways by which PFOA may have reached these media. To these ends, the types, number, and locations of samples to be collected have been selected to obtain data that will provide estimates of PFOA concentrations and allow for comparisons between locations.

This phase of sampling activities has been designed to develop the data necessary to perform a screening level exposure assessment and to initially characterize fate and transport issues. The data collection efforts planned for this phase include an evaluation of the former sludge incorporation areas where sludge from the facility's wastewater treatment plant was historically land applied. The sampling activities planned for this



phase include soil, groundwater, and three species of vegetation and one small mammal species sampling to initially assess the nature and extent of PFOA present in the sludge incorporation area, the presence of PFOA in the sampled plants and small mammals and the availability for off-site migration from this area. A series of nested wells will be installed within the former sludge incorporation area to allow for groundwater sampling in the residuum unit, the epikarst (weathered bedrock between the residuum and limestone bedrock units) and the shallow limestone bedrock. To assess groundwater flow directions, a hydrogeological assessment in the former sludge incorporation area is included as part of this phase. Other on-site data that will be collected during Phase 2 includes the sampling of soils in the vicinity of the 8 LOI wells that are currently being monitored for PFOA on a semi-annual basis.

The next scheduled sampling in the Tennessee River, defined in the LOI, will be incorporated into the Phase 2 sampling program and will include sampling of sediment and surface water, and the clams or mussels, and fish in the Tennessee River. As an enhancement of the LOI activities, additional sampling locations in the Tennessee River and Bakers Creek will be added to the three LOI locations to better characterize the distribution of PFOA in surface water, sediments and aquatic biota.

Phase 2 activities will also include the performance of an off-site well inventory, sampling of the Decatur municipal water supply, an evaluation of waste disposal facility(ies), a sample of the Morgan County landfill leachate, and the collection of demographic data for the Decatur area.

Following the completion of Phase 2 field activities, the results of the multi-media sampling conducted in both Phases 1 and 2 will be compiled and summarized in a final Data Assessment Report. These data will be used to prepare a Screening Level Exposure Assessment. In addition, a Future Data Needs Assessment Report will be produced that will identify additional data necessary for refining the screening level exposure assessment and would contain an outline of a Work Plan for a Phase 3 monitoring program.



## SCREENING LEVEL EXPOSURE ASSESSMENT

The screening level exposure assessment for current human exposure to PFOA will involve the development of quantitative assessments, to the extent possible, for those pathways and receptors applicable to the Decatur site. For those pathways/receptors where a quantitative exposure assessment cannot be performed, a semi-quantitative or qualitative exposure assessment will be performed. Although the screening level exposure assessment will focus primarily on human exposure, it will characterize the presence of PFOA in environmental media, including biota, on and off the site as a result of current and past manufacturing activities.

The field sampling program was developed by 3M to meet the objective of obtaining data for performing a quantitative screening level exposure assessment for human receptors. To that end, a preliminary assessment of potential routes of exposure for PFOA that may be present at the Decatur facility to the adjacent surroundings and human populations was performed.

The preliminary assessment of potential routes of human exposure was based primarily on the knowledge gained from the Resource Conservation Recovery Act (RCRA) Facility Investigation (RFI) program conducted for nonfluorochemicals at the site which was used to identify potential exposure pathways for general classes of receptors such as on-site grounds maintenance workers and the general public. The potential exposure pathways and receptors knowledge will be updated through tools such as the demographic survey. The resulting preliminary site conceptual exposure model (SCEM) for PFOA (see Section 4) was used in conjunction with the expressed EPA data needs (EPA 2003a, EPA 2003b, and EPA 2003c) to develop the technical approach for the Phase 2 monitoring program. Complete and potentially significant exposure pathways that were identified in the pathways assessment were selected by 3M for further evaluation and, where indicated, data collection.



## PHASE 3

The Phase 1 and Phase 2 work which will be performed by 3M will address EPA data needs. EPA and 3M agree that additional sampling to further quantify pathways and human exposure and to characterize the presence of PFOA in environmental media is required in Phase 3. Additional monitoring will be conducted to provide a more complete understanding of the sources and magnitude and extent of PFOA on and off-site as a result of manufacturing activities at the facility. Phase 3 work will be informed by the results of the Phase 1 and Phase 2 data collection and evaluation along with new research results or newly discovered historic information about the site.

This phase of the investigation will consist of the preparation of a Work Plan for Phase 3 monitoring activities and implementation of the field sampling activities. This phase is intended to address any data needs identified in the Data Needs Assessment Report as they relate to the Screening Level Exposure Assessment by 3M and/or identified by the Peer Consultation Panel after its review of the Data Assessment Report, Screening Level Exposure Assessment, and Future Data Needs Assessment Report that would be prepared at the end of Phase 2. The specific nature and extent of Phase 3 field investigations that will be required to address the data needs will be identified in a separate Work Plan that would be submitted to EPA for review and discussion.

Based on the current state of knowledge, examples of work that could be considered as a Phase 3 include, but are not limited to, the following:  additional on-site and off-site soil and groundwater sampling; additional monitoring of off-site waste disposal facilities; additional surface water, sediment, and seepage zone monitoring; air measurements and additional biota sampling. Additional biota sampling that could be considered for Phase 3 include additional samples of the same species sampled during Phase 2 and additional species of biota that are different from those sampled during Phase 2.

## 1.3 ORGANIZATION OF THIS DOCUMENT

This Work Plan is organized into the following sections:

Section 1 –   Contains a discussion of the background and objectives of the PFOA characterization program and an overview of the phased approach to data collection.

Section 2 –   Contains information provided by 3M on the environmental setting for the Decatur area.

Section 3 –   Contains a description provided by 3M of past activities at the former sludge incorporation area.

Section 4 -   Contains a description of the preliminary site conceptual exposure model.

Section 5 –   Contains an extensive discussion of the Phase 2 sampling activities.

Section 6 –   Contains a description of the field documentation procedures, the Data Assessment Report, Screening Level Exposure Assessment, and Future Data Needs Assessment Report that will be prepared after completion of the Phase 2 sampling program.

Section 7 –   Contains the references used in the preparation of the Work Plan.



# 2.  ENVIRONMENTAL SETTING

## 2.1    LAND USE

3M began operations at the Decatur, Alabama, facility in 1961 with the construction of the chemical manufacturing plant (Chemical Plant). In 1962, the facility was expanded to include a film manufacturing plant (Film Plant). Prior to construction, the area consisted mostly of agricultural and residential properties. Currently, the land surrounding the facility is predominantly industrial and commercial. Bordering industries include BP (formerly Amoco Chemical) to the west; Daikin America, Inc. and MDA, Inc. to the south; the Alabama state docks to the east; and Cargill, Inc. (formerly Cerestar) to the southeast. (Solutia [formerly Monsanto Chemicals] is also located east of the Decatur facility on the east side of Baker's Creek). Figure 2-1 is a site location map.

## 2.2    TOPOGRAPHY AND DRAINAGE

The 3M Decatur site is located in the Highland River section of the Interior Low Plateau's physiographic province. This province is characterized by gently rolling hills, broad low drainage divides, and gentle stream gradients. Topographic elevations range from approximately 550 feet above mean sea level (ft msl) near the Tennessee River to 635 ft msl in the west-central portion of the site.

Surface water discharges from the property via several manmade ditches. Surface-water from non-process areas in the northern half of the site is directed to several outlets that drain to the Tennessee River. Surface-water in the plant production areas is collected in storm drains or ditches and diverted to the on-site WWTP for treatment prior to discharge through the site's NPDES-permitted outfall. Surface water from the central and southern portions of the property drains to the east, south, and west, and ultimately discharges to the Tennessee River or Baker's Creek. The facility currently has 11 stormwater outfalls that are included in the NPDES permit.





**FIGURE 2-1   SITE LOCATION MAP
3M DECATUR, AL**



The Tennessee River (Wheeler Reservoir) flows to the west and has a summer pool elevation of 556 ft msl and a 100-year flood plain elevation of 568 ft msl. During winter months, the pool level is lowered approximately 5 to 10 feet to help manage the increased rainfall during this period. Although eastern portions of the site could lie within the 100-year flood plain, the industrialized portions of the facility are entirely above the 100-year flood area.

## 2.3    GEOLOGY

### 2.3.1  Regional Geology

The 3M Decatur site is located in the Highland Rim section of the Interior Low Plateau's physiographic province. The geology of Morgan County typically consists of unconsolidated soil underlain by consolidated bedrock consisting of limestone, chert, and shale. A generalized stratigraphic column for the Decatur site is shown as Figure 2-2. Descriptions of each of the major geologic units are provided in the following paragraphs.

The unconsolidated soil is comprised of silty to clayey sand, collectively referred to as the residuum. The residuum includes transported sediments originating from previous transgressions of the Tennessee River system, and soil derived by the in situ physical and chemical weathering of the bedrock (saprolite). Typically, the residuum at the site ranges in thickness from approximately 10 feet to up to 95 feet.

The alluvial soil at the site consists of red silty and clayey sand to sandy clay with occasional lenses of rounded chert gravel. Soil outcrops along with current margin of the Tennessee River indicate that gravel near the base of this soil sequence may include large angular boulders of chert, suggesting an intermixing of well-worked river deposits with eroded chert clasts from the underlying bedrock. Outcrops of fresh bedrock in these areas also indicate, at least locally, that the alluvial soils were deposited at the soil/bedrock interface. As a result, it can be concluded that the highly erratic bedrock surface was likely formed by a combination of physical and chemical weathering processes.





**FIGURE 2-2  GENERALIZED STRATIGRAPHIC COLUMN
3M DECATUR FACILITY, DECATUR, AL**



The saprolite (weathered bedrock) soil can be described as brown to yellowish brown clayey silty sand to sandy silt. Lenses of sand and chert replacement nodules occur locally; the chert typically increases in abundance with depth. Boring data indicate soil at the bedrock interface is often saturated beyond its liquid limit, resulting in localized "muck" zones. These zones are often interlayered with competent limestone, indicating a transitional contact with the bedrock.

Mississippian Age Tuscumbia limestone underlies the residuum. This unit consists of gray to light gray coarse-grained fossiliferous limestone and fine-grained limestone (micrite) with chert replacement nodules and lenses. The Tuscumbia limestone gently dips to the south-southeast and has an approximate thickness of 200 feet. Fractures observed within the Tuscumbia limestone are bedding controlled or oblique, originating from stress relief (joint) fractures. Fracture occurrences decrease with depth.

## 2.3.2   Site Geology

The geology beneath the 3M Decatur site consists of residuum underlain by the Tuscumbia limestone, which, in turn, is underlain by the Fort Payne chert. The residuum is a low permeability soil material consisting of silty sand and clayey sand with varying percentages of gravel, underlain by sandy silt to clayey silt with weathered limestone/chert clasts.

The contact between the residuum and bedrock is transitional, expressed by interlayering of saturated soil and competent limestone. This transition zone, or epikarst, varies in thickness at the site from approximately 5 feet to up to 30 feet. The more developed epikarst zones are typically associated with linear depressions in the current bedrock surface, suggesting potential physical weathering mechanisms associated with the Tennessee River system.

The Tuscumbia limestone underlies the residuum to an approximate depth of 150 feet below ground surface (ft bgs). Fractures within this unit occur primarily along bedding planes, and typically do not exceed 10 millimeters (mm) in thickness. Water-bearing



fractures observed in this unit are not continuous, and do not appear to yield significant quantities of water. The occurrence of fractures decreases with depth.

An asphaltic limestone approximately 10 feet thick occurs below the Tuscumbia limestone, and has been interpreted as the top of the Fort Payne chert. Water-bearing fractures were not observed within the Fort Payne chert, suggesting that the asphaltic limestone likely acts as a lower confining unit for the Tuscumbia limestone.

## 2.4    HYDROGEOLOGY

### 2.4.1  Regional Hydrogeology

Based upon information generated during the RCRA Facility Investigation (RFI) conducted at the site it was found that regional groundwater within Morgan County is primarily within the Tuscumbia-Fort Payne aquifer, which is comprised of the Tuscumbia limestone and Fort Payne Chert. Primary porosity in the unweathered Tuscumbia limestone and Fort Payne chert is low, averaging less than a few percent of the total volume of rock. Groundwater within the bedrock occurs in secondary openings enlarged along fractures and bedding planes, and within solution features near the bedrock surface. Groundwater flow associated with this system is controlled by the number, extent, orientation, and interconnection of these water-bearing fractures. Groundwater flow in the Decatur, Alabama, area is generally to the north toward the Tennessee River.

The Tuscumbia-Fort Payne aquifer is considered a primary aquifer for public drinking water supplies in northern Alabama (but not in the vicinity of the Decatur Site). Based on information obtained during the RFI, it was reported that supply wells completed in this aquifer yield from approximately 40 gallons per minute (gpm) to greater than 2,000 gpm. Locally, however, this aquifer is not a porous medium and may not yield significant quantities of groundwater. In the Decatur, Alabama, area, or more specifically, in the area of the 3M Plant property, average yields from wells completed in this aquifer system are less than 0.5 gpm. Therefore, the Tuscumbia-Fort Payne aquifer is not used at the 3M facility or by the City of Decatur as a water supply source. Potable water used at the site,



and the Decatur area in general, is provided by the Decatur municipal water system whose source is from surface water (i.e. the Tennessee River).

Wells completed within the residuum generally yield very little water, less than 1 gpm. As a result, this residuum unit is generally not considered as an economical water source. Regionally, the residuum acts as a recharge zone for the underlying Tuscumbia-Fort Payne aquifer.

## 2.4.2   Site Hydrogeology

Data collected from the extensive investigations conducted at the site under other regulatory programs and site monitoring wells indicate that the local hydrogeology consists of perched water zones (which are localized and not continuous), an unconfined residuum/epikarst water-bearing unit, a semiconfined fractured limestone water-bearing unit, and an underlying sequence of massive bedded chert and limestone that constitutes a basal confining unit. These units appear to be connected only on a very localized scale and cannot be considered laterally uniform or continuous.

Potentiometric data for the site indicate that groundwater occurs both as unconfined and semiconfined systems. Unconfined groundwater occurs within the residuum, epikarst, and to some extent, shallow fractures within the Tuscumbia limestone. Groundwater elevations for this system range from approximately 615 ft msl south of the inactive landfill to approximately 555 ft msl near the Tennessee River with depths to groundwater ranging from near ground surface to approximately 32 ft bgs. In the plant production area groundwater flow in the shallow system (residuum, epikarst) is generally to the north with discharge the Tennessee River or east toward Baker's Creek with an average gradient of $1.4 \times 10^{-2}$ feet per foot. This groundwater gradient contour map is depicted in Figure 2-3. Shallow groundwater flow in the former sludge incorporation area is to the west-southwest based on groundwater levels collected during the sludge incorporation program.



TENNESSEE
RIVER -
WHEELER
RESERVOIR

STORMWATER
POND

04P-0016-8

912R ○
991.21

Monitoring Well Location
and Groundwater Elevation
(fmsl)

Potentiometric Surface Contour
in Feet Above Mean Sea Level )fmsl)

Indicates Bedrock Surface at
Higher Elevation Than Potentiometric
Surface

Note: Groundwater Levels Recorded
in September 2002

⟶ Generalized Groundwater Flow Direction

Scale in Feet

600          0          600          1200

3M Decatur Site
Morgan County, Alabama

Figure 2-3

Residuum Groundwater
Potentiometric Surface Map

WEST☉N
SOLUTIONS
Restoring Resource Efficiency

Some locations where residuum and bedrock monitoring wells are adjacent to each other, indicate differing potentiometric surfaces suggesting confined or semiconfined bedrock conditions. Groundwater elevations within these bedrock fracture systems approximate those of the unconfined system, indicating a northerly to northeasterly flow direction as shown in Figure 2-4. The groundwater gradient for bedrock groundwater is approximately 0.2 foot per foot. Bedrock groundwater discharge is into the Tennessee River. A flow net analysis conducted for the bedrock groundwater, as part of the RFI, indicates that the zone of discharge into the river is within 200 ft of the shoreline.

## 2.5    ECOLOGICAL SETTING

The following subsections focus on the terrestrial habitat in the former sludge incorporation area and are based on observations made during site walk-throughs and on literature describing habitats typical of northern Alabama, the 3M Decatur facility, and its surroundings in support of the RFI conducted at the site.

### 2.5.1    Habitat Identification & Ecological Resources in the Sludge Incorporation Area

#### 2.5.1.1    Terrestrial Habitat

The area in the immediate vicinity of the manufacturing portions of the site is highly disturbed (paved, gravel-covered, etc.) and provides little habitat for ecological resources. The former sludge incorporation area consists of a series of former agricultural fields currently designated as a natural wildlife habitat area that is undergoing registration under the Wildlife Habitat Council Program.



Note: Groundwater Levels Recorded
in September 2002

Scale in Feet

3M Decatur Site
Morgan County, Alabama

Figure 2-4

Shallow Bedrock
Groundwater Potentiometric Surface Map



### 2.5.1.2    Ecological Resources

A literature review was conducted to identify the potential wildlife communities and the species present in each habitat type, in the vicinity of the 3M Decatur facility. A list of potential species was created based on the known habitat requirements of each species and available habitats on the site.

The former sludge incorporation area, although now in the early stages of succession, is expected to eventually provide foraging and nesting habitat for a wide variety of birds, invertebrates, reptiles, and mammals. Furthermore, planned resource management of this area is likely to enhance wildlife utilization of this habitat. The Tennessee River/Baker's Creek riparian complex supports wildlife that use more than one habitat within the study area (e.g., nesting versus foraging habitat). A wide variety of birds, reptiles, amphibians, fish, mammals, and invertebrates are expected to occur in the immediate riparian area and adjacent areas with suitable habitat.

The areas used for sludge incorporation are former agricultural fields many of which are currently in the early stages of old-field succession. Consequently, it is expected that vegetation in much of the area will be dominated by herbaceous plants with some woody species entering the succession. The old-fields include a mixture of native and introduced grasses and common herbaceous species likely to be present include composite species of *Aster*, *Ambrosia*, and *Solidago*. Early stage shrubby species beginning to colonize the area are expected to include sumacs (*Rhus spp.*), catbrier (*Smilax spp.*), and blackberries (*Rubus spp.*). Woody species entering or likely to enter the succession include hackberry (*Celtis spp.*), winged elm (*Ulmus alata*), black locust (*Robinia pseudoacacia*), honey locust (*Gleditsia triacanthus*) and sweet gum (*Liquidambar styraciflua*).

Based on the results of the literature review, the following members of the avian and mammalian community are likely to inhabit or utilize the former sludge incorporation area. The most common songbirds may include the redwinged blackbird (*Agelaius phoeniceus*), eastern meadowlark (*Sturnella magna*), eastern kingbird (*Tyrannus tyrannus*), American goldfinch (*Carduelis tristis*), mourning dove (*Zenaida macroura*),



and various sparrow species (*Passer spp.*) Common mammals may include the meadow vole (*Microtus pennsylvanicus*), white-footed mouse (*Peromyscus leucopus*), least shrew (*Cryptotus parva*), short-tailed shrew (*Blarina brevicauda*), eastern cottontail rabbit (*Sylvilagus floridanus*), woodchuck (*Marmota monax*), and white-tailed deer (*Odocoileus virginianus*). The small mammal community is expected to provide prey for apex predator species such as redtailed hawk (*Buteo jamaicensis)* and foxes (V*ulpes spp.).*

As stated previously, this area has been designated a natural wildlife habitat area. Consequently, natural successional processes, and potentially, active natural resources management practices are expected to result in additional enhancement of the wildlife habitat in this area.



# 3. FORMER SLUDGE INCORPORATION AREAS

## 3.1    BACKGROUND

From 1978 to 1998, 3M incorporated sludge from the on-site wastewater treatment plant via subsurface injection in an on-site area designated as the Sludge Incorporation Area. This activity was conducted under a National Pollutant Discharge Elimination System (NPDES) permit (No. AL0000205) which was issued by the Alabama Department of Environmental Management (ADEM) to 3M. The sludge generated at the wastewater treatment plant was from the treatment of manufacturing facility wastewater and was approximately 1 to 3% solids. Sludge was hauled via a tank truck from the wastewater treatment plant to the incorporation zone. The tank truck was equipped with a series of tines and injection nozzles which injected the sludge approximately 1 foot below ground surface. Subsurface sludge incorporation was a requirement of the NPDES permit and no direct surface application of sludge was permitted or believed to have occurred. The former sludge incorporation area is located on the southern portion of the 3M plant property as shown in the Figure 3-1.

The former sludge incorporation area consisted of 575 acres of land located south of the facility production areas. The area used for sludge incorporation was comprised of 13 application "fields or zones" and two control fields. A diagram of these "fields" is shown in Figure 3-2.

Table 3-1 provides a history of sludge incorporation activities based on our discussions with 3M personnel familiar with the sludge disposal operations Field 7 was the original control area until 1991. In 1991, 3M sold 95.7 acres of the land encompassing fields 1 through 4 to Daikin and 13 acres to MDA, Inc (a joint venture between 3M and Daikin). In 1992, a new control area was established north of Fields 12 and 13. No sludge was applied to Field 14 or the new control area. In addition, Table 3-2 includes a summary of the amounts of sludge applied into the various fields.





**FIGURE 3-1    LOCATION OF THE SLUDGE INCORPORATION AREA
3M DECATUR, AL**





**FIGURE 3-2  SLUDGE INCORPORATION AREA
3M DECATUR, AL**



**Table 3-1 History of Sludge Incorporation Area**
**3M Decatur, AL**

| Period of Application | Zone |
|---|---|
| 1978-1981 | 1 through 4 and 6 |
| 1982-1986 | 6 and 9 |
| 1987-1988 | 8, 10, and 11 |
| 1989 | 6, 8, 10 and 11 |
| 1990 | 8, 10, and 11 |
| 1991 | 8 |
| 1992 | 8 and 13 |
| 1993 and 1994 | 8, 12, and 13 |
| 1995 | 5, 8, 9, and 12 |
| 1996 | 8 and 9 |
| 1997 | 5, 8, 9, and 12 |
| 1998 | 9 and 12 |

(1) Fields 1-4 are on the property which was sold to Daikin and MDA, Inc.
(2) Field 14 is control (no sludge application).



### Table 3-2  Summaries of Quantities of Sludge Applied in the Sludge Incorporation Area

| Field Number or Zone | Years of Operation | Metric Tons/Year (Average; Dry Weight) | Total Metric Tons Applied (Dry Weight) |
|---|---|---|---|
| 1 | 1978-81 | 317.94 | 1,272 |
| 2 | 1978-81 | 163.57 | 654 |
| 3 | 1978-81 | 371.60 | 1,486 |
| 4 | 1980-81 | 360.10 | 720 |
| 5 | 1995-97 | 371.24 | 1,114 |
| 6 | 1981-89 | 588.42 | 5,296 |
| 8 | 1987-91 | 1,405.43 | 7,027 |
| 8A | 1992 | 392.94 | 393 |
| 8B | 1992-97 | 702.76 | 4,216 |
| 9 | 1982-98 | 236.36 | 4,018 |
| 10 | 1987-90 | 1,039.52 | 4,158 |
| 11 NE | 1987-90 | 661.16 | 2,645 |
| 11 NE & SW | 1991 | 1,185.04 | 1,185 |
| 12 | 1993-98 | 278.52 | 1,671 |
| 13 | 1993-94 | 3,647.12 | 7,294 |



In accordance with the NPDES permit, incorporation of sludge was limited to fields that were cropped during the next appropriate growing season. Currently, the former sludge incorporation area is not cropped and has naturally revegetated. These areas have been designated as a natural wildlife habitat area with restricted access. It must be noted that since the inception of the program by 3M to incorporate sludges, ADEM applied specific limits on the amounts and quality of the sludge incorporation on the land. Under the permit as described in Section 3.2 below, samples were analyzed for inorganic fluorides; the permit did not require analysis for organic fluorine or for specific fluorochemicals such as PFOA. The concentration of inorganic fluoride in the sludge is unlikely to correlate with PFOA concentrations in sludge. It should be noted that the analytical method for inorganic fluoride determination does not measure PFOA concentrations. While samples were analyzed for inorganic fluorides, no analyses were performed for PFOA or other fluorocarbons. 3M ceased land application of sludges in 1998.

EPA has requested further information about crops grown in the sludge area. Based on our discussions with 3M personnel familiar with sludge disposal operations, it appears that cotton was the primary crop formerly grown in the sludge incorporation area and that it was not tested for PFOA. Typical practice was to plant winter wheat after harvesting the cotton crop. Winter wheat was subsequently harvested with the wheat seed retained for future plantings and the wheat straw left in place or tilled back into the soil. To a lesser extent, soybeans and perennial rye were also grown in the former sludge incorporation area. Soybeans and rye hay were harvested for use as animal feed. Upon cessation of land application of sludges, agricultural usage was also discontinued in the former sludge incorporation area.

## 3.2    NPDES PERMIT MONITORING REQUIREMENTS

The 3M Decatur Facility NPDES Permit No. AL0000205 contained specific monitoring requirements for the former sludge incorporation area in Part IV, Section B of the permit. The facility's NPDES permit stipulated that only sludge from the wastewater treatment plant should be land applied.



The NPDES permit required that the sludge should be analyzed for parameters listed in Table 3-3 and the results reported to ADEM on a quarterly basis. Total accumulation of zinc, nickel, and cadmium had to be reported to ADEM on a quarterly basis for each field (zone) on which land application had occurred for that quarter. Sludge application was limited to fields (zones) that would be cropped during the next appropriate growing season.

Stormwater runoff from areas (fields) where land application activities were being conducted was sampled, analyzed, and reported to ADEM on a quarterly basis for the parameters listed in Table 3-4. Stormwater runoff sampling, analysis, and reporting had to be conducted once per six months where land application has occurred in the past and once per year where sludge had never been applied.

The permit also required that on a quarterly basis, groundwater in all monitor wells located within the area (zone) of sludge incorporation, the upgradient well (113C), the well within the control area (114C), and well 122C be sampled and analyzed for the parameters listed in Table 3-3 and reported to ADEM. Even though 3M ceased land application of sludges in 1998, 3M continued through 1999 to obtain water level measurements and groundwater samples from the monitor wells in the former sludge incorporation area. As an example, water levels were collected from residuum monitor wells 110C through 124C in July 1998. Water table elevations ranged from approximately 555 feet mean sea level (msl) to 603 feet msl, as shown on Table 3-5. Based on the water levels, a water table elevation map for the former sludge incorporation area was developed as shown on Figure 3-3.

As shown in Figure 3-3, the direction of groundwater flow beneath the sludge incorporation areas is generally to the west-southwest. In the sludge incorporation fields 6, 7, 9 and 10, groundwater flow is to the west. In fields 5, 8 and 11, groundwater flow is to the southwest toward Highway 20/72. In the areas north of field 6 and in the 3M plant production areas, the direction of groundwater flow is to the north-northeast, toward the Tennessee River. As shown in Table 3-5, depth to groundwater is highly variable (due to



**Table 3-3**

**Sludge and Groundwater NPDES Permit Monitoring Parameters**

| Parameter | Groundwater | Sludge |
|---|---|---|
| pH | X | X |
| Aluminum | X | X |
| Calcium | X | X |
| Chromium | X | X |
| Copper | X | X |
| Iron | X | X |
| Magnesium | X | X |
| Mercury | X | X |
| Nickel | X | X |
| Potassium | X | X |
| Sodium | X | X |
| Zinc | X | X |
| Sulfates | X | X |
| Fluoride, inorganic | X | X |
| Lead | X | X |
| Nitrates | X | |
| Total Phosphorus/Phosphorus | X | X |
| Total Dissolved Solids | X | |
| Specific Conductance/Conductivity | X | X |
| Ammonia as Nitrogen | | X |
| Chlorides | | X |
| Solids | | X |
| Organic Nitrogen | | X |



**Table 3-4 Stormwater Runoff NPDES Permit Monitoring Parameters**

| Parameter |
|---|
| Flow |
| pH |
| Chemical Oxygen Demand |
| Oil and Grease |
| Fluoride, inorganic |
| Total Recoverable Aluminum |
| Total Recoverable Nickel |
| Total Recoverable Zinc |
| Total Kjeldahl Nitrogen |
| Total Organic Carbon |
| Total Suspended Solids |
| Total Recoverable Chromium |
| Chlorides |



## Table 3-5 Water Level Monitoring Report
### July 1998

| Well No. | Time | Total Depth (ft) | TOC Elevation | Depth to Water (ft) | Groundwater Elevation | Comments |
|---|---|---|---|---|---|---|
| 110C | 12:35 | 37.36 | 607.53 | 8.92 | 598.61 | In low area near tree line |
| 113C | 11:40 | 70.53 | 644.45 | 40.79 | 603.66 | On hill south of landfill |
| 114C | 11:15 | 60.65 | 603.96 | 27.44 | 576.52 | South of Goose Pond |
| 115C (1) | 11:25 | 54.98 | 614.06 | 21.5 | 592.56 | In field southwest of landfill |
| 116C (1) | 11:55 | 55.56 | 606.71 | 46.9 | 559.81 | In field southwest of landfill near railroad |
| 117C | 11:05 | 70.7 | 611.64 | 56.25 | 555.39 | Along access road in field |
| 118C | 14:35 | 51.2 | 588.77 | 33.42 | 555.35 | In corn field at SW corner of property |
| 119C | 14:15 | 35.53 | 589.86 | 34.53 | 555.33 | In corn field at SW corner of property |
| 120C | 14:55 | 40.56 | 588.68 | 31.92 | 556.76 | In corn field at SW corner of property |
| 121C | 15:20 | 43.08 | 606.57 | 42.77 | 563.8 | Near large pine tree at edge of corn field |
| 122C | 13:05 | 68.25 | 614.48 | 48.24 | 566.24 | At tree line in south center of property |
| 123C | 13:30 | 35.25 | 579.76 | 22.58 | 557.18 | In corn field at SE corner of property |
| 124C | 15:55 | 39.28 | 572.72 | 17 | 555.72 | Elevation is estimated due to damage |

Notes:
All measurements are from top of casing (TOC)
Elevations are feet mean sea level
(1) Wells have been recently closed due to location of soil stockpiles



**LEGEND**

• MONITOR WELL

$\curvearrowright$ —555 POTENTIOMETRIC SURFACE IN FEET MSL

⬅ GROUNDWATER FLOW DIRECTION

Scale in Feet
0    375    750

**FIGURE 3-3**
**WATER TABLE ELEVATION**
**SLUDGE APPLICATION FIELDS**
**JULY 1, 1998**
**3M DECATUR, AL**



topography) and varies from approximately 9 ft bgs to greater than 50 ft bgs. It must be noted that these findings, based on water level measurements taken in 1998, will be verified by obtaining new water level data during Phase 2 of the PFOA investigation program.

As noted earlier, the residuum is a low permeability unit primarily comprised of silty sand, clay, and weathered limestone. Chert fragments increase with depth. The depth to bedrock varies from approximately 35 to 70 feet (bgs) beneath the sludge application areas. Monitor wells installed in the residuum unit typically yielded less than a one-half gallon per minute. Many of the wells were bailed dry and often would take days or months to fully recharge. Groundwater flow in the residuum is expected to be limited due to the presence of low permeability clays with extremely low effective porosities.



# 4. SITE CONCEPTUAL EXPOSURE MODEL

A preliminary site conceptual exposure model (SCEM) was developed to evaluate potential human exposure to PFOA associated with previous and current activities at the 3M Decatur facility. This SCEM identifies the primary current and historical sources of PFOA at the site, the potential release mechanisms from those sources, the potential migration pathways of PFOA, and the primary potentially exposed human populations and the routes by which these populations may be exposed to PFOA. The preliminary SCEM incorporates information from past PFOA investigations, the results of the RFI program conducted at the site, and preliminary demographic information. As additional information is obtained on concentrations of PFOA in environmental media from Phase 2 sampling and on potential receptors from Phase 2 demographic data collection, the SCEM will be revised accordingly.

Figure 4-1 is a schematic depiction of PFOA sources and potential transport pathways to environmental media on and in the vicinity of the 3M Decatur facility. This figure and the following narrative on potential release mechanisms and migration and exposure routes focuses on various environmental compartments that may have been affected by releases of PFOA from the facility. The Phase 2 sampling program described in Section 5 was developed on the basis of 3M's present understanding of potential migration and exposure routes, the Data Needs expressed by EPA (EPA 2003a, EPA 2003b, and EPA 2003c) and the objectives of performing a screening level exposure assessment and characterizing the presence of PFOA in environmental media, including biota on and around the site, as a result of current and past manufacturing activities.

**Current and Historical Sources and Release Mechanisms**

The principal sources of PFOA associated with the facility include:

- Air emissions from manufacturing operations
- Sludge application fields and other affected areas
- Wastewater treatment plant





04P-0783

**FIGURE 4-1  POTENTIAL TRANSPORT
PATHWAYS SCHEMATIC**



These primary and secondary sources, their associated transport routes and exposure pathways, and their importance in the development of the Phase 2 sampling program are discussed in the following subsections. It is recognized that soils, groundwater, and other media containing PFOA can act as secondary sources and pathways for exposure on and off-site.

**Air Emissions**

While not manufactured at the Decatur facility, PFOA used in the manufacturing process is emitted from the process stack located in the Chemical Manufacturing Area of the facility. In addition to air emissions of approximately 11 pounds per year from the 3M Dyneon facility, the adjacent Daikin facility has air emissions of approximately 450 pounds per year. The PFOA emissions are subjected to atmospheric dispersion and dilution in association with prevailing wind pattern. Depending on a variety of process emission and meteorological factors, PFOA will be distributed in ambient air at varying concentrations. Plume dispersion modeling of air emissions conducted at the 3M facility predict the highest ambient air concentrations of PFOA near the process facility declining exponentially with distance from the stack with some potential to migrate beyond the facility boundaries. As a result, there exists the potential for human receptors to be exposed through inhalation to some levels of PFOA both on-site and off-site. The inhalation of PFOA resulting from air emissions from the Daikin facility and, to a lesser extent, from the 3M Dyneon facility represents a complete exposure pathway to human receptors both on- and off-site.

In addition to ambient air concentrations, the air emissions of PFOA may also deposit on the surrounding soils, waterbodies and vegetative growth. Modeling of the deposition of PFOA from the facility was not available for the development of this conceptual model. Nevertheless based on the atmospheric dispersion modeling, it is anticipated that PFOA would deposit at some level on soils and surface water both on and off-site.

Upon deposition of PFOA on soil, the chemical may be subject to a variety of physical (e.g., leaching, erosion), chemical (e.g., photodegradation) and biological processes (e.g.,



microbial degradation, biotic uptake). The resulting concentration in soil will be a function of the PFOA concentration in air, the rate of deposition, the duration of the facility emissions, as well as the natural processes described above. Human receptors may be exposed to PFOA in soil through a number of direct and indirect routes of exposure. Direct routes of exposure include incidental ingestion of soils, dermal contact and absorption of PFOA, and inhalation of PFOA-laden dust. The direct exposure to PFOA in soils represents a complete exposure pathway for both on-site and off-site human receptors.  Indirect routes of exposure to PFOA in soils may include the uptake of PFOA in fruits and vegetables grown in soils containing PFOA as could be the case for individuals with home gardens or commercial crop production.  It is currently not known to what extent PFOA accumulates in vegetation. Note that this pathway is not relevant to on-site soils because there are no vegetable products grown on-site.

In addition, there is a potential for the leaching of PFOA deposited in soil to migrate to groundwater or runoff into surrounding surface waters where potential human exposure may occur. As exposures through these pathways are thought to be more significant in association with the sludge application area, they will be discussed in the next subsection.

In summary, complete exposure pathways associated with potential human exposure to air emissions from PFOA include:

- Inhalation of PFOA in on-site ambient air by facility grounds maintenance worker.

- Inhalation of PFOA in off-site ambient air by offsite residents.

- Incidental ingestion, dermal contact and dust inhalation of PFOA in on-site soils by facility grounds maintenance worker.

- Incidental ingestion, dermal contact and dust inhalation of PFOA in off-site soils by offsite residents.

- Ingestion of fruit and vegetables grown in off-site soils containing PFOA.



**Sludge Application and Other Affected Areas**

From 1978 to 1998, 3M incorporated sludge from the on-site wastewater treatment plant via subsurface injection in an on-site area designated as the Sludge Incorporation Area. Due to the injection of PFOA in the soils of sludge application fields, the greatest concentrations of PFOA in soils are expected to occur in this area. Although the vertical distribution of PFOA is not known, it is expected that the discing of the fields during planting, as well as other physical disturbances has resulted in detectable levels of PFOA in the surface soil horizon of these fields. As a result, site grounds maintenance workers may be exposed to PFOA in soil through incidental ingestion of soils, dermal contact with soil, and inhalation of PFOA-laden dust.

In addition, based on existing data in the Chemical Plant area, PFOA has the potential to leach from the sludge incorporation area and other areas with affected soils to the underlying groundwater. There are no current uses of groundwater on-site and as such, human exposure to groundwater on-site is not a complete exposure pathway. However, based on hydrogeological information, the groundwater beneath the sludge application fields has a flow gradient off-site. The extent to which PFOA has the potential to migrate offsite currently is not known. Moreover, none of the properties surrounding the site have been shown to use groundwater as a potable water supply based on a well inventory performed as part of the RFI characterization in the 1990's. Nevertheless, because there is a potential for off-site migration of PFOA in groundwater and it has not been recently validated that off-site groundwater is not being used for drinking water or irrigation, it is premature to eliminate this pathway as a potential human exposure pathway.

In addition to potential migration to groundwater, the former sludge incorporation area soils may serve as a source of PFOA to other migration pathways on site as well as offsite. PFOA in soils may migrate to surface waters by means of erosional sediment transport during storm events or snowmelt and can be carried by resuspension of soil in air and redeposition on or off-site. As a result, human exposure mediated through surface water, groundwater, or other pathways may be affected by previous application of wastewater sludge in these fields. Human exposure pathways associated with the surface



water medium will be addressed in the discussion of the discharge from the wastewater treatment plant as the wastewater discharge may be a source of contributions of PFOA to the Tennessee River.

The potential exists for windblown soils or volatilized PFOA to migrate to other locations on-site or to adjacent properties off-site. PFOA in these dusts would be subsequently deposited on and incorporated in the soils in these areas. As indicated for the deposition for air emissions, offsite human exposure to PFOA would potentially occur through the incidental ingestion of soils, dermal contact and absorption, inhalation of dust and ingestion of fruits and vegetables grown in these soils. PFOA which volatilizes from former sludge incorporation area fields would disperse and distribute in association with prevailing wind patterns where inhalation exposure may occur on- or off-site.

In summary, potentially complete exposure pathways associated with potential human exposure to PFOA in the sludge application fields include:

- Incidental ingestion, dermal contact and dust inhalation of PFOA in on-site soils by a facility grounds maintenance worker.

- Inhalation of volatilized PFOA from on-site soils by a facility grounds maintenance worker.

- Ingestion of and contact with groundwater by offsite residents or indirectly through the consumption of livestock or produce irrigated with groundwater containing PFOA.

- Incidental ingestion, dermal contact and dust inhalation of PFOA in off-site soils by offsite residents due to windblown transport of PFOA-bearing soil.

- Ingestion of vegetables grown in soils containing PFOA by off-site residents due to windblown transport of PFOA-bearing soil.

- Inhalation of volatilized PFOA from PFOA-bearing soils by offsite residents and other potentially exposed individuals.



**Wastewater Discharge**

Available data indicate that treated process wastewater containing PFOA was discharged from the facility's NPDES-permitted WWTP outfall to Baker's Creek near its confluence with the Tennessee River. PFOA released to Baker's Creek and the Tennessee River may partition in any of several surface water compartments including the water column and associated dissolved and particulate fractions, sediment, and biological tissue.  It is expected that PFOA levels in surface water and sediment, and consequently in fish tissue will be highest in the vicinity of the wastewater discharge or other significant sources (e.g., groundwater discharge). Away from the discharge points, the distribution and concentrations of PFOA in the river will be a function of the hydrography of the river, as well as dilution potential. Existing data indicate that PFOA in surface water and sediment of the Tennessee River extends downstream of the 3M discharge. Data from previous fish sampling events in Bakers Creek and the Tennessee River demonstrate the accumulation of PFOA in fish tissue. The mechanism by which this occurs is not fully understood at this time. It is not clear the extent to which the PFOA levels in fish result from direct uptake of PFOA from the water across the gill membranes or from trophic transfer and dietary exposure. As stated above with respect to air emissions, current WWTP discharges containing small concentrations of PFOA are expected to be significantly lower than historical levels.

ADEM has identified designated uses to be protected for these surface waters to include primary contact recreation and recreational fishing. As a result, the recreational angler who catches and consumes fish from Bakers Creek and the Tennessee River is potentially exposed to PFOA. Moreover, the recreational boater, water skier or similar may be exposed to PFOA in surface water and sediment through incidental ingestion and dermal contact.

In summary, potentially complete exposure pathways associated with human exposure to PFOA in the surface water include:



- Incidental ingestion of and dermal contact with PFOA in surface waters by the recreational boater/angler.

- Incidental ingestion of and dermal contact with PFOA in sediments by the recreational boater/angler.

- Ingestion of fish containing PFOA by recreational anglers.

- Ingestion of drinking water derived from the river downstream.

**Discussion of PFOA and Environmental Media**

The primary sources and the mechanisms by which PFOA is released from the source areas and distributed within the habitats in and around the Decatur facility has been described in the preceding narrative on the SCEM. Although under the MOU, the PFOA Site-Related Environmental Assessment Program entails performing a screening level assessment of human exposure and not an ecological exposure assessment, these sources and mechanisms would apply in general to both human and ecological receptors.

Under the MOU 3M will perform a characterization of the presence of PFOA in environmental media, including biota. Through this Phase 2 Work Plan, 3M will gather data and other information on the presence of PFOA in selected biota in and around the Decatur site. 3M intends to utilize these data and information to develop a characterization of PFOA concentrations in the specific species of biota sampled and, based on this characterization, to develop a Phase 3 Work Plan for collecting additional biota monitoring.

Both the characterization based on the data and information from the Phase 2 Work Plan as well as the Phase 3 Work Plan for additional biota monitoring will need to take into account the pathways and classes of ecological receptors potentially exposed to PFOA in and around the Decatur facility. These pathways and classes are discussed below in the form of a general overview of habitat, migration pathways, and potential exposure to selected classes of receptors. In this context, it should be emphasized that not all of the



exposure pathways identified in this overview discussion necessarily have ecological significance at the Decatur, AL site.

### *Potential Pathways*

PFOA exposure to fish and other aquatic biota can potentially occur along surface water pathways through ingestion, direct contact, and absorption. Other mammals and birds may be exposed to PFOA in surface waters through the consumption of water from streams, creeks and rivers. Sediments containing PFOA can potentially lead to exposure to PFOA through direct contact by invertebrate and vertebrate receptors with sediments as well as uptake of PFOA in sediments by plants. PFOA in soils can potentially lead to direct contact with PFOA by invertebrate and vertebrate receptors as well as uptake of PFOA in soils by plants. Trophic transfer in these three environmental media (surface water, sediment and soil) could provide a mechanism of indirect exposure to higher order species as described below. Air deposited PFOA on and off-site can also be a source of PFOA in media in both terrestrial and aquatic environments; soils, surface waters and sediments.

### *Terrestrial Receptors*

Potential terrestrial receptors include vegetation, soil fauna, and vertebrates such as birds, and mammals. Plants provide a route of indirect exposure to herbivorous fauna through uptake, translocation, and sequestration of PFOA in plants. Soil microbes and soil invertebrates are also components of the ecology of terrestrial habitats and may be exposed because of their direct contact with soil. Soil invertebrates are also potential prey items for a variety of ground-foraging birds and mammals. A variety of birds utilize the terrestrial habitats foraging on the vegetation, soil invertebrates, small mammals and other birds that inhabit these areas. In addition to exposure through the incidental ingestion of soils, birds are potentially exposed through the uptake and assimilation of vegetation (e.g., seeds) and prey that they consume. Some birds occupy a terminal position in the food chain of the terrestrial system and are thus susceptible to exposure through the trophic transfer. Mammals constitute a smaller component of the terrestrial



fauna and are permanent inhabitants of the terrestrial habitats feeding on grasses and invertebrates. Predatory mammals that forage these areas may be exposed through incidental ingestion of soils, as well as through the vegetation and prey that they consume.

***Aquatic Receptors***

Potential aquatic receptors such as aquatic vegetation, benthic organisms, fish, birds, and mammals are present in the vicinity of the facility. Plants may also provide a route of indirect exposure to herbivorous invertebrates and fish through uptake, translocation and sequestration of the PFOA in plants.

The Tennessee River, Bakers Creek, and, potentially, the Avenue A drainage support aquatic insects and other invertebrates that use the sediments for the depositing of eggs and the development of larval forms prior to hatching. Benthic invertebrates are also components of the ecology of aquatic habitats and are potential prey for a variety of invertivorous birds and mammals. The surface waters surrounding the Decatur facility support a variety of macroinvertebrate species that serve as a forage base for predatory species such as fish, mammals, and birds. Fish are a nutrient and forage source in these aquatic systems.

The surface waters and their adjacent riparia also serve as habitat for a variety of avian species throughout the year. Much of the border of the Tennessee River is woodlands or ruderal fields that provide edge habitat for aerial-foraging birds that feed on newly hatched species of invertebrates metamorphosed from the shallow river bottom. These riparian areas also provide perching habitat for stream foraging species of birds and are sufficiently shallow for wading predatory birds. In addition to providing potential exposure through sediments, the surface waters provide a source of water for birds and mammals using the surface waters as foraging habitat.



## Phase 2 Data Collection

Potentially complete and significant pathways present in the SCEM were selected by 3M for additional evaluation and, where indicated, data collection during the Phase 2 program. The SCEM identifies various environmental media including air, soil, groundwater, surface water, sediments, and biota that may either result in potential exposure to human receptors or constitute a transport pathway to other media to which humans may be exposed. The Phase 2 sampling program has been designed to develop quantitative data for those media representing potentially complete exposure pathways for use in a screening level exposure assessment. In addition, the Phase 2 sampling program includes the collection of data on PFOA concentrations in various media and locations to initially characterize fate and transport issues. While data on PFOA concentrations in some of these media may not be representative of a complete exposure pathway, the information is needed to develop an understanding of the current and potential future distribution of PFOA at and in the vicinity of the facility.

As stated above, the monitoring data collected from the Phase 2 Work Plan as described in the next section will provide information on the presence or absence of PFOA in selected biota in and around the Decatur site. These data will be characterized for the specific biota sampled taking into account the general overview discussion above on pathways and classes of ecological receptors and will be used to develop a Phase 3 Work Plan for additional biota monitoring.

Additional discussion of the specific aspects of the Phase 2 sampling program and the rationale for the selection of types, number, and locations of samples is contained in the following section.



# 5. PHASE 2 PFOA SAMPLING PROGRAM

The following subsections describe the sampling and ancillary data collection that 3M will perform during Phase 2 of the PFOA environmental monitoring program at the Decatur site. All sampling activities will be performed in accordance with the safety procedures contained in the site-specific Health and Safety Plan (HASP) provided in Appendix A. The specific methods, procedures, and protocols governing sampling and analyses, quality assurance/quality control (QA/QC) procedures, and other pertinent details are more completely presented in the Quality Assurance Project Plan (QAPP). The analytical methods for determining PFOA concentrations in all media are provided in Appendix B and Standard Operating Procedures (SOPs) for sampling methods for all media are provided in Appendix C.

Table 5-1 shows the summary of environmental media, general location, and number of primary samples that will be collected during the Phase 2 investigation. It should be noted that due to the presence of the Daikin facility adjacent to the 3M facility, PFOA concentrations in a variety of media such as soil, vegetation, sediment, surface water, and biota may reflect contributions from Daikin in addition to past and present sources associated with 3M manufacturing activities.

The experimental design of the proposed Phase 2 sampling effort has been developed by 3M considering the expected use of the data for understanding the potential exposure to PFOA in a variety of environmental media and the transport (migration) pathways by which PFOA may have reached these media. The technical approach for the overall PFOA monitoring program has also been informed by the Data Needs expressed by EPA in various PFOA planning documents (EPA 2003a, EPA 2003b, and EPA 2003c). To these ends, the types, number, and locations of samples to be collected have been selected by 3M to obtain data that will provide estimates of PFOA concentrations and allow for comparisons between locations.




WESTON SOLUTIONS Restoring Resource Efficiency

## Table 5-1 Summary of Phase 1 and 2 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring

| Activity | No. of Samples/Locations/<br>Descriptions of Activity | Rationale for Collection |
|---|---|---|
| 1. Soil Sampling | a. 5 Samples at varying depths in the vicinity of the 8 LOI groundwater monitoring wells. Total of 40 samples<br><br>b. 18 soil samples collected from soil borings at various depths from each of 3 sludge incorporation fields and one control field (72samples). An additional 40 samples will be collected among the sludge incorporation and control fields (10 from each field) from the surface (0-3" depth) and shallow depths (3"-6" depth). Composite soil samples of 5 ft core intervals from borings in each of the 3 sludge incorporation fields and the control field to bedrock. Total of approximately 140 samples.<br><br>c. 6 samples from 6-inch intervals and approximately 7 composite samples from 5-ft core intervals at a control location in the northwest corner of the facility.<br><br>d. Off-site soils. Number and depth of soil samples will be based on analyses of initial Phase 2 results from the former sludge incorporation area investigation. | 1) To determine the levels of PFOA in the soil associated with previous activity on-site.<br><br>2) to assess potential human exposure through incidental ingestion of soil, inhalation of dust and dermal contact.<br><br>3) to evaluate the soil to groundwater transport processes. |
| 2. Groundwater Sampling/Evaluation | a. Continue sampling of 8 LOI wells on a biennial frequency<br><br>b. Install 8 sets of 3 nested wells in the above 3 sludge incorporation fields and one control field in the former sludge incorporation area to monitor residuum, epikarst and shallow bedrock zones. Total of 24 groundwater samples (8 wells x 3 samples per well nest).<br><br>c. Collect water level data and perform hydrogeological evaluation of the former sludge incorporation area. Based on this evaluation and soils data, decide on an approach for collecting off-site soils and groundwater data (as part of Phase 2) from areas south and west of the | 1) To determine the levels of PFOA in groundwater associated with current or past manufacturing activities.<br><br>2) to assess potential human exposure to PFOA through consumption of groundwater or other groundwater uses (e.g. irrigation).<br><br>3) to evaluate the groundwater migration potential from onsite to offsite uses or |

**Table 5-1 Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring (Continued)**

| Activity | No. of Samples/Locations/ Descriptions of Activity | Rationale for Collection |
|---|---|---|
| | site in concert with EPA.<br><br>d. Install three sets of 3 nested wells off-site. Locations will be based on analyses of initial Phase 2 results from the former sludge incorporation area investigation. Total of 9 samples. | discharges to surface water. |
| 3. Surface Water Sampling | a. Expand number of sampling locations in the Tennessee River, Bakers Creek, and the on-site Avenue "A" drainage to 8 locations.<br><br>b. Add 12-node grid for surface water sampling (water column) at groundwater/surface water interface adjacent to facility shoreline. Total of 20 surface water samples.<br><br>c. Install peepers (dialysis-type sampling devices) into sediment at 12-node grid for pore water sampling at groundwater/surface water interface adjacent to facility shoreline. Total of 12 pore water samples. | 1) to determine PFOA levels in the Tennessee River and in on-site surface waters.<br><br>2) to compare PFOA levels with the results from previous surface water sampling.<br><br>3) to evaluate the potential sources of PFOA to surface waters.<br><br>4) to assess potential human exposure to PFOA through direct contact with and incidental ingestion of surface water.<br><br>5) to provide information on factors associated with uptake of PFOA by aquatic biota and subsequent consumption by humans. |
| 4. Sediment Sampling | a. Expand number of sampling locations in the Tennessee River, Bakers Creek and A Avenue drainage to 8 locations.<br><br>b. Add 12-node grid for sampling at groundwater/surface water interface adjacent to facility shoreline. Total of 36 samples. | 1) to determine PFOA levels in the Tennessee River and in on-site sediments.<br><br>2) to compare PFOA levels with the results from previous sediment sampling. |



**Table 5-1 Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring**
**(Continued)**

| Activity | No. of Samples/Locations/ Descriptions of Activity | Rationale for Collection |
|---|---|---|
| | | 3) to evaluate the potential sources of PFOA to sediments.<br><br>4) to assess potential human exposure to PFOA through direct contact with and incidental ingestion of sediments.<br><br>5) to provide information on factors associated with uptake of PFOA by aquatic biota and subsequent consumption by humans. |
| 5. Terrestrial Biota Sampling | a. Conduct a vegetation survey in the former sludge incorporation area in the former sludge incorporation area and the northwestern control location. Obtain vegetation samples in the vicinity of soil sample locations. Total of 24 vegetation samples.<br><br>b. Conduct a small mammal survey in the former sludge incorporation area. Obtain small mammal samples in the vicinity of soil sample locations in the former sludge incorporation area and the northwestern control location. Total of 8 small mammal specimens with analyses of serum and liver samples. | 1) to determine the levels of PFOA in 3 species of vegetation on the sludge application area.<br><br>2) to determine the levels of PFOA in one small mammal species in the sludge application area. |
| 6. Fish/Invertebrate Sampling | a. Expand fish sampling in the Tennessee River to 6 locations for two species. Collect whole fish and fillet samples. Total of 120 samples.<br><br>b. Sample lower order species (clams and mussels) at 6 locations in the Tennessee River. Total of 6 composite samples. | 1) to determine PFOA levels in fish and clams/mussels in the Tennessee River and Bakers Creek.<br><br>2) to compare PFOA levels with the results from previous fish and clam/mussel sampling. |



**Table 5-1 Summary of 3M Decatur Phase 1 and 2 PFOA Environmental Monitoring
(Continued)**

| Activity | No. of Samples/Locations/ Descriptions of Activity | Rationale for Collection |
|---|---|---|
| | | 3) to assess potential human exposure to PFOA through ingestion of fish.<br><br>4) to provide information on factors associated with uptake of PFOA by aquatic biota and subsequent consumption by humans. |
| 7. Additional Assessment of Possible Routes of PFOA Exposure | a. Perform an off-site well survey.<br><br>b. Collect samples from Decatur municipal water supply on a bimonthly basis. Total of 6 samples.<br><br>c. Collect information on off-site disposal of facility wastes.<br><br>d. Collect samples of Morgan County landfill leachate and Decatur WWTP effluent and sludge. Total of 3 samples. | 1) to confirm early 1990's findings that Decatur municipal water system, not wells, is the potable water source for the site and its environs.<br><br>2) to determine PFOA levels in the Decatur Municipal Water supply<br><br>3) to assess potential human exposure to PFOA through ingestion of public water.<br><br>4) to assess potential transport and exposure pathways associated with off-site waste disposal. Based on review of data additional sampling around disposal facilities could be performed in Phase 3. |



The following subsections describe the Phase 2 sampling by environmental medium and location in detail and provide the rationale for the selection of the sampling locations and the intended use of the data that will be collected.

## 5.1    SOIL SAMPLING PROGRAM

### 5.1.1    Overview

Based upon a review of the historical sludge incorporation and hydrogeological data presented in the previous subsections, soil and groundwater sampling for PFOA will be conducted in the following fields of the former sludge incorporation area:

- Field 6 – This field received sludge in the early part of the sludge incorporation program (1981-1989). Data from samples obtained from this field may provide an assessment of the possible long term movement of PFOA within the soil column. This information will be used to assess the degree to which the leaching of PFOA from the surface soil horizon contributes to potential groundwater contamination of PFOA. In addition, these surface soil data will be used in conjunction with other surface soil data to assess potential human exposure to PFOA in soil.

- Field 8 – This field received the greatest quantity of sludge during the middle (1987-1991) part of the sludge incorporation program and data may provide an assessment of the movement of PFOA in the soil column. In addition, a small portion of this field is located adjacent to Highway 20/72 and groundwater data from this field may inform the potential for off-site movement of PFOA to the south. In addition, these data will also be used as previously described for Field 6.

- Field 9 – This field received the maximum amount of sludge during the latter (1997-1998) part of the sludge incorporation program and data from this field may be used to ascertain possible short term movement of PFOA in the soil



column and the potential for off-site movement of groundwater towards Finley Island Road to the west. This field (Number 9) was chosen instead of Field 13 because Field 13 is currently covered over with large stockpiles of soil that were excavated from a different area of the plant.

- Field 14 (Control Field)– This field is not believed to have received any sludge and samples obtained from this field would represent "control" conditions i.e. an assessment of a field where no sludge had been applied. This field is also separated from the other incorporation fields by a diversion ditch so storm water run-off from other adjacent fields should not have affected Field 14. Surficial soil sampling from this field should also provide information on the possible effect of airborne distribution and deposition of PFOA from historic facility emissions and windblown dust from adjacent fields.

In addition to the sampling to be performed in the former sludge incorporation area, soil borings will be performed in the vicinity of the 8 LOI wells that are currently being monitored for PFOA on a semi-annual basis. These samples are intended to assess whether soils in the vicinity of the LOI wells are sources of the PFOA detected in groundwater. Given that the LOI wells are generally located downwind along the direction of the prevailing winds at the site, surface soil samples from these locations and the control locations discussed below may also provide useful information on the extent of deposition of PFOA from airborne sources.

The following discussion describes the soil sampling program proposed for the study of the former sludge incorporation area and the soils in the vicinity of the 8 LOI wells. In addition to the on-site sampling described in the following subsections, off-site soil sampling will be conducted after review of the initial Phase 2 soil results and is further described in Subsection 5.2.2.



### 5.1.2  Soil Sampling in the Former Sludge Incorporation Area

Each of the four fields identified in the previous subsection will be divided into quadrants. Based on field reconnaissance, two of the quadrants from each field will be selected for borings. The field reconnaissance will consider drainage/run-off patterns, topography, presence of vegetative cover, and type of vegetative cover in selecting locations. The use of vegetative factors in selecting soil sampling locations is discussed further in Subsection 5.3. In each of the fields, the borings for the nested groundwater monitoring wells will be installed in two locations. Except for the control field, one of these locations will be in an area where sludge was applied in the field and the other in an area where no sludge was applied. Tentative locations for the borings will be selected in areas where it is believed that sludge was incorporated. To identify these locations, soils will be field screened using a hand auger or shallow test pit for visual indicators of sludge incorporation. As the borings are advanced, any visual signs of sludge will be noted on the descriptive logs and those horizons will be sampled accordingly.

Soil samples in each of the above fields will be collected from the borings that will be installed to construct the nested groundwater monitoring wells (see Subsection 5.2 for additional details). Utilizing these borings, soil samples will be obtained from the surface to the water table at varying depths. While it is not anticipated that this data will characterize mass transfer rates, data from these borings will provide information on the vertical and horizontal distribution of PFOA within the soil column in the former sludge incorporation area. During the course of the installation of the boring, the hole will be logged by a qualified geologist. Soil samples will be collected in accordance with the soil sampling SOP contained in Appendix C. Soil samples will be analyzed by the analytical method contained in Appendix B.

Soil samples from the borings in each quadrant located in an area where sludge was applied will be obtained based on the following sequence:

- Surficial soil: Collected from 0-3" below ground surface (bgs) interval. This zone will be more reflective of the effects of air deposition, shallow root zone, erosional effects, and small mammal foraging exposure.



- Sludge incorporation zone: Collected based on visual assessment of soil core; minimal depth of 6-12" bgs may be adjusted on the basis of field observations of a sludge layer in order to sample the sludge affected zone. This zone will be more reflective of sludge incorporation and the deeper root zone.

- Below incorporation zone: one composite of 1 to 2 ft bgs (12-inch interval) and one composite at 2 to 2.5 ft bgs. This zone will reflect PFOA concentrations just below the sludge incorporation depth and the initial effect of vertical movement of PFOA.

- Subsurface zone:  5 to 5.5 ft bgs. This zone will reflect the vertical trend of PFOA into the intermediate soil depths.

- Deep zone: Bottom of unsaturated zone; 6-inch interval. This zone will reflect the vertical trend of PFOA movement into the deeper soil strata prior to entering the groundwater table.

In the second borehole installed in the quadrant where no evidence of former sludge application is noted, a total of 3 soil samples will be collected in a more limited sampling sequence. This can be compared to the results from the above boring description to assess the affects of sludge incorporation on vertical distribution trends and a possible horizontal distribution.

- Surficial soil: Collected from 0-3" bgs.
- Sludge incorporation zone: 6-12" bgs.
- Subsurface zone:  5 to 5.5 ft bgs.

In the event that perched water is encountered during boring, an additional 6-inch interval sample(s) will be collected from the perched zone and the presence and extent of the perched zone will be logged in the field logbook or soil boring and/or well installation forms. In the control field (Field 14), one of the borings will follow the 6 sample sequence and the other boring will follow the 3 sample sequence.

In each of the 4 fields, the above described soil samples will be collected from 2 borings with 6 samples each and 2 borings with 3 samples each for a total of 72 samples.  In addition to the samples collected from discrete intervals described above, samples will be collected from various depths from 5 feet whole core intervals.  These depth samples will



and from one boring in the control field (Field 14). The 5-feet core intervals will be examined by the field geologist. If this examination shows that the soil type is uniform across the entire core interval, then a composite sample will be collected for analyses. However, if this examination shows that there are different soil types within the core interval, then 2 discrete samples will be collected from the core interval. In this manner, samples will be collected from the surface to the groundwater table (i.e. 0 to 5 feet, 5 to 10 feet, 10 to 15 feet, etc.). It is anticipated that this "full core" approach will allow the collection of samples from any intervals with high PFOA concentrations (hot spots) that may not be sampled by the discrete 6-inch interval sampling depths described above.

An additional ten (10) soil samples will be collected from each of the four fields and analyzed for PFOA. These additional 10 soil samples will be obtained from the surficial (0-3"depth) and the shallow (3-6" depth) horizons to more completely characterize spatial trends and allow for the assessment of the potential for PFOA uptake by vegetation and exposure to small mammals inhabiting the fields. In this manner, the vertical and lateral distribution of PFOA in the former sludge incorporation area soils can be established. A total of approximately 140 soil samples will be collected from the former sludge incorporation area. Soil samples will be analyzed for PFOA, total organic carbon (TOC), and sieve and grain size.

### 5.1.3  Soil Sampling in the Vicinity of the LOI Wells

Soil borings will be performed in the vicinity of the eight (8) groundwater monitoring wells currently being sampled and analyzed for PFOA under the Phase I (LOI) program. These eight wells are 220L, 220R, 226L, 226R, 310R, 317L, 320L, and 327R (see Figure 5-1). Soil samples will be collected at the following five (5) depths near each of the eight LOI wells to yield a total of 40 samples from the following discrete intervals:

- 0-3" bgs.
- 6-12" bgs.
- 2 – 2.5 ft bgs.
- 5 – 5.5 ft bgs.
- Bottom of unsaturated zone; 6-inch interval.



WESTON SOLUTIONS

**LEGEND**

■ Monitor well
Sampled 3/28/01

■ Monitor well
Sampled 7/16/03

■ Monitor well
Sampled 3/28/01 and 7/16/03

FILM PLANT

CHEMICAL PLANT

3M WASTEWATER TREATMENT PLANT

310R
317L
308R
320L
315R
306R
327R

216R

MAIN ENTRANCE

213R
210R
220L
220R
226R
226L

MARSHY AREA

MUDFLAT AREA

INACTIVE LANDFILL

ACCESS ROAD

217R

VENUE

BAKER'S CREEK

N

200   0   200   400  Feet

3M Decatur Site
Morgan County, Alabama
RCRA Facility Investigation

**LOI Wells**

C:\Decatur\GIS\3mdec\SiteLayout\aprs\SamplingLocations.apr | Fig 1 | c:\decatur\gis\3mdec\plts\loiwells.eps | 4:10 PM, 3/9/2004



Soil samples will be analyzed for PFOA, TOC, and sieve and grain size. PFOA data from these soil samples will help in the evaluation of the likelihood that these soils are acting as sources for the PFOA detected in the groundwater. In addition, the soil samples represent locations that are in the northern part of the site and in the prevailing wind direction. Data from these soil samples will help in ascertaining PFOA levels in the site soils, attributable to air emissions as well as other potential contributing sources. However, it must be noted that the 8 LOI wells are located in the manufacturing area of the facility. Consequently, surface soil samples may not be available in certain locations due to the presence of impervious surfaces such as asphalt or concrete in the immediate vicinity.

### 5.1.4   Soil Sampling at the Northwestern Corner Control Location

In addition to the sludge incorporation area control field (Field 14) sampling described in Subsection 5.1.2.1, a location will be selected in the northwestern corner of the facility to serve as an additional control location for comparisons with soil PFOA concentration data from samples from both the former sludge incorporation area field soils and the soils in the vicinity of the LOI wells. Samples will be collected from one boring at the 0 to 3" bgs, 6-12" bgs, 1 to 2 ft bgs, 2 to 2.5 ft bgs, and 5 to 5.5 ft bgs intervals and from a 6" interval at the bottom of the unsaturated zone. An adjacent soil boring will be installed and composite samples will be collected over 5 ft core intervals from the ground surface to the water table. A total of approximately 13 samples will be collected from this location (assuming a depth to groundwater of 35 ft).

### 5.2     GROUNDWATER SAMPLING PROGRAM

### 5.2.1   Groundwater Sampling in the Former Sludge Incorporation Area

In the former sludge incorporation area, as noted in the earlier subsection, a set of 3 nested groundwater monitoring wells will be installed at two (2) locations in each of the three (3) former sludge incorporation fields and one (1) control field. Information on the construction of new monitoring wells is contained in the monitoring well installation SOP



(Appendix C). In each set of 3 nested wells, there will be one well completed at the base of the residuum unit to monitor the residuum groundwater, one well completed in the epikarst (weathered bedrock between the residuum and limestone bedrock units) and one well in the shallow limestone bedrock. In this manner, the groundwater in each of the 3 groundwater zones underlying the former sludge incorporation area will be sampled and analyzed for PFOA. A total of 24 groundwater samples will be analyzed for PFOA. All groundwater samples will be collected in accordance with the groundwater sampling SOP contained in the QAPP. Groundwater samples will be analyzed in accordance with the analytical method contained in Appendix B. In addition to PFOA, groundwater wells will also be monitored for temperature, pH, conductivity, total suspended solids (TSS), and total dissolved solids (TDS).

After the nested wells are installed, the well elevations and locations will be surveyed for horizontal and vertical control. Water level measurements will be obtained from all the wells to establish groundwater contours and flow directions. This information will be a key to the performance of a hydrogeological evaluation of the former sludge incorporation area. The results of the hydrogeological evaluation will allow for the assessment of groundwater movement off-site and its potential for impacting off-site locations, especially to the south and west of this area. The soil and groundwater investigations in the former sludge incorporation area will be performed during the initial part of the Phase 2 of the PFOA environmental monitoring program.

### 5.2.2  Off-Site Groundwater and Soil Sampling

Based upon an evaluation of the former sludge incorporation area soils and groundwater investigation data and the results of air modeling, 3M will define 3 additional off-site nested groundwater monitoring well locations as part of the latter portion of Phase 2 field activities. Based on the probable direction of groundwater flow determined from the limited existing hydrogeological data, it is expected that the focus of this effort would be in off-site locations to the south and west of the former sludge incorporation area. This information will be part of a technical consultation with EPA and samples of



groundwater and soils will be collected from each of the 3 nested wells and analyzed for PFOA. The results of additional off-site work would be included in the Data Assessment Report, the Screening Level Exposure Assessment, and the Future Data Needs Assessment Report that will be submitted to the Peer Consultation Panel.

### 5.2.3  LOI Wells

Groundwater samples from the eight (8) LOI monitoring wells located in the northern parts of the facility will continue to be collected on a semi-annual basis. Data from these sampling events (historical and future) will be used to establish PFOA levels in the groundwater in the manufacturing areas of the site.

### 5.3    BIOTA ASSESSMENT AND SAMPLING

As stated in the MOU under Section V.A. on Program Scope, "although the Screening Level Exposure Assessment will focus primarily on human exposure, it will characterize the presence of PFOA in environmental media, including biota, on and off the site as a result of current and past manufacturing activities". To fulfill this MOU commitment, selected sampling of biota will be performed in the former sludge incorporation area fields in order to evaluate the presence of PFOA (from the surficial soil zone or air deposition) in three plant and one small mammal species. Herbivorous small mammals that forage on vegetation and soils integrate the exposure to PFOA via dietary and other exposure pathways over time. It must be noted that these data are intended to advance the understanding of the presence of PFOA in this particular environmental compartment and the relative contributions of PFOA from various exposure pathways relevant to wild small mammal populations. Data on tissue PFOA concentrations in small mammals residing in this area may be suitable for comparisons with laboratory data on small mammals for the purpose of assessing potential exposure to small mammal populations. However, the assessment of potential human exposure will use established human exposure assessment methodology (EPA, 1992) due to the significant differences between humans and wild small mammal populations in the type and extent of exposure,



and their respective behavioral and dietary characteristics. The former sludge incorporation area is managed as wildlife habitat with restricted access.

The type of vegetation and vegetative cover in the former sludge incorporation area is varied Based on a July 26 to 29, 2004 vegetation survey. This vegetative diversity must be considered in selecting soil boring/sampling locations to determine whether forage plants are common to all of the fields being investigated. To the extent possible, selection of sampling locations and the species of vegetation to be sampled will target plant species that are common to the three fields that received sludge and the control field to permit comparison within and among test plots. Based on the July 26 to 29, 2004 small mammal survey, the small mammal community in the area of sampling is dominated by the hispid cotton rat *(Sigmadon hispidus)* and the selection of the vegetation for sampling will be informed by the selected target species' dietary preference and the seasonality of the sampling effort. The following subsections contain a discussion of the approach to the assessment of vegetative uptake of PFOA and the sampling that will be performed in these areas.

### 5.3.1   Vegetation Community Assessment and Sampling

An understanding of the vegetation community and its structure is critical to an overall habitat assessment. A combination of vegetation community assessments and qualitative field investigations will be used to develop a vegetation community map and assess the plant species composition within each delineated vegetation community. Depending on the results of the investigation, and overall project objectives, more detailed (e.g., semi-quantitative, flagging the boundary of vegetation communities) assessments may be proposed. The assessment will support proposed soil sampling for PFOA in the former sludge incorporation area.

#### *5.3.1.1        Vegetation Community Assessment*

An initial vegetation community assessment in the former sludge incorporation area was conducted from July 26 to 29, 2004. This survey was intended to identify the vegetation



community that is present in the former sludge incorporation areas and the control area (field 14) where soil and vegetation sampling is proposed. A letter report will be prepared to document the methods and results of the vegetation and small mammal surveys.

The investigation included: 1) a review of existing information to assess the approximate location and extent of vegetation types, 2) a field investigation to refine the initial community mapping and to qualitatively assess the vegetation species composition within each habitat type.

- <u>Initial Assessment of Vegetation Types</u>

    WESTON performed a review of available information, mapping resources, and reports to prepare a draft vegetation communities map for the sludge incorporation area. Information sources included:

    - County Soil Survey
    - USFWS National Wetlands Inventory
    - USGS 7.5 Minute Topographic Quad
    - Aerial Photography
    - Site personnel knowledge
    - Reports prepared for ongoing activities at the facility

    The approximate location and extent of major vegetation communities and the field designations from the former sludge incorporation activities were sketched onto available site maps. This preliminary vegetation community map will be used to support follow-on field investigations within the former sludge incorporation area, including: 1) a field investigation to qualitatively assess dominant vegetation communities and to inventory plant species, 2) the selection of small mammal inventory and sampling locations, and 3) the selection of soil sampling locations in areas of similar vegetation communities.



- <u>Field Assessment of Vegetation Communities</u>

    WESTON conducted a site visit to verify the preliminary vegetation community map and to qualitatively assess the species composition of the dominant vegetation community types.

    The qualitative vegetation assessment consisted of primarily walk-through surveys. The survey identified the major and minor vegetation community types in the sludge incorporation areas. Individual communities were surveyed by walking and documenting plant species, while noting the approximate dominance of each species within each community type.

    The preliminary vegetation community map is being revised based on the results of the field survey.

It should be noted that this field survey was conducted in mid summer (i.e. late July). During this survey, the field team also attempted to identify the other types of vegetation (i.e. goldenrod, _Solidago_ species) which may be more prominent during other seasons.

### 5.3.1.2    *Vegetation Sampling*

The results of the vegetation community assessment and field survey will be compiled and reviewed in conjunction with the small mammal survey data, to finalize the vegetative sampling plan for PFOA. To the greatest extent possible, target plant species will be selected on the basis of common occurrence among the test plots, dominance within each of the test plots, and wildlife dietary preferences. The selection of vegetation sampling locations, species, tissues (e.g., fruits, foliage, roots), and sampling protocols will be determined after review and evaluation of the field survey results. Sampling procedures are contained in the vegetation sampling SOP (Appendix C). It is anticipated that sampling will be performed on approximately 3 different plant species. Samples of 3 species will be collected from each of the two soil boring locations at the areas within each plot that formerly received sludge applications. In the control field, three species will also be collected at 2 locations. Three species will be collected at a location in the



northwest corner control location. Consequently, a total of approximately 27 vegetation samples will be collected among the five plots for PFOA analyses (i.e., 3 species x 2 locations x 4 fields and 3 species at the northwestern control location). The vegetation analytical methodology that will be used is provided in Appendix B and the vegetation sampling protocol is provided in Appendix C.

## 5.3.2  Small Mammal Surveys and Sampling

### 5.3.2.1    Small Mammal Survey

Several species of small mammals likely live in the study area. In order to characterize the mammalian community, a preliminary small mammal survey was performed by trapping using Sherman live box traps from July 26 to 29, 2004. Areas to be trapped were based on available habitat and the similarity of the vegetative community to that present in other prospective sampling locations at each of the four fields. One trap line with 14 traps was set at each of the fields that received sludge applications (Fields 6, 8, and 9), as well as the background area location (Field 14). A scientific collection permit (SCP) was obtained from the Alabama Department of Conservation and Natural Resources (DCNR) and all collection efforts were performed in accordance with the requirements of the SCP.

Traps were set for two to three nights with the objective of trapping ten adult animals of the same species from each of the four fields. Once the traps were set, they were checked a minimum of twice daily in the field, during early morning and late afternoon or early evening hours. Daytime trapping was only performed on July 27, 2004 during overcast and unseasonally cool conditions to minimize mortality due to heat stress and dehydration. Trapped mammals were identified at the location of capture and released unharmed. The most abundant species at each sampling location and in the study area as a whole was the hispid cotton rat (*Sigmadon hispidus*) with 55 captured. A single white-footed mouse (*Peromyscus leucopus*) was captured.

A review of the literature will be performed to determine dietary preferences of the hispid cotton rat target species. Dietary preferences and seasonality of the sampling effort will



be evaluated to assist in the selection of the appropriate vegetation material for the co-located vegetation and soil samples. As stated earlier, the small mammal survey results will be documented with the vegetative community survey results in a letter report and provided to EPA for a technical discussion prior to sampling.

### 5.3.2.2    Small Mammal Sampling for PFOA Analysis

The hispid cotton rat, the dominant member of the small mammal community at the study site may be a prospective species for PFOA sampling and analysis. The hispid cotton rat is primarily herbivorous with some consumption of ground nesting bird eggs and chicks and insects and typically has a small home range of 0.25 to 0.99 acres (Whitaker & Hamilton 1998). Consequently, the small mammal trapping activities will likely be designed to preferentially target the capture of the target species by means of trap selection, placement, and intensity. Target species catch rates from the initial survey will be evaluated to determine the number of traps and trap nights required to obtain samples from each prospective sampling location. Once the traps are set, they will be checked a minimum of twice daily in the field, during early morning and early evening hours.

On the data sheet for each small mammal, the sample location, date, initials of collector(s), sample identification number, species, sex, weight (g), total length (mm), tail length (mm), hind foot length (mm), and ear length (mm) will be recorded. Each individual small mammal will also be inspected for abnormalities or deformities, including dental deformities, which will be described on data forms. Additional information on the sampling methodology is contained in the small mammal sampling SOP (Appendix C). After collection of serum samples, the specimens will be dissected and liver samples submitted for analysis. Two specimens of the target species will be collected from the immediate vicinity of each of the two soil boring locations within each plot in the former sludge incorporation area and at the northwestern control location. Consequently, a total of approximately 8 small mammal specimens (or more if necessary to meet the minimum sample volume/mass requirement and the number of matrices) will be collected



among the five plots for PFOA analyses. The small mammal PFOA analytical method is provided in Appendix B.

## 5.4    SEDIMENT SAMPLING

Sediment sampling in the Tennessee River/Bakers Creek will be performed at a total of 8 locations including the 3 LOI locations sampled in 2002 (Entrix, 2003). The sediment data is intended for use in the screening level exposure assessment and will be co-located with surface water sample locations and, in the Tennessee River and Bakers Creek, fish and clam/mussel sampling locations (see Subsections 5.5 and 5.6).

The LOI sediment sampling locations were located upstream of the facility at river mile 307.5 (LOC-3), across the river from the facility at river mile 301 (LOC-2), and downstream of the facility at the mouth of Fox Creek (river mile approximately 296; LOC-1) and are shown in Figure 5-2. Additional locations that will be sampled during the Phase 2 field investigation include a far downstream location (below river mile 296), the cove and mouth of Bakers Creek in the vicinity of the facility's WWTP outfall, Bakers Creek upstream of the facility's outfall, and the two locations in the Avenue A drainage within the facility (Figure 5-2). Three samples of sediments will be collected at each of the eight locations for a total of 24 samples (Table 5-1). Sediment sample collection will incorporate a variety of methods. For example although the use of petite ponar will be the preferred method for the collection of sediment samples, this sampling device is not useful in those sections of rivers or streams where the substrate contains



Figure 5-2
Phase 2 Surface Water and Sediment
Sampling Locations
3M Corporation
Decatur, Alabama

Q:\3mdec\mxd\drg_site.mxd



significant quantities of coarse materials e.g., pebbles, detritus or similar. At these locations, a stainless steel corer will be used to obtain the sediment sample. All samples will be collected from the top 10 cm of the sediment. Sediment sampling procedures are described in detail in the sediment sampling SOP (Appendix C).

In addition to the sediment samples from the 8 locations described above, sediments will also be sampled in the Tennessee River in the near-shore zone at the expected location of the groundwater/surface water interface adjacent to the facility (Figure 5-2). An evaluation of the flow net analysis shows that the distance into the Tennessee River from the facility's shoreline (within 200 feet), which would receive the majority of the affected groundwater from the Chemical Plant, is approximately 200 feet. Based on a flow net analysis of the discharge of groundwater potentially reflecting contamination from the Chemical Plant area, it is estimated that the maximum shoreline length of the groundwater plume discharge is 2,100 feet. This area will be sampled using a 200-foot by 200-foot grid representing approximately 12 40,000-square foot ($ft^2$) grid blocks. A total of 12 sediment samples (one in each grid node) will be collected from the center point of each grid block. In addition to PFOA, sediment samples will be analyzed for TOC and sieve grain size. These ancillary parameters may assist in the interpretation of PFOA concentration data and fate and transport characterization. In addition, surface water and pore water samples will be collected at each of the 12 sediment sampling locations (see Subsection 5.5). These data are intended to characterize the nature and extent of groundwater transport of PFOA to surface water as well as to determine the resulting surface water concentration to which infaunal and epifaunal species may be exposed.

## 5.5    SURFACE WATER SAMPLING

Surface water sampling will be performed in conjunction with the sediment sampling described in Subsection 5.4. A single surface water sample will be collected at each of the six locations in the Tennessee River and Bakers Creek and at each of the two locations in the Avenue A drainageway. In addition, surface water samples will be collected immediately above the substrate at each of the 12 sediment sampling locations in the nearfield grid in the Tennessee River at the suspected area of the



groundwater/surface water interface. Samples from the Tennessee River and Bakers Creek locations will be collected using a Kemmerer or similar sampler. Samples will be collected from the water column based on the water depth at the sampling locations. For those locations at which the depth is equal to or less than 10 ft, samples will be collected at 0.6 of depth. That is, for a location with a depth of 10 ft, the sample will be collected 6 ft from the surface. For locations greater than 10 ft, surface water samples will be composited from samples from the 0.2 and 0.8 depths. Additional details on surface water sampling is provided in the surface water sampling SOP (Appendix C).

Pore water samples will be obtained by installing peepers (dialysis-type sampling devices) into the sediments and retrieving the peepers after a sufficient amount of time for equilibration. Prior to deploying the peepers in the field, a laboratory method validation study will be performed. The method validation study will consist of fabricating peepers, filling the peepers with deionized water, placing them in vessels containing test solutions with known concentrations of PFOA in deionized water, retrieving the peepers after 7 days to allow for equilibration with the test solution, and analyzing both the peeper contents and test solutions for PFOA. A comparison of the results of the peeper and test solution PFOA concentrations will determine the effectiveness of the peepers for collecting representative samples of pore water.

Surface water samples from the shallow Avenue A drainage will be collected directly into the sample containers. Additional information on surface water and pore water sampling methods is contained in the surface water sampling and pore water sampling SOPs (Appendix C). In addition to PFOA, surface water samples will analyzed for temperature, pH, dissolved oxygen (DO), conductivity, total suspended solids (TSS), and total dissolved solids (TDS). The PFOA analytical method for surface water sampling is contained in Appendix B.



## 5.6    AQUATIC BIOTA SAMPLING

### 5.6.1  Fish Sampling

Fish sampling will be performed at the six locations selected for sediment and surface water sampling in the Tennessee River and Bakers Creek. Fish sampling will not be performed in the vicinity of the sampling grid adjacent to the shoreline at the suspected groundwater/surface water interface due to a lack of suitable fish habitat. Similarly, no fish collection is proposed for the Avenue A drainageway. A scientific collection permit SCP was obtained from the Alabama DCNR for fish collection and all collection efforts will be performed in accordance with the SCP requirements. Target species for the fish sampling effort are largemouth bass (*Micropterus salmoides*) and channel catfish (*Ictalurus punctatus*). These two target species were selected for the following reasons:

- Correspondence with the fish samples collected in the 2002 sampling effort.

- Commonly consumed by recreational anglers.

- Predator species that are expected to represent the highest trophic levels and, therefore, may exhibit the largest bioaccumulation of PFOA.

- Wide distribution.

- Both are recommended target species (EPA, 1993; EPA 2000).

By virtue of their habitat preference, a bottom-dwelling species such as the channel catfish may have a larger potential exposure to sediment-associated constituents that could be reflected in tissue concentrations (EPA, 2000).

A combination of several fish sampling methods will be employed to collect fish. These methods include electrofishing and trotlining. Electrofishing is an efficient capture method that can be used to obtain reliable information on species composition and fish abundance. It can also be used to sample areas unsuitable for other capture methods (i.e., dense vegetation, pilings, and rocky shorelines) (EPA, 1993 and Reynolds, 1996). Electrofishing will be conducted using a boat-mounted electrofishing unit. A generator-powered Coffelt Mark XX variable voltage pulsator electrofisher fitted with a boat



mounted anode, and a trailing stainless-steel cable cathode, with a potential output of 600 volts and 15 amps, will be used. Trotlines consisting of long, heavy cords with multiple baited hooks attached by sections of monofilament line are expected to be the most effective method for collecting catfish and will be deployed at the sampling locations. Other potential fish collection methods may include gillnets, hoop or fyke nets, or bag seines. However, due to concerns about bycatch (nontarget species) and excessive mortality associated with gillnets and, to a lesser extent, with hoop or fyke nets, preference will be given to active electrofishing and passive trotlining with frequent gear checks.

In order to collect data suitable for assessing the range of variability in fish tissue PFOA concentrations, samples will be prepared from individual fish specimens for analysis rather than composite samples from multiple specimens. Each fish retained for tissue analysis will be weighed to the nearest gram and total length will be measured to the nearest millimeter. Data will be recorded on a sample label and in the field logbooks. Both skin-on filet and whole body samples will be collected for analysis. Filet tissue samples are intended for use in the screening level exposure assessment and whole body samples are intended for comparison with previous data collected on whole body PFOA concentrations. Both filet tissue and whole body samples will be prepared in the field for shipment to the analytical laboratory. Additional information on the fish sample handling, field data collection, and preparation procedures will be provided in the fish sampling SOP contained in Appendix C.

At each of the 6 fish sampling locations, 10 samples of each species (largemouth bass and channel catfish) will be collected. Of these 10 samples per species, five will be prepared for filet tissue samples and five will be prepared for whole body samples. Consequently, a total of 120 fish samples will be collected for PFOA analyses. The PFOA analytical method for fish samples is contained in Appendix B.

### 5.6.2   Clam Sampling

Asiatic clams (*Corbicula fluminea*) will be collected from each of 6 fish sampling locations by a benthic sled or a petite ponar dredge. Because of variations in substrate in



the Tennessee River and habitat preferences of the Asiatic clam, sample locations may vary from those locations selected for sediment sampling. Additional information on clam sample collection is contained in Appendix C. Clam tissue samples will be prepared in the field to provide composite samples for PFOA analyses. It is expected that composite samples will consist of 10 or more clams. The PFOA analytical method for clam samples is contained in Appendix B. The intended use of the clam data is comparison with previous data collected on clam PFOA concentrations.

## 5.7    ADDITIONAL ASSESSMENT OF POSSIBLE ROUTES OF PFOA EXPOSURE

### 5.7.1  Off-Site Well Inventory

3M performed an off-site well inventory review during the early 1990's as part of the facility's RFI program and did not identify any potable water wells in a two (2) mile radius of the facility. It is anticipated that the residences, farms, businesses, and industrial entities are using the municipal water supply for potable and irrigation purposes rather than groundwater. In order to verify the findings of the 1990's survey an additional well inventory will be completed as part of the Phase 2 activities. The new well inventory will expand the radius under consideration to 5 miles. If this evaluation indicates that potable and irrigation water in the vicinity of the facility is solely obtained from the municipal water supply system, then human exposure to PFOA (i) through direct groundwater consumption by humans as potable water or (ii) through indirect groundwater consumption by humans as a result of irrigation uses both will be considered incomplete exposure pathways for purposes of the screening level exposure assessment

### 5.7.2  Decatur Municipal Water Supply

Because the Decatur municipal water system is the source of potable water to the site and the residents in the vicinity of the site, the potential PFOA levels in the water supply must be considered in the screening level exposure assessment for human receptors. In 2000, 3M conducted monitoring of the Decatur water supply system and based on that data, the



levels of PFOA in the City of Decatur drinking water were below detectable limits (< 25ng/L).

To verify this initial sampling data, six rounds of samples will be obtained from the Decatur municipal water supply for analysis of PFOA. These municipal water supply samples will be obtained on a bi-monthly frequency. The water samples will be analyzed in accordance with the PFOA analytical method contained in Appendix B.

### 5.7.3   Off-Site Waste Disposal Facilities

In order to evaluate the presence of PFOA associated with the past disposal of wastes at off-site waste disposal facilities, information will be obtained on the locations and descriptions of disposal facilities used, the types of 3M and Dyneon wastes disposed, and periods of use. In addition, information will be obtained on operating practices at landfills that are determined to have received wastes from 3M and/or Dyneon and the potential transport, migration, and exposure pathways associated with the facilities. Based on an evaluation of this information, 3M may propose conducting additional sampling in the vicinity of these disposal facilities, as part of Phase 3 of the PFOA environmental monitoring program. It must be noted that based on discussions with 3M personnel familiar with facility waste management, it appears that the Morgan County landfill, located about two miles from the site, was the primary off-site disposal facility and that a second landfill, the BFI landfill received lesser quantities. The leachate from the Morgan County landfill was sampled and analyzed for PFOA in 2000 and the results have been reported to the EPA Docket OPPT-2003-0012. The leachate is sent to the City of Decatur's wastewater treatment plant (WWTP) for treatment. The City of Decatur's WWTP, in turn, discharges its treated effluent upstream of the 3M Decatur site and sludge is disposed at the Morgan County Landfill . Therefore, any exposure to PFOA released via the Decatur WWTP effluent would be assessed using the Tennessee River data. A sample of the Decatur WWTP sludge and a sample of the final effluent will be collected as part of the Phase 2 sampling and analyzed for PFOA. In Phase 2, a sample of leachate will be collected from the Morgan County landfill and analyzed for PFOA for



comparison with the 2000 leachate data. The Decatur WWTP effluent sample and the Morgan County landfill leachate sample will be analyzed in accordance with the water analytical method contained in Appendix B. In addition, information obtained from the well inventory (see Subsection 5.7.1) will be evaluated to determine whether any potable wells are located within two miles of the Morgan County landfill.

3M also sent some wastes off-site to an incinerator and to a hazardous waste landfill. As part of the survey off-site waste disposal facilities, that will be conducted as described in the earlier part of this subsection, 3M will assess the potential exposure pathways associated with these two off-site disposal practices (i.e. incinerator and hazardous waste landfill). The results of this survey will be used to assess the need for additional sampling activities around these 2 facilities  as part of the Phase 3 program.

## 5.8    DEMOGRAPHIC DATA COLLECTION

Demographic data will be collected for the area surrounding the facility and, where appropriate, for the area(s) surrounding off-site waste disposal facilities. The demographic data will be used in the characterization of various factors that may affect the selection of those populations or subpopulations that may be exposed to PFOA. Examples of the type of data that will be collected include information on recreational angling in the Tennessee River and Bakers Creek from sources such as any creel or angler surveys performed in the area by the Alabama Department of Natural Conservation and Resources (DCNR) and any other documentation on the nature and extent of the recreational fishery.

## 5.9    SUMMARY OF DATA COLLECTION

Table 5-2 contains an overview of the data that will be collected as part of the enhancements to the Phase 1 data collection commitments under the LOI and the Phase 2 PFOA characterization program. Based on the results of the Phase 2 data collection, interpretation, and screening level exposure assessment, 3M will develop a Phase 3



program following a Peer Consultation Process, which includes public comment and input by and discussion with EPA.

## 5.10   PROJECT SCHEDULE

The anticipated schedule for major elements of the Phase 2 characterization program includes:

- Bilateral EPA/3M technical discussions, ongoing

- Final MOU and Work Plan, mid-August 2004

- Formal approval of MOU and Work Plan, mid to late September 2004

- Field work, analytical and final reports, July 2004 – April 2006

- Data Assessment Reports, October 2006

- Peer Consultation Process, November 2006 - 2007



## TABLE 5-2   OVERVIEW OF PHASE 1 AND 2 PFOA MONITORING

| | On-Site | | | Off-Site | | |
|---|---|---|---|---|---|---|
| **Phase 1** | **Media** | **# of Samples** | **Frequency** | **Tennessee River** | **# of Samples** | **Frequency** |
| | Effluent | 1 | Quarterly | Surface water | 5 | Biennially[1] |
| | Groundwater (8 wells) | 8 | Ongoing | Sediment | 5 | Biennially |
| | Air Modeling | N/A | Completed | Fish (2 species) | 3 locations | Biennially |
| **Phase 2** | Soils in vicinity of LOI wells | 40 | Once | **Tennessee River** | **Locations/ # of Samples** | **Frequency** |
| | Soils in former sludge incorporation area and at the NW control location | 140 | Once | Surface water | 18 | Once |
| | | | | Pore water | 12 | Once |
| | Vegetation in vicinity of soils | 27 | Once | Sediments | 30 | Once |
| | Small mammals (serum and liver) | 10 each | Once | Fish (2 species) whole fish and fillets | 120 total; 6 locations[2] | Once |
| | Surface Water | 2 | Once | Lower Order Species (clams/mussels) | 6 composites total; 6 locations[2] | Once |
| | Sediments | 6 | Once | Well survey | 5 mile radius | Once |
| | Groundwater - (8 sets of 3 wells in sludge incorporation area) | 24 | Once | Decatur Water Supply | 6 | Bimonthy |
| | Hydrogeologic assessment in vicinity of wildlife habitat/sludge incorporation area | N/A | Once | Waste Disposal Survey - Landfill leachate and WWTP, and effluent sludge | 1 sample each | Once |
| | | | | Additional soils and groundwater samples | To be determined | Once |

[1] Every 2 years - next scheduled sampling is in 2004 and will be incorporated into the Phase 2 program.

[2] This represents sampling in 3 additional locations form the LOI commitment.



# 6. DOCUMENTATION AND REPORTING

PFOA concentration data for the environmental media samples will be validated and maintained in an electronic database. Interim submissions of raw data, including field logs, field measurements, analytical records, and results of QA/QC samples will be submitted to EPA in accordance with the requirements of the MOU. All data that has received final QA/QC checks will be submitted quarterly with that quarter's status reports. To the extent feasible, data will be repeated in consistent units within each of the media. For example, groundwater, surface water, and pore water PFOA concentrations will be reported in nanograms per liter (ng/L). In some cases, different units or a different weight basis will be necessary. For instance, while soil concentrations will be reported on a dry weight basis, vegetation sample results will be reported on a wet weight basis. A Data Assessment Report will be prepared summarizing the methodology and findings of the Phase 2 investigation including robust summaries of the results of all soil, groundwater, vegetation, sediment, surface water and biota sampling. Sampling points will be located on site maps based on surveyed coordinates. Stratigraphic logs will be prepared for the soil borings and well completion reports for new groundwater wells. Sampling methodology will be summarized along with QA/QC results.

The report will compile the analytical results, present conclusions regarding PFOA concentrations and possible migration pathways, and identify any data needs that require additional investigation (onsite and off-site). The report will also include photographs of the investigation areas. Lastly, all laboratory analytical reports will be included in one of the appendices of the Data Assessment Report.

The Phase 2 data reported in the Data Assessment Report will be used in the preparation of a Screening Level Exposure Assessment that will be performed in accordance with the procedures contained in *Guidelines for Exposure Assessment* (EPA, 1992). Finally, a Future Data Needs Assessment will be prepared that identifies future data and an outline of a Work Plan for performing a Phase 3 investigations. The future data needs assessment will be a scientifically-based analysis of whether the data collected in the Phase 1 and



Phase 2 investigations and the screening level exposure assessment are sufficient to answer the charge stated in Section 1 of this Work Plan and the MOU.

The Data Assessment Report, Screening Level Exposure Assessment, and Future Data Needs Assessment Report will be submitted to the Peer Consultation Panel, in accordance with the procedures spelled out in the MOU between 3M and EPA.



# 7. REFERENCES

3M. 2003. Letter to S. Johnson (OPPT) Re: Environmental Health and Safety Measures Relating to Perfluorooctanoic Acid and Its Salts (PFOA). 13 March 2003. St. Paul, Minnesota.

Entrix. 2001. *Selected Fluorochemicals in the Decatur, Alabama Area*. June, 2001. Docket ID AR226-1109. June 2001. East Lansing, Michigan.

Entrix. 2003. *A Survey of Selected Fluorochemicals in the Decatur, Alabama Area 2002 Sampling*. July 2003. East Lansing, Michigan.

EPA, 2003a. *Preliminary Framework for Enforceable Consent Agreement Data Development for PFOA and Telomers*. May 20, 2003. EPA, Office of Pollution Prevention and Toxics (OPPT). Washington, D.C.

EPA, 2003b. *Item 10: Monitoring Fluoropolymers, EPA Data Needs.* Draft September 21, 2003. EPA, Office of Pollution Prevention and Toxics (OPPT). Washington, D.C.

EPA, 2003c. *Fluoropolymers in the Environment: EPA's Current Understanding of Sources and Pathways, A "Road Map" for a Path Forward.* EPA, Office of Pollution Prevention and Toxics (OPPT). Washington, D.C.

EPA. 2000. *Guidance for Assessing Chemical Contaminant Data for Use in Fish Advisories, Volume I, Fish Sampling and Analysis*. Third Addition. EPA. Office of Water. Washington, District of Columbia.

EPA. 1993. *Fish Field and Laboratory Methods for Evaluating the Biological Integrity of Surface Waters,* EPA, Environmental Monitoring Systems Laboratory, Cincinnati, OH.

EPA. 1992. *Guidelines for Exposure Assessment*. EPA. Risk Assessment Forum. EPA/600/Z-92/001. Washington, District of Columbia.



Reynolds. J.B. 1996. Electrofishing. Pages 221-254 in B.R. Murphy and D.W. Willis editors. Fisheries Techniques, Second Edition. American Fisheries Society. Bethesda, MD.

Whitaker, Jr., S. O. and W. J. Hamilton, Jr. 1998. Mammals of the Eastern United States. Third Edition. Cornell University Press. Ithaca, New York.

**PHASE 2 WORK PLAN FOR**

**SAMPLING ENVIRONMENTAL MEDIA FOR PFOA AT THE
3M DECATUR, AL PLANT**

**VOLUME 2 OF 3
APPENDIX A – HEALTH AND SAFETY PLAN**

**AUGUST 2004**

Prepared for

**3M COMPANY
ST. PAUL, MN  55133**

Prepared by

**WESTON SOLUTIONS, INC.
West Chester, Pennsylvania 19380**

W.O. NO. 02181.129.081.0001



**APPENDIX A**

**HEALTH AND SAFETY PLAN (HASP)**

# TABLE OF CONTENTS

**SECTION**                                                                                          **PAGE**

**SECTION 1    INTRODUCTION**.................................................................................... **1-1**

    1.1    SCOPE OF WORK................................................................................ 1-1

    1.2    SITE DESCRIPTION AND BACKGROUND ................................................ 1-2

**SECTION 2    STAFF ORGANIZATION, QUALIFICATIONS, AND
RESPONSIBILITIES**........................................................ **2-1**

    2.1    3M PROJECT DIRECTOR ..................................................................... 2-1

    2.2    3M FIELD MANAGER .......................................................................... 2-1

    2.3    WESTON PROJECT MANAGER ............................................................. 2-1

    2.4    FIELD TEAM MANAGER/PROJECT HEALTH AND SAFETY MANAGER 2-2

    2.5    FIELD TEAM LEADER/SITE HEALTH AND SAFETY COORDINATOR ... 2-2

    2.6    WESTON FIELD CHARACTERIZATION TEAM ......................................... 2-3

**SECTION 3    HAZARD ASSESSMENT AND RISK ANALYSIS** ...................................... **3-1**

    3.1    SITE PREPARATION/MOBILIZATION ....................................................... 3-1

    3.2    SOIL SAMPLING AND MONITOR WELL DRILLING/INSTALLATION .... 3-6

    3.3    WATER SAMPLING ............................................................................ 3-10

    3.4    SEDIMENT SAMPLING ....................................................................... 3-11

    3.5    SMALL MAMMAL SAMPLING ............................................................ 3-11

    3.6    FISH SAMPLING ............................................................................... 3-14

    3.7    ADDITIONAL FIELD OPERATING PROCEDURES.................................... 3-17

**SECTION 4    ACCIDENT PREVENTION PLAN**.......................................................... **4-1**

    4.1    RESPONSIBILITIES ............................................................................. 4-1

    4.2    LOCAL REQUIREMENTS ...................................................................... 4-2

    4.3    WESTON SUBCONTRACTOR CONTROL ................................................ 4-2

    4.4    TEMPORARY FACILITIES..................................................................... 4-3

    4.5    TRAINING ......................................................................................... 4-3

    4.6    TRAFFIC CONTROL ............................................................................ 4-3

    4.7    MAINTENANCE/SITE HOUSEKEEPING ................................................. 4-3

    4.8    EMERGENCIES................................................................................... 4-3

    4.9    JOB SITE INSPECTION........................................................................ 4-4

# TABLE OF CONTENTS

## (Continued)

**Section**                                                                                                                **Page**

| | | |
|---|---|---|
| 4.10 | ACCIDENT INVESTIGATION | 4-4 |
| 4.11 | TEMPORARY POWER SYSTEMS | 4-4 |
| 4.12 | SAFE CLEARANCE PROCEDURES (LOCK-OUT/TAG-OUT) | 4-5 |
| 4.13 | OFFICE TRAILER ANCHORING SYSTEM | 4-5 |
| 4.14 | WEATHER-RELATED CONTINGENCY PLAN | 4-6 |
| 4.15 | ACTIVITY HAZARDS ANALYSIS | 4-6 |
| 4.16 | HAZARD COMMUNICATION | 4-6 |
| **SECTION 5** | **TRAINING** | **5-1** |
| 5.1 | PREASSIGNMENT TRAINING | 5-1 |
| | 5.1.1 Off-Site Training | 5-1 |
| | 5.1.2 Site-Specific Training | 5-2 |
| 5.2 | PERIODIC TRAINING | 5-2 |
| 5.3 | VISITORS | 5-2 |
| **SECTION 6** | **PERSONAL PROTECTIVE EQUIPMENT** | **6-1** |
| 6.1 | REQUIRED LEVELS OF PROTECTION AND ACTION LEVELS | 6-1 |
| 6.2 | PROTECTIVE EQUIPMENT | 6-4 |
| 6.3 | WORK PRACTICES | 6-4 |
| 6.4 | SAFETY MEETINGS | 6-5 |
| 6.5 | RESPIRATORY FIT TESTING | 6-5 |
| 6.6 | MODIFICATIONS TO LOPs | 6-5 |
| **SECTION 7** | **MEDICAL SURVEILLANCE** | **7-1** |
| **SECTION 8** | **AIR MONITORING** | **7-1** |
| 8.1 | DIRECT-READING INSTRUMENT MEASUREMENTS | 8-1 |
| **SECTION 9** | **SITE CONTROL** | **9-1** |
| **SECTION 10** | **PERSONNEL AND EQUIPMENT DECONTAMINATION** | **10-1** |
| 10.1 | PERSONNEL PROCEDURES | 10-1 |
| | 10.1.1 Level C Personnel Decontamination | 10-1 |
| | 10.1.2 Level D and Modified Level D Personnel Decontamination | 10-1 |

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

# TABLE OF CONTENTS

## (Continued)

**Section**                                                                 **Page**

10.2     EQUIPMENT DECONTAMINATION ............................................................ 10-1

10.3     SAMPLE CONTAINER DECONTAMINATION .......................................... 10-2

**SECTION 11 FIRST AID AND EMERGENCY RESPONSE EQUIPMENT AND
PROCEDURES ....................................................................................... 11-1**

11.1     EMERGENCY TELEPHONE NUMBERS ................................................. 11-1

11.2     ROUTE TO HOSPITAL.............................................................................. 11-1

11.3     EMERGENCY RESPONSE PLAN ............................................................ 11-2

    11.3.1     Pre-Emergency Planning and Coordination with Outside Parties ...... 11-2

    11.3.2     Personnel Roles, Lines of Authority, and Communication ............... 11-2

    11.3.3     Emergency Recognition and Prevention............................................. 11-3

    11.3.4     Safe Distances and Places of Refuge ................................................. 11-3

    11.3.5     Site Security and Control ................................................................... 11-3

    11.3.6     Evacuation Routes and Procedures .................................................... 11-3

    11.3.7     Decontamination Procedures .............................................................. 11-4

    11.3.8     Emergency Medical Treatment and First Aid..................................... 11-4

    11.3.9     Emergency Alerting and Response Procedures .................................. 11-4

    11.3.10    Critique of Response and Followup.................................................... 11-4

**SECTION 12 STANDARD OPERATING PROCEDURES, ENGINEERING
CONTROLS, AND WORK PRACTICES .................................................... 12-1**

12.1     BUDDY SYSTEM....................................................................................... 12-1

12.2     EATING, DRINKING, AND SMOKING PRECAUTIONS ........................... 12-1

12.3     IGNITION SOURCES................................................................................. 12-1

12.4     EXPLOSIVE ATMOSPHERES ................................................................. 12-2

12.5     EYEWASH .................................................................................................. 12-2

12.6     FIRE EXTINGUISHERS ............................................................................ 12-2

12.7     WATER AND SANITATION....................................................................... 12-2

12.8     ROUTINE SAFETY INSPECTIONS ......................................................... 12-3

12.9     CONTROL OF MINOR SPILLS ................................................................ 12-3

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

# TABLE OF CONTENTS

## (Continued)

**Section**        **Page**

**SECTION 13 LOGS, REPORTS, AND RECORDKEEPING** ............................................. **13-1**

    13.1    HEALTH AND SAFETY LOGBOOK ........................................... 13-1

    13.2    MEDICAL MONITORING ..................................................... 13-1

    13.3    VISITOR LOG ........................................................................ 13-1

    13.4    INCIDENT REPORTS ............................................................. 13-1

    13.5    3M ACCESS .......................................................................... 13-2

## ATTACHMENTS

**ATTACHMENT 1—CHEMICAL HAZARD DATA SHEETS**

**ATTACHMENT 2—OPERATING PROCEDURES (WESTON FIELD OPERATING PROCEDURES)**

**ATTACHMENT 3—HEALTH AND SAFETY CHECKLISTS**

**ATTACHMENT 4—SITE-SPECIFIC CONTRACTOR SAFETY REQUIREMENTS**

**ATTACHMENT 5 – CDC SMALL MAMMAL TRAPPING GUIDELINES**

**ATTACHMENT 6—3M DECATUR RCRA EMERGENCY/CONTINGENCY PLAN**

**ATTACHMENT 7—INCIDENT REPORTING FORM**

**ATTACHMENT 8—LEVELS OF PROTECTION**

**ATTACHMENT 9—MAP SHOWING ROUTE TO HOSPITAL**

## LIST OF FIGURES

**Title**                                                                 **Page**

Figure 1-1    Vicinity Map, Phase 2 Characterization Program, 3M Decatur Facility, Decatur, Alabama ........................................................................................ 1-4

Figure 1-2    Former Sludge Incorporation Area, 3M Decatur Facility, Decatur, Alabama .... 1-5

Figure 2-1    Project Organization Chart .................................................................... 2-4

## LIST OF TABLES

**Title**                                                                 **Page**

Table 3-1    Properties of Potential Environmental Contaminants........................................ 3-18

Table 3-2    Level of Protection and Monitoring by Task and Contaminant Type ............... 3-23

Table 3-3    LOI Monitoring Wells ................................................................................. 3-24

Table 6-1    Action Levels, .............................................................................................. 6-7

Table 11-1    Emergency Telephone Numbers....................................................................... 11-5

# LIST OF ACRONYMS

| | |
|---|---|
| 3M | Minnesota Mining and Manufacturing Company |
| AIHA | American Industrial Hygiene Association |
| AL | action level |
| ANSI | American National Standards Institute |
| bgs | below ground surface |
| BTEX | benzene, toluene, ethylbenzene, xylene |
| COC | chain-of-custody |
| dB | decibel |
| EPA | U.S. Environmental Protection Agency |
| ERP | Emergency Response Plan |
| eV | electron volt |
| EZ | exclusion zone |
| FLDs | Field Operating Procedures |
| GFCIs | ground fault circuit interrupters |
| HASP | Health and Safety Plan |
| HMTA | Hazardous Materials Transportation Act |
| IPE | isopropyl ether |
| IP | ionization potential |
| LEL | lower explosive limit |
| LOP | level of protection |
| MEK | butanone |
| MIBK | 4-methyl-2-pentanone |
| MiniRAM® | Miniature Real-Time Aerosol Monitor |
| MOU | Memorandum of Understanding |
| MSDS | Material Safety Data Sheet |
| NIOSH | National Institute for Occupational Safety and Health |
| OSWER | Office of Solid Waste and Emergency Response |
| OVM | direct-reading instrument |
| PEL | permissible exposure limit |
| PFOA | Perfluorooctanoic acid |
| PID | portable photoionization detector |
| PPE | personal protective equipment |
| RCRA | Resource Conservation and Recovery Act |
| SCBA | self-contained breathing apparatus |

## LIST OF ACRONYMS (Continued)

SHSC                    Site Health and Safety Coordinator

SI                      site investigation

SZ                      support zone

TWA                     time-weighted average

UL                      Underwriters Laboratories

V                       volts

VOCs                    volatile organic compounds

WESTON®                 Weston Solutions, Inc.

**SECTION 1**

**INTRODUCTION**

## 1.1  SCOPE OF WORK

This site-specific Health and Safety Plan (HASP) defines the safety and health requirements necessary to perform investigation activities, including sampling of various media, associated with the Phase 2 Perfluorooctanoic Acid (PFOA) Characterization Program at the 3M Company (3M) Decatur facility located in Decatur, Alabama. This HASP presents the minimum requirements for health and safety that must be met by site personnel engaged in site operations. This HASP does not in any way relieve site personnel, contractors, or subcontractors from responsibility for the health and safety of their personnel. Contractors will be required to review site conditions and work to be performed to determine specific health and safety requirements for their personnel. Any visitors to the site will be required to comply with the approved HASP to gain entry into work sites.

This HASP has been prepared by the Supervising Contractor, Weston Solutions, Inc. (WESTON®), on behalf of 3M. This HASP was written to be consistent with all applicable federal, state, and local health and safety requirements. Specific references consulted in assembling this HASP include the following:

- 29 Code of Federal Regulations (CFR) 1910 and 1926 (Occupational Safety and Health Administration [OSHA] General Industry and Construction Standards, respectively).

- National Institute for Occupational Safety and Health (NIOSH) Occupational Safety and Health Guidance Manual for Hazardous Waste Site Activities, 1985.

- 40 CFR 260-270 (U.S. Environmental Protection Agency [EPA] Solid Waste Standard).

- EPA Standard Operating Safety Guides, Office of Solid Waste and Emergency Response (OSWER), June 1992.

- 3M Decatur Plant Site RCRA Emergency Plan, January 1988.

- 3M Decatur Plant Contractor Safety Requirements, December 1996.

- Applicable state and local regulations.

- Weston Solutions, Inc. (WESTON®) Corporate Health and Safety Program.

Table 1-1 presents a summary of the tasks to be completed during the site investigations. This HASP specifically covers the tasks presented in Table 1-1 as described in detail in the *Phase 2 Work Plan for Sampling Environmental Media (Phase 2 Work Plan)*.

## 1.2  SITE DESCRIPTION AND BACKGROUND

3M owns and operates a major specialty chemical and polymer film manufacturing facility in the vicinity of Decatur, AL. The location of the facility is shown on the map included as Figure 1-1. 3M is entering into a Memorandum of Understanding (MOU) with the U.S. Environmental Protection Agency (EPA) and other interested parties to conduct a PFOA characterization program at its Decatur facility. Under this MOU, 3M will perform field sampling of various environmental media including soils, groundwater, sediment, surface water and biota at and in the vicinity of its Decatur facility. As part of this ongoing evaluation, 3M retained WESTON to perform the PFOA Characterization Program at the facility.

This HASP covers the activities to be performed under the Phase 2 Work Plan. The HASP defines the hazards, and methods to protect personnel from these hazards, as identified during previous site work or in background information.

The categories of suspected and specific chemicals and materials identified from a review of available historical information and the results of the Resource Conservation and Recovery Act (RCRA) Facility investigation (RFI, Weston 2003) are as follows:

- Perfluorooctanoic acid  (PFOA)

- Chlorinated solvents: 1,1-DCE, 1,1,1-TCA, 1,1-DCA, 1,2-DCA, chloroform, methylene chloride, chloroethane and vinyl chloride.

- Volatile organic compounds (VOCs): acetone, isopropyl ether (IPE), 4-methyl-2-pentanone (MIBK), 2-butanone (MEK), and benzene, toluene, ethylbenzene, xylene (BTEX).

- Inorganic compounds or metals: arsenic, chromium, cadmium, lead, and mercury.

Additional information regarding the potential hazards associated with, as well as examples of known concentrations of, these contaminants of potential concern is presented in Section 3 of this HASP.

In the preparation of this HASP, the assumption was made that the chemicals identified in the previous sampling efforts are representative of the contaminants present at the locations north of the railroad track (see Figure 1-2) that will be investigated at the facility. Not all of the contaminants are expected to be present at every location to be investigated, as discussed in Section 3. Attachment 1 of this HASP provides Chemical Hazard Data Sheets for contaminants of concern at the investigation study sites associated with the PFOA characterization program.

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

**Figure 1-1    Vicinity Map, Phase 2 Characterization Program, 3M Decatur Facility, Decatur, Alabama**



1-4



LEGEND

■ Monitor well
  Sampled 3/28/01

■ Monitor well
  Sampled 7/16/03

■ Monitor well
  Sampled 3/28/01 and 7/16/03

Former Sludge
Incorporation
Area

BAKER'S CREEK

HWY 20/72

N

700    0    700    1400   Feet

3M Decatur Site
Morgan County, Alabama

FORMER SLUDGE
INCORPORATION
AREA

## SECTION 2

## STAFF ORGANIZATION, QUALIFICATIONS, AND RESPONSIBILITIES

Personnel must be aware of the staff organization, and the responsibilities and qualifications of each organization member. Figure 2-1 presents a diagram of the staff organization for the Phase 2 characterization program activities at the 3M Decatur, AL facility. The organizational structure will be reviewed and updated periodically by the Project Manager. The general health and safety responsibilities of key Phase 2 characterization program team members are discussed in the following subsections.

All personnel must have the necessary qualifications consisting of sufficient knowledge gained through experience and training to effectively execute the duties of their position. Specific training requirements are discussed in Section 5 of this HASP.

### 2.1  3M PROJECT DIRECTOR

At the top of the site organizational structure is the 3M Project Director, Mr. Michael Santoro. The 3M Project Director is the primary off-site contact. The responsibilities of the 3M Project Director include defining project objectives, allocating resources, determining the chain of command, evaluating the program outcome, and ultimate responsibility for implementation of the site health and safety program.

### 2.2  3M FIELD MANAGER

The 3M Field Manager, Mr. Phillip Wirey, will be the primary contact for all on-site activities. The 3M Field Manager will be responsible for coordinating clearance for all field activities as detailed throughout this HASP.

### 2.3  WESTON PROJECT MANAGER

The WESTON Project Manager, Mr. Jaisimha Kesari, P.E., DEE, is the primary contact for the WESTON Field Team Manager and the 3M Project Manager. The WESTON Project Manager is responsible for ensuring that all field personnel have the necessary qualifications and perform

2-1

their work in conformance with the HASP, reviewing field reports, and interfacing with the project team regarding resolution of health and safety problems or concerns.

## 2.4  FIELD TEAM MANAGER/PROJECT HEALTH AND SAFETY MANAGER

The WESTON Field Team Manager/Health and Safety Manager, Mr. Timothy Frinak, P.G., CHMM, has the highest level of contractor authority on-site. The Field Team Manager/Health and Safety Manager is responsible for reporting to the WESTON Project Manager, directing response operations, controlling site activities, and acting as the authority behind implementation of the site health and safety program. Mr. Frinak will participate in the 3M Decatur facility-required 4-hour on-site safety course (and yearly review, if required).

Mr. Frinak will be responsible for review and approval of the provisions of the HASP and any amendments that may become necessary. The Project Health and Safety Manager will also be responsible for the following tasks:

- Conduct project safety audits on a routine basis (at least quarterly).

- Review monitoring results and accident reports, as necessary.

- Report problems or concerns regarding project safety.

- Interpret the monitoring/sampling data required to upgrade or downgrade personal protective measures.

- Provide health and safety consultation as needed.

## 2.5  FIELD TEAM LEADER/SITE HEALTH AND SAFETY COORDINATOR

The Field Team Leader/Site Health and Safety Coordinator (SHSC) reports directly to the Field Team Manager and is responsible for implementing the health and safety program in the field. The SHSC will be determined on a task-specific basis. The SHSC directly advises the Field Team Manager on all aspects of health and safety on-site and advises the Field Team Manager to cease or change operations in the event that worker or public health or safety is threatened.

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

**2.6  WESTON FIELD CHARACTERIZATION TEAM**

The WESTON field characterization team is responsible for completing on-site tasks and for complying with all aspects of the site health and safety program.

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

**Figure 2-1 Project Organization Chart**



SHSC - Site Health and Safety Coordinator
TBD - To Be Determined

04P-0493-1

MK01\K:\1645\SHARED\3M\DECATUR\FC\WORK PLAN FILE - 8-25-04\APP A HASP\HASP_ALL_REV.DOC                    8/25/2004

**SECTION 3**

**HAZARD ASSESSMENT AND RISK ANALYSIS**

Personnel will be made aware of any chemical, physical, and biological hazards of concern associated with each task as provided in Table 5-1 of the Phase 2 Work Plan. The potential hazards of each task are discussed in the following subsections. Protective measures and proper personal protective equipment (PPE) are discussed in later sections of this HASP. WESTON's Field Operating Procedures (FLDs) are presented in Attachment 2 to provide greater detail. Specific FLDs related to specific tasks are referenced in the following subsections where applicable. The complete HASP will be maintained on-site at all times for reference. A summary health and safety checklist is included in Attachment 3.

The principal chemicals of concern were initially presented in Section 1. Table 3-1 presents their chemical and toxicological properties, as well as known concentrations detected during previous activities conducted at the Decatur facility. Protection from these substances will be accomplished by following the health and safety procedures outlined herein.

The following subsections address the specific hazards and risks associated with each task to be performed as part of the Phase 2 characterization program at the 3M Decatur facility.

## 3.1  SITE PREPARATION/MOBILIZATION

Prior to initiating Phase 2 characterization program activities, the following site preparations will be completed:

- "3M Daily Work Permit" will be obtained in accordance with 3M's Contractor Safety Requirements (Attachment 4).

- Work areas will be cleared of brush, if necessary.

- Traffic control patterns to work areas will be developed, if necessary.

- Site control zones will be established.

- Utility clearances will be obtained.

Potential hazards associated with the PFOA Characterization Program site preparation activities (such as clearing and grubbing and establishment of temporary roadways) include physical hazards such as:

- FLD 01  Noise Protection
- FLD 02  Inclement Weather
- FLD 05  Heat Stress Prevention and Monitoring
- FLD 06  Cold Stress
- FLD 07  Wet Feet
- FLD 09  Hot Work
- FLD 10  Manual Lifting and Handling of Heavy Objects
- FLD 11  Rough Terrain
- FLD 12  Housekeeping
- FLD 14  Site Security
- FLD 15  Remote Areas
- FLD 19  Working Over or Near Water
- FLD 20  Traffic
- FLD 22  Heavy Equipment Operation
- FLD 29  Materials Handling
- FLD 30  Hazardous Materials Use and Storage
- FLD 31  Fire Prevention/ Protection/Response Plans
- FLD 32  Fire Extinguishers Required and Requirements
- FLD 34  Utilities
- FLD 35  Electrical Safety
- FLD 38  Hand and Power Hand Tools
- FLD 41  Hand and Emergency Signals
- FLD 43  Biological Hazards
- FLD 47  Clearing, Grubbing and Logging Operations

To ensure that underground and overhead utilities are not disturbed or are protected from PFOA characterization task-related activities, utilities clearance will be conducted at each site prior to intrusive activities according to 3M's Contractor Safety Requirements (Attachment 4) as well as state requirements and FLD 34. All personnel will practice proper electrical safety according to FLD 35.

The 3M plant staff will verify utility locations and ensure compliance with facility-specific procedures. Sample locations will be moved from any potential utilities identified by 3M during the utility clearance procedure. Extreme caution will be taken if piping, utility lines, or other

subsurface structures are exposed during intrusive activities. If necessary, cribbing or other measures will be used to support utilities if exposed during test pit excavations/soil sampling.

Equipment that will be mobilized to the site to complete the sampling tasks includes the following:

- Heavy equipment (drill rig, backhoe, trackhoe, etc.).
- Pumps and hoses.
- Pressure-washing equipment.
- Field monitoring and sampling instruments.
- Small power and handtools.

Potential hazards associated with the PFOA characterization activities, as identified in Table 5-1 of the Phase 2 Work Plan, include physical hazards such as:

- FLD 01  Occupational Noise and Hearing Conservation
- FLD 02  Inclement Weather
- FLD 05  Heat Stress Prevention and Monitoring
- FLD 06  Cold Stress
- FLD 07  Wet Feet
- FLD 10  Manual Lifting and Handling of Heavy Objects
- FLD 11  Rough Terrain
- FLD 12  Housekeeping
- FLD 13 Structural Integrity
- FLD 14  Site Security
- FLD 15  Remote Areas
- FLD 18  Operation and Use of Boats
- FLD 19  Working Over or Near Water
- FLD 20  Traffic
- FLD 22 Heavy Equipment Operator
- FLD 28 Excavating/Trenching

- FLD 29  Materials Handling
- FLD 30  Hazardous Materials Use and Storage
- FLD 31  Fire Prevention/ Protection/Response Plans
- FLD 32  Fire Extinguishers Required and Requirements
- FLD 34  Utilities
- FLD 35  Electrical Safety
- FLD 37  Pressure Washers
- FLD 38  Hand and Power Hand Tools
- FLD 41  Hand and Emergency Signals
- FLD 42  Lockout/Tagout
- FLD 43  Biological Hazards
- FLD 44  Biological Hazards - Bloodborne Pathogens Exposure Control Plan - First Aid Providers
- FLD 46  Control of Exposure to Lead

- FLD 47 Clearing, Grubbing and Logging Operation
- FLD 48 OSHA Inspections
- FLD 49 Safe Storage of Samples

Traffic presents a primary hazard during the mobilization of equipment and investigation activities in two ways:

1.    When site workers are working close to roadways, the potential exists to be struck by oncoming traffic.

2.    Driving to, from, and on the site.

Site-specific motor vehicle and equipment requirements are presented in the 3M contractor safety requirements contained in Attachment 4. In addition, WESTON's traffic safety guidelines are provided in FLD 20. The following procedures will be implemented for investigation activities near busy roadways:

- Workers in the proximity of active roadways will be reminded each day to be aware of their location in reference to roadways and to avoid working close to traffic.

- Workers near active roadways must wear reflective vests.

- 3M plant security personnel must be consulted in order to comply with applicable requirements.

- Workers must be aware of the danger related to the vehicles that are routinely on active roadways at the facility.

- Flag persons may be required to control the speed of nearby traffic. Barricading is extended to the point where it is visible to approaching traffic. If needed, flag persons will be WESTON personnel who are familiar with 3M Decatur traffic patterns.

- Drivers are required to inspect their vehicles daily. The check will include steering, brakes, mirrors, lights, horn, tires, and windshield wipers. Any special safety items, such as backup alarms and kill switches, will also be checked to ensure safe operation. Drivers will be required to report all defects, and repairs will be made promptly.

Extra precautions will be taken when driving vehicles under off-highway conditions to prevent shifting of loads when crossing rough terrain (FLD 11). In addition:

- Trucks must be reversed under the direction of a signal person, if the operator cannot clearly view the area to the rear.

- Windshields, rear-view mirrors, and lights will be kept clean.

- The Site Health and Safety Coordinator (SHSC) will ensure that seatbelts are installed and functional on all vehicles used by WESTON personnel and WESTON subcontractors, and that all passengers use them.

- Personnel are not allowed to ride on the outside or back (i.e., pickup trucks) of vehicles. The number of passengers will be limited to the number of seatbelts in the vehicle.

- Operators will immediately report any damage or failure of parts and accessories to the Site Health and Safety Coordinator. It is advantageous to have a fire extinguisher, first-aid kit, and road flares on the vehicle at all times.

- Control areas will be established where noise levels may exceed 85 decibels (dB). Based on past experience, this may apply to operators of backhoes and personnel at drilling operations. Individuals entering the control areas will be required to wear hearing protection with a sufficient noise reduction rating. Based on past experience, a minimum protection of earplugs will be sufficient for WESTON's field activities at the Decatur facility.

Hazardous and nonhazardous materials brought on-site will be controlled and stored in accordance with 3M and OSHA requirements. This includes the following:

- Materials must be stacked and stored to prevent sliding or collapse.

- Flammables and oxidizers must be stored in separate nonsmoking areas and flammable gases must be stored away from combustible materials.

- Personnel are prohibited from riding on the outside of material-handling equipment.

- Flammable liquids must be stored in approved containers in flammable storage cabinets or storerooms, or 25 feet from any other storage or office area or any ignition source.

- As a minimum, a 20-pound fire extinguisher, appropriate for the type of fire that could occur, must be within 50 feet of any accumulation of 5 gallons or more of flammable liquids or gases.

Material Safety Data Sheets (MSDSs) will be maintained on-site for each of the substances used during the Phase 2 characterization program. Additional hazardous material handling and storage

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

measures are provided in FLD 30. Because work area preparation may include the use of power tools such as drills or saws, FLD 38 (Hand and Power Handtools) and FLD 35 (Electrical Safety) are included in Attachment 2 for guidance. All extension cords will be grounded with internal ground fault circuit interrupters (GFCIs), if not provided at the panel. Safety guidelines provided in the manufacturer's specifications will be implemented for each power tool.

## 3.2  SOIL SAMPLING AND MONITOR WELL DRILLING/INSTALLATION

Soil sampling activities will consist of surface soil sampling, sediment/drainageway soil sampling, and/or soil boring, as outlined in Table 5-1 of the Phase 2 Work Plan.

To ensure that the project team is protected from exposure to area contaminants (chemical stressors), the proper PPE will be worn by each individual, and air monitoring (dependent on the type of contaminants of concern for the area) will be conducted for this and all tasks as directed in Table 3-2. As indicated, protocols for upgrading PPE and air monitoring strategies are discussed in Sections 6 and 8, respectively.

Typically, upgrades in PPE are based on airborne concentrations of work area contaminants as compared to background conditions. Several investigatory and characterization activities have been conducted in the north portion of the facility in the vicinity of the LOI wells (as shown on Figure 1-2), during which extensive air monitoring and soil and groundwater sampling have been performed.  These activities included soil boring and well installations (intrusive activities) similar to those to be conducted during the Phase 2 characterization program.  Based upon air monitoring and sample results from these previous activities conducted in the vicinity of the LOI wells, as provide in Table 3-1, modified Level D will be the level of protection required for the intrusive Phase 2 characterization activities.

Intrusive activities to be performed in the southern, or upgradient, portion of the site associated with the Phase 2 characterization program are not expected to encounter VOC contaminated soils. Therefore, these activities will be initiated without air monitoring. Upon indication (visual or olfactory) that a VOC may exist in the area, activities will be suspended until proper air monitoring equipment is obtained and the area is screened and assessed.  If necessary, air

monitoring will continue to be conducted during intrusive activities performed in the southern portion of the site.

Potential hazards associated with soil sampling include the following:

- Toxicity hazards associated with inhalation, dermal, ocular, and ingestion exposure to contaminants, and to potentially contaminated decontamination washwater during decontamination activities. Personal protective measures and air monitoring will be implemented (see Sections 6 and 8).

- Physical and safety hazards such as noise, impact, crushing, laceration, and abrasion associated with excavation, inclement weather, heat/cold stress, wet feet, falling materials, improper lifting, slip/fall hazards, rough terrain, remote areas, vehicular traffic, heavy equipment operation, structural integrity of excavation, boring and drilling operations, inadvertent contact with underground utilities, and pressure washing during decontamination (FLDs 01, 02, 05, 06, 07, 10, 11, 13, 15, 20, 22, 28, 34, 37, 41, and 47).

- Biological hazards such as disease-vectoring insects, animals (i.e., poisonous snakes), and poisonous plants (FLD 43).

Prior to initiating boring, or drilling operations, health and safety guidance procedures will be obtained from the subcontractor(s). Based on the information obtained from the subcontractor, task-specific training will be provided to each individual by the Project Health and Safety Manager and the Site Health and Safety Coordinator. The training will include the following:

- Anticipated and potential hazards.
- Inspection procedures.
- Operating procedures.
- Health and safety protection protocols.
- Shutdown procedures.

To ensure underground and overhead utilities are not disturbed or are protected from soil boring or monitoring well installation, a utilities search will be conducted (FLD 34). The 3M Field Manager will be contacted to verify utility locations and ensure compliance with facility-specific procedures. Soil boring or monitoring well locations will be moved if utilities are identified during the utility clearance. A distance of at least 20 feet, or the height of the boom, whichever is greater, will be maintained from any overhead power line. In the event that an overhead or underground utility is contacted or ruptured, personnel will leave the work area and proceed to a

predetermined gathering point. No attempt will be made to shut down or remove equipment from the work area. After everyone has been evacuated to a safe distance, the 3M Field Manager, the 3M Project Director, and the WESTON Project Manager will be contacted to mitigate the situation.

Soil boring sampling will be completed using a Geoprobe or drill rig. Monitor well installation and drill rig activities will be completed while collecting continuous split-spoon soil samples. All soil borings will be properly abandoned upon completion of the soil sampling. During well installation, a diverter will be used to keep the breathing zone/immediate work area clear of mud, liquids, and vapors, which could contain VOCs. Based on past experience at the site, this method has allowed work to continue in Level D/Modified Level D PPE for monitor well installations performed by WESTON to date.

The Site Health and Safety Coordinator or a member of the drilling crew will inspect the drill rig at least daily for structural damage, loose nuts and bolts, proper tension in chain drives, loose or missing guards or protective covers, fluid leaks, damaged hoses, and/or damaged pressure gauges and pressure relief valves. The drill rig inspection checklist provided in WESTON's drill rig operating practice (included in Attachment 2) can be used to ensure an adequate inspection has been completed. The Site Health and Safety Coordinator will ensure that the drill rig supervisor checks and tests all safety devices, such as emergency shutdown switches, at least daily at the start of a drilling shift. Drilling will not be permitted until all emergency shutdown and warning systems are working correctly.

The Site Health and Safety Coordinator or drill rig supervisor will ensure that all new drill rig workers are informed of safe operating practices on and around the drill rig. The drilling company's supervisor will ensure that each new employee reads and understands the safety manual. The drilling company's supervisor will also carefully instruct a crew worker in drilling safety and observe the new worker's progress toward understanding safe operating practices. The Site Health and Safety Coordinator will ensure that all personnel working around the drill rig are informed of the location of the kill switches.

Prior to drilling, adequate site clearing and leveling will be performed to provide a safe working area for the drill rig and supplies. Drilling will not be commenced when tree limbs, unstable ground, or site obstructions can cause unsafe conditions.

It is especially important that precautions be taken when using drill rigs in the vicinity of electrical power lines and other utilities. The following procedures will be implemented prior to the start of drilling activities:

- Locate, note, and emphasize all overhead and buried utilities on all boring location plans and boring assignment sheets.

- When overhead electrical power lines exist at or near a drilling site or project, consider all wires to be live and dangerous.

- Watch for sagging power lines before entering a site. Do not lift power lines to gain entrance. Call the 3M Field Manager and ask him to lift or raise the lines or deenergize (turn off) the power.

- Before raising the drill rig mast in the vicinity of power lines, walk completely around the drill rig. Determine what the minimum distance will be from any point on the drill rig to the nearest power line when the mast is raised and/or is being raised. Do not raise the mast or operate the drill rig if this distance is less than 20 feet (6 meters) or, if known, the minimum clearance stipulated by federal, state, and local regulations.

- Keep in mind that both hoist lines and overhead power lines can be moved toward each other by the wind.

- Move the drill rig with the mast down to avoid contact with power lines.

- If there are any questions concerning the safety of drilling on sites in the vicinity of overhead power lines, call the WESTON Field Manager.

- If a sign warning of underground utilities is located on a site boundary, do not assume that underground utilities are located on or near the boundary or property line under the sign. Call the 3M Field Manager to investigate. The underground utilities may be a considerable distance from the warning sign.

- Determine jointly with the 3M plant personnel the precise location of underground utility lines, mark and flag the locations, and determine jointly with utility personnel what specific precautions must be taken to ensure safety.

Drilling operations will be terminated if an electrical storm approaches. The drill rig mast will be lowered, and the entire crew will move away from the drill rig. For additional guidance, the WESTON drill rig operating practice (1.6) is included in Attachment 2.

## 3.3  WATER SAMPLING

Water sampling activities will consist of surface water and groundwater sampling activities. Potential hazards associated with water sampling include the following:

- Toxicity hazards associated with inhalation, dermal, ocular, and ingestion exposure to free, residual, or spilled hazardous wastes; VOCs present in the groundwater; and to potentially contaminated washwater during decontamination activities. Personal protective measures and air monitoring will be implemented (see Sections 6 and 8).

- Physical and safety hazards such as abrasion associated with sampling, inclement weather, heat/cold stress, wet feet, falling materials, improper lifting, slip/fall hazards, working on or near water, boating hazards, remote areas, and vehicular traffic (FLDs 02, 05, 06, 07, 10, 15, 18, 19, 20, and 41).

- Biological hazards such as disease-vectoring insects, animals (i.e., poisonous snakes), and poisonous plants (FLD 43).

An important potential hazard associated with water sampling involves the potential for exposure to the contaminants of concern in the water or groundwater during sampling and decontamination activities. To ensure that the project team is protected from exposure to the area contaminants, the proper PPE will be worn by each individual and air monitoring will be conducted as specified in Table 3-2. Protocols for upgrading PPE and air monitoring strategies are discussed in Sections 6 and 8.

Physical hazards such as noise, working with manual sampling equipment and pumps, will be managed by implementing the FLDs included in Attachment 2. In general, the approaches outlined for soil sampling will be implemented for water sampling activities.

## 3.4  SEDIMENT SAMPLING

Sediment sampling activities will be performed as part of the Phase 2 characterization program in accordance with the details presented in the Phase 2 Work Plan. Potential hazards associated with sediment sampling include the following:

- Toxicity hazards associated with inhalation, dermal, ocular, and ingestion exposure; VOCs present in the sediments; and potentially contaminated washwater during decontamination activities. Personal protective measures and air monitoring will be implemented (see Sections 6 and 8).

- Physical and safety hazards such as noise, impact, laceration, and abrasion associated with sampling, inclement weather, heat/cold stress, wet feet, working near water, boating hazards, slip/fall hazards, and remote areas (FLDs 01, 02, 05, 06, 07, 10, 11, 15, 18, 19, 20, and 41).

- Biological hazards such as disease-vectoring insects, animals (i.e., poisonous snakes), and poisonous plants (FLD 43).

An important potential hazard associated with sediment sampling involves the potential for exposure to the contaminants of concern in the surface water or sediments during sampling and decontamination activities. To ensure that the project team is protected from exposure to the area contaminants, the proper PPE will be worn by each individual and air monitoring will be conducted as specified in Table 3-2. Protocols for upgrading PPE and air monitoring strategies are discussed in Sections 6 and 8.

Physical hazards such as noise and working with manual sampling equipment, will be managed by implementing the FLDs included in Attachment 2. These FLDs include health and safety precautions for working near water and operation and use of boats (FLDs 18, 19). The field team members will follow the safety procedures in FLDs 18 and 19 where applicable for sediment sampling in Baker's Creek and/or the Tennessee River. In general, the approaches outlined for soil sampling will be implemented for water and sediment sampling activities.

## 3.5  SMALL MAMMAL SAMPLING

Small mammal sampling will be performed as part of the Phase 2 characterization program in accordance with the details presented in the *Phase 2 Work Plan* and will consist of an initial survey of small mammal populations by a limited trapping effort followed by more intensive

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

trapping and the collection of blood and liver samples from small mammals in and around the former sludge incorporation area. Potential hazards associated with small mammal trapping and the collection of tissue samples includes the following:

- Toxicity hazards associated with inhalation, dermal, ocular, and ingestion exposure to contaminants in site soils, and to potentially contaminated decontamination washwater during decontamination activities. Personal protective measures and air monitoring will be implemented (see Section 6 and 8).

- Physical and safety hazards such as inclement weather, heat/cold stress, wet feet, improper lifting, slip/fall hazards, rough terrain, and remote areas. (FLDs 01, 02, 05, 06, 07, 10, 11, and 15).

- Biological hazards such as disease-vectoring insects, animals (i.e. poisonous snakes), and poisonous plants (FLD 43). Additional biological hazards associated with small mammal sampling are described below.

An important potential hazard associated with small mammal trapping, handling, and tissue collection involves the potential for exposure to hantavirus. There are numerous viral strains within the hantavirus assemblage and exposure to some of these hantaviruses may result in hantavirus pulmonary syndrome (HPS) in humans (CDC, 1995). The hantavirus responsible for the initial detections of HPS in the southwestern U.S., Sin Nombre Virus (SNV), is primarily associated with the deer mouse (*Peromyscus maculatus*). Inhalation of aerosolized virus from the small mammal host's urine or feces is the primary mode of infection in humans (CDC, 1995).

Other small mammal species may also serve as competent hosts for SNV and related hantavirus strains that have been shown to cause HPS. These include the cotton rat (*Sigmadon hispidus*) which is host to the Black Creek Canal virus, the white-footed mouse (*P. leucopus*) which is host to the New York virus, and the rice rat (*Oryzomys palustris*), which is host to the Bayou virus (CDC, 2004). These three rodents species have distributions which include northern Alabama.

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

The southern portion of the range of the distribution of the meadow vole (*Microtus pennsylvanicus*), a prospective target species for the small mammal sampling effort, is also located in northern Alabama. However, the meadow vole is host to the Prospect Hill virus (PHV) which has not been determined to cause human disease (CDC, 1995 and CDC, 2004).

While risk associated with aerosolization of viruses is highest in confined spaces with rodent infestations, personnel handling rodents from small traps and preparing blood and/or tissue samples are also at risk unless safety precautions are implemented (CDC, 1995). Because of the potential risk for infection from small mammals hosting hantaviruses and other zoonotic agents and the high case fatality ratio associated with HPS, personal protective measures will be implemented to mitigate the risk to sampling team members. These measures are based on the safety guidelines established in the *Methods for Trapping and Sampling Small Mammals for Virologic Testing* (CDC, 1995) and included as Attachment 5 to this HASP. Protective equipment will include the use of full face respirators with N-100 high efficiency particulate air (HEPA) filter cartridges during trap retrieval and sample processing. Thick rubber or nitrile gloves will be used when handling rodents or traps that either contain rodents or are potentially contaminated by rodents. Gloves will be washed with a disinfectant solution of 5% hospital-grade Lysol® prior to removal. Traps and sample preparation surfaces will also be disinfected with 5% Lysol. All sample processing will be performed at an outside sample processing station. Additional information on safe handling procedures associated with collection and transport of small mammals, the collection of blood samples and performing necropsies to remove the liver samples, and related activities is contained in Attachment 5.

The Exygen Research, Inc. laboratory will be performing chemical analyses of blood and liver tissue samples and has been informed of the potential for hantavirus with the small mammal samples.

**References:**

CDC. 1995. *Methods for Trapping and Sampling Small Mammals for Virologic Testing*. U.S. Department of Health and Human Services. Public Health Service. Centers for Disease Control and Prevention (CDC). National Center for Infectious Diseases. Atlanta GA. Available at:

http://www.cdc.gov/ncidod/dvrd/spb/mnpages/rodentmanual.htm

CDC. 2002. *Hantavirus Pulmonary Syndrome – United States: Updated Recommendations for Risk Reduction*. Morbidity and Mortality Weekly Reports (MMWR) Recommendations and Reports 51(RR09); 1-12. July 26, 2002. available at:

http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5109a1.htm

CDC. 2004. *All about Hantaviruses* web page prepared by the CDC National Center for Infectious Diseases Special Pathogens Branch. Atlanta GA.    Available at: http://www.cdc.gov/ncidod/diseases/hanta/hps/index.htm accessed 2 July 2004.

## 3.6   FISH SAMPLING

Methods which may be used during this project to capture fish may include one or more of the following gear types: hand seines, gill nets, trotlines, and electrofishers. The primary hazards associated with these collection methods include: working near or over water, rough or uneven terrain, and electrical shock.

Hand seines will be operated by two or more individuals, and consist of a long, wall-like collecting net with a float line at the top and a lead line at the bottom. Seine nets will be used in shallow water where fish can be captured by surrounding an area and pulling the seine ashore to enclose the catch.

Seines will not be used in water with snags or other obstructions, and tend to roll up when pulled over weeds.    Nets are difficult to pull in areas of high flow because of water resistance. Therefore, prior to attempting to seine a collection area, the area will be investigated to determine the feasibility, the efficiency, and the safety of using this collection method. Because

of the hazards associated with collecting fish by this method, the following precautions should be taken:

- Because the water depth is variable, prior to starting wading activities, the depth in a particular area shall be determined to minimize the potential for submersion.

- Because chest waders and/or hip boots will be required, appropriate precautions shall be taken. When filled with water, even partially, waders become heavy and pose a serious threat to the individual wearing them. Therefore, no sampling team personnel will venture into areas where submersion is likely. A belt fitted snugly around the top of the waders may also be worn to limit the ability of water to enter the boots. Safety lines may also be required, depending on conditions.

- The type of bottom may affect the field crew's footing and its ability to work efficiently and safely. If necessary sure grip devices, such as creepers or carpeting may be added to the soles of boots to improve traction.

- The accessibility of field locations shall be considered in the field planning. Proximity of vehicle access will be determined beforehand for ease of equipment portage and to allow prompt access by response personnel in the event of an emergency. It is required that the team leader be familiar with access roads and trails available in each area.

- Obstructions such as submerged rocks, trees, and floating objects affect the safety of boat use on lakes and waterways. Awareness of their locations is also significant in use of nets, trotlines, and instruments with the potential for snagging. Visual reconnaissance of areas for possible obstructions shall be made and their positions noted.

Trotlines may be used to selectively harvest bottom feeding fish specimens. Trotlines consist of long, heavy cords with multiple baited hooks attached by sections of monofilament line. Trotlines may be anchored by means of anchors or other weights attached to the ends of the trotlines or by tying the ends to stakes, limbs, or other immovable objects along the shoreline. The ends of the trotline sets will be marked by buoys and/or flagging tape to identify their location. The principal hazards associated with the deployment of trotlines are entanglement with the cordage and punctures from the hooks. Because of these hazards, the following precautions shall be observed:

- Trotlines will be deployed only in area of low current velocities to minimize the potential for drifting (or loss) of the trotlines from their intended locations.

- Trotline sets will be identified by flagging or buoys to minimize the risk associated with entanglement by members of the sampling team.

- Facility personnel will restrict access to the stream to only members of the sampling team for the duration of the trotline sets.

- Sampling team members will use caution in baiting, setting, handling, and harvesting the trotlines to minimize the potential for puncture wounds.

- Because the trotline hooks will be baited with materials such as commercial tub bait or chicken livers, the potential for infection resulting from puncture wounds exists. First aid equipment will be available to allow any puncture wounds to be immediately cleaned and disinfected.

The primary method that will be used to capture fish will be electrofishing. It should be noted that all electrofishing gear can develop electrical currents that are potentially harmful or lethal to man. Operators must be familiar with proper usage, potential involved, and safety procedures. Because of these hazards the following precautions shall be observed:

- The operator of an electrofisher must understand that the chance of receiving an electrical shock is multiplied when dealing with electric currents in or near water more than any other place.

- The Coffelt electrofishers have a high voltage output and certain safety precautions must be observed to provide safe operation and prevent possible dangerous shock. When operating the electrofisher the operator should never contact the anode. This situation could complete a path through the body for the electric current and cause a possible lethal shock. To prevent shocks from occurring the following equipment shall be used:

  - Non-leaking chest high waders. Wet boots can conduct electricity. If the waders become wet inside,

  - Non-leaking rubber electricians gloves that reach the elbow or higher. Wet gloves can conduct electricity. If the gloves become wet inside, electrofishing activities will be halted until and the gloves are thoroughly dry or replacement gloves are donned.

- The following are some do's and don'ts for electrofishing:

  - Do always make sure that all personnel are clear of the area surrounding the anode before turning on the power.

  - Don't continue to electrofish if your boots or gloves become damp or wet.

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

- Do make sure that the anode and cathode electrodes make a good connection with the output cable and that both electrodes are in contact with the water.

- Don't operate an electrofisher if you have any prior heart condition/history or if you have been under abnormal strain which may weaken your heart.

- Do review and know how to administer first aid treatment for electrical shock.

Because of the relatively high potential for hazard, all electrofishing equipment will be examined and approved for use, for reliability of safety devices and proper performance of the unit by a qualified technician prior to use in the field.  It is the responsibility of the Site Safety Officer and Project Team Leader to verify that such equipment has been examined and approved for use prior to use.  All maintenance and safety checks shall be recorded and kept by the SSO.  Periodic checks will be determined by frequency of use.

## 3.7  ADDITIONAL FIELD OPERATING PROCEDURES

During the course of these Phase 2 characterization program activities, it may become necessary to conduct activities not specified in the sampling procedure descriptions. In order to anticipate some of these activities, the following FLDs have also been included in Attachment 2:

- FLD 09      Hot Work
- FLD 36      Welding/Cutting/Burning
- FLD 39      Illumination
- FLD 48      WESTON Hazard Communications Program

3M Decatur Plant
Revision: 00
Date: August 2004
Section: HASP

Table 3-1

**Properties of Potential Environmental Contaminants,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL**

| Contaminant | Concentrations Detected in Previous Investigations | OSHA PEL (TWA) | ACGIH TLV (TWA) | Carcinogen | Characteristics/ Physical Description | Route of Exposure | Human Exposure Symptoms | Target Organs |
|---|---|---|---|---|---|---|---|---|
| 1,1 - Dichloroethylene (1,1-DCE) | 55 µg/kg (327R soil) | NE | 5 ppm | A4, Carc | Colorless liquid or gas (above 89°F) with a mild, sweet, chloroform-like odor. | Inh Abs Ing Con | Irritation of eyes, skin, throat; dizziness, headache, nausea, dyspnea (breathing difficulty); liver, kidney dysfunction; pneumonitis. Potential occupational carcinogen. | Eyes, skin, respiratory system, CNS, liver, kidneys |
| 1,1 –Dichloroethane (1,1-DCA) | 15 µg/kg (327R soil) 3.6 µg/L (310R gw) | 100 ppm | 100 ppm | A2, Carc | Colorless, oily liquid with a chloroform-like odor | Inh Ing Con | Irritation of skin, CNS depression, liver, kidney, lung damage | Skin, liver, kidneys, lungs, CNS |
| 1,1,1 – Trichloroethane (1,1,1-TCA) | 7 µg/kg (327R soil) | 350 ppm | 350 ppm | A2, Carc | Colorless liquid with a mild, chloroform-like odor. | Inh Ing Con | Irritation eyes, skin, headache, lassitude, CNS depression, poor equilibrium, dermatitis, cardiac arrhythmias, liver damage | Eyes, skin, CNS, cardiovascular system, liver |
| 1,2-Dichloroethane (1,2-DCA) | 12 µg/kg (327R soil) | 50 ppm | 10 ppm | A3, Carc | Colorless liquid with a pleasant, chloroform-like odor. | Inh Ing Abs Con | Irritation of eyes, corneal opacity, CNS depression, nausea, vomiting, dermatitis, liver, kidney, cardiovascular system damage, (potential occupational carcinogen) | Eyes, skin, kidneys, liver, central nervous system, cardiovascular system |

**Table 3-1**

**Properties of Potential Environmental Contaminants,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL
(Continued)**

| Contaminant | Concentrations Detected in Previous Investigations | OSHA PEL (TWA) | ACGIH TLV (TWA) | Carcinogen | Characteristics/ Physical Description | Route of Exposure | Human Exposure Symptoms | Target Organs |
|---|---|---|---|---|---|---|---|---|
| 2-butanone (MEK) | 12 µg/kg (327R soil) | 200 ppm | 200 ppm | No | Colorless liquid with a moderately sharp, fragrant, mint-or acetone-like odor. | Inh Ing Con | Irritation of eyes, skin, nose, headache, dizziness, vomiting, dermatitis | Eyes, skin, respiratory system, CNS. |
| 4-methyl-2-pentanone (MIBK) | 140 µg/kg (327R soil) | 100 ppm | 50 ppm | No | Colorless liquid with a pleasant odor | Inh Ing Con | Irritation of eyes, skin, mucous membrane; headache, coma, dermatitis; in animals: liver, kidney damage | Eyes, skin, respiratory system, CNS, liver, kidneys |
| Acetone | 4,300 µg/kg (327R soil) 6.9 µg/L (317L gw) | 1,000 ppm | 500 ppm | A4 | Colorless liquid with a fragrant, mint-like odor. | Inh Ing Con | Irritation of eyes, nose, throat; headache, dizziness; CNS depression; dermatitis. | Eyes, skin, respiratory system, CNS |
| Benzene | 520 µg/kg (327R soil) 21 µg/L (310R gw) | 1 ppm ST 5 ppm | 0.5 ppm | A1, Carc | Colorless to light-yellow liquid with an aromatic odor. (Note: A solid below 42°F.) | Inh Abs Ing Con | Irritation of eyes, skin, nose, respiratory system; giddiness, headache; nausea; staggered gait; fatigue; anorexia; lassitude (weakness, exhaustion); dermatitis; bone marrow; depression. | Eyes, skin, respiratory system, blood, CNS, bone marrow (leukemia) |

**Table 3-1**

**Properties of Potential Environmental Contaminants,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL
(Continued)**

| Contaminant | Concentrations Detected in Previous Investigations | OSHA PEL (TWA) | ACGIH TLV (TWA) | Carcinogen | Characteristics/ Physical Description | Route of Exposure | Human Exposure Symptoms | Target Organs |
|---|---|---|---|---|---|---|---|---|
| Chloroform | 11 µg/kg (327R soil) | C 50 ppm | 10 ppm | A3, Carc | Colorless liquid with a pleasant odor. | Inh Abs Ing Con | Irritation of eyes, skin; dizziness, mental dullness; nausea; confusion, headache, fatigue; anesthesia; enlarged liver. | Liver, kidneys, heart, eyes, skin, CNS |
| Ethylbenzene | 44 µg/kg (327R soil) | 100 ppm | 100 ppm | A3 | Colorless liquid with an aromatic odor. | Inh Ing Con | Irritation of eyes, skin, mucus membranes; headache; dermatitis; narcosis; coma. | Eyes, skin, respiratory system, CNS |
| Isopropyl ether | 490 µg/kg (220R 4 soil)  780 µg/L (310R gw) | 500 ppm | 250 ppm | No | Colorless liquid with a sharp, sweet, ether-like odor. | Inh Ing Con | Irritation of eyes, skin, nose, respiratory discomfort; dermatitis; in animals: drowsiness, dizziness, unconsciousness, narcosis. | Eyes, skin, respiratory system, CNS |
| Methylene chloride | 32 µg/kg (327R soil) | 25 ppm ST 125 ppm | 50 ppm | A3, Carc | Colorless liquid with a chloroform-like odor. | Inh Abs Ing Con | Irritation of eyes, skin; fatigue, weakness; somnolence (unnatural drowsiness), lightheadedness; numbness, tingling in limbs; nausea. | Eyes, skin, CVS, CNS |

**Table 3-1**

**Properties of Potential Environmental Contaminants,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL
(Continued)**

| Contaminant | Concentrations Detected in Previous Investigations | OSHA PEL (TWA) | ACGIH TLV (TWA) | Carcinogen | Characteristics/ Physical Description | Route of Exposure | Human Exposure Symptoms | Target Organs |
|---|---|---|---|---|---|---|---|---|
| Toluene | 30 μg/kg (327R soil)<br><br>3.3 μg/L (320L gw) | 200 ppm C 300 ppm 500 ppm (10-min max. peak) | 50 ppm | A4 | Colorless liquid with a sweet pungent, benzene-like odor. | Inh Abs Ing Con | Irritation of eyes, nose; fatigue, weakness, confusion, euphoria, dizziness, headache; dilated pupils, lacrimation (discharge of tears); nervousness; muscle fatigue; insomnia; paresthesia; dermatitis; liver, kidney damage. | Eyes, skin, respiratory system, CNS, liver, kidneys |
| Vinyl chloride | 7 μg/L (310R gw) | 1 ppm C 5 ppm | 1 ppm | A1, Carc | Colorless gas or liquid with a pleasant odor at high concentrations. (Note: Shipped as a liquefied compressed gas.) | Inh Con | Weakness; abdominal pain, gastrointestinal bleeding; enlarged liver; pallor or cyanosis of extremities; liquid frostbite. | Liver, CNS, blood, respiratory system, lymphatic system |
| Xylene | 160 μg/kg (327R soil) | 100 ppm | 100 ppm | A4 | Colorless liquid with aromatic odor. | Inh Abs Ing Con | Dizziness, excitement, drowsiness; incoordination, staggered gait; irradiation of eyes, nose, throat; corneal vacuolization; anorexia, nausea, vomiting, abdominal pain; dermatitis. | CNS, eyes, gastrointestinal tract, blood, liver, kidneys, skin |

Sources:   *Threshold Limit Values for Chemical Substances and Physical Agents, Biological Exposure Indices*, ACGIH (1998).
          *NIOSH Pocket Guide to Chemical Hazards*, U.S. Department of Health and Human Services (January, 2003).

**Table 3-1**

**Properties of Potential Environmental Contaminants,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL
(Continued)**

Key:

| | | |
|---|---|---|
| Abs | = | Skin absorption. |
| ACGIH | = | American Conference of Government Industrial Hygienists |
| A1 | = | Confirmed human carcinogen by ACGIH. |
| A2 | = | Suspected human carcinogen by ACGIH. |
| A3 | = | Animal carcinogen by ACGIH. |
| A4 | = | Not classifiable as a human carcinogen by ACGIH. |
| A5 | = | Not suspected as a human carcinogen by ACGIH. |
| C | = | OSHA ceiling concentration; must not be exceeded during any part of the workday. |
| Carc | = | Potential occupational carcinogen by NIOSH. |
| CNS | = | Central nervous system. |
| Con | = | Skin and/or eye contact. |
| CVS | = | Cardiovascular system |

| | | |
|---|---|---|
| gw | = | Groundwater. |
| Ing | = | Ingestion. |
| Inh | = | Inhalation. |
| NE | = | Not established. |
| PEL | = | Permissible exposure limit. |
| PNS | = | Peripheral nervous system. |
| ppm | = | Parts per million. |
| OSHA | = | Occupational Safety and Health Administration. |
| ST | = | OSHA short-term exposure limit; 15-minute TWA exposure that should not be exceeded at any time during the workday. |
| TLV | = | Threshold limit value. |
| TWA | = | Time weighted average. |

3-22

3M Decatur Plant
Revision: 00
Date: July 2004
Section: HASP

**Table 3-2**

**Level of Protection and Monitoring by Task and Contaminant Type**

**Phase 2 Characterization Program, 3M Decatur Facility
Decatur, AL**

| Potential Contaminants of Concern | Minimum Initial Level of Protection | | | | | | |
|---|---|---|---|---|---|---|---|
| | Vegetation Survey & Sampling Geophysical Survey | Surface Soils Sampling | Aquatic Sampling | Small Mammal Sampling | Soil Borings/ Well Installation | Surface-Water/ Sediment Sampling | Groundwater Sampling |
| For any/all of the contaminants listed below use initial level of protection | Level D/ Modified Level D | Modified Level D | Modified Level D | Level C | Modified Level D | Level D | Modified Level D |
| Type of Monitoring | | | | | | | |
| Metals (lead, chromium, cadmium, nickel, etc.) | N | N | NA | NA | N | N | N |
| Solvents (acetone, 1,1-DCE, etc.) | N | N | NA | NA | N / OVM Detector tubes, as warranted | N | N |
| BTEX | N | NA | NA | NA | N / OVM Detector tubes, as warranted | NA | N |
| Hantavirus | NA | NA | NA | NA | NA | NA | NA |

N = No monitoring necessary due to the nature of the activity/matrix and/or levels of contaminants are known to be of low concentrations for which Level D/Modified Level D protection is sufficient.
NA = Not applicable.
BTEX = Benzene, toluene, ethylbenzene, and xylene.
1,1-DCE = 1,1-Dichloroethylene.
OVM = Organic vapor monitor.

**Table 3-3**

**LOI Monitoring Wells**

**Phase 2 PFOA Characterization Program**
**Decatur, AL**

| Monitoring Location | Description |
|---|---|
| Wells 226R & L | Located east of inactive landfill and south of wastewater treatment – monitor background conditions in residuum and shallow limestone groundwater |
| Well 220R and L | Located northeast of inactive landfill – monitors predominant flow path of plume in residuum and shallow limestone zones |
| Well 320L | Located north of inactive landfill – monitor secondary flow path of plume |
| Wells 327R | Located in the former incinerator area – monitors residuum groundwater near source area |
| Wells 310R & 317L | Located in the Chemical Plant – monitors dominant groundwater flow pathways in the Chemical Plant |

**SECTION 4**

**ACCIDENT PREVENTION PLAN**

An important element of the site-specific health and safety program is the implementation of an accident prevention program. It is essential that the contents of this HASP, as well as the contents of the accident prevention program, are communicated to all personnel who work at the site. There are four approaches to preventing accidents considered in this HASP:

- **Educate personnel** as to the requirements of the HASP.

- **Eliminate unsafe conditions.** Efforts must be initiated to identify conditions that can contribute to an accident and to remove exposure to these conditions.

- **Reduce unsafe acts.** Personnel will make a conscious effort to work safely. A high degree of safety awareness must be maintained so that safety factors involved in a task become an integral part of that task.

- **Frequent inspections.** Regular safety inspections of the work site, material, equipment, and operations by qualified persons ensure early detection of unsafe conditions. Health and safety deficiencies will be corrected as soon as possible, or site activities will be suspended.

The following Accident Prevention Plan covers those specific measures personnel will take to minimize the occurrence of accidents on-site. It was prepared to complement the existing *3M Decatur RCRA Emergency/Contingency Plan* (3M, 1998 as updated and amended), included as Attachment 6 of this HASP.

**4.1  RESPONSIBILITIES**

Effective implementation of the Accident Prevention Plan for the Phase 2 characterization program activities is ultimately the responsibility of each individual working on-site. The Site Health and Safety Coordinator will be responsible for development of the plan, for its introduction to all site personnel, and for the day-to-day implementation and enforcement of the plan. The Field Team Manager and Site Health and Safety Coordinator will maintain a working knowledge of all aspects of this manual as they pertain to site activities.

Accidents resulting in any fatality, lost-time injury or illness, hospitalization of three or more personnel, or property damage to 3M or contractor property (which occurred during the performance of the contract) must be: (1) reported by telephone to the 3M Field Manager at (256) 552-6631 and to the WESTON Project Manager at (610) 701-3761 as soon as possible, but not later than 2 hours after occurrence; and (2) reported in writing within 5 days of occurrence on the Incident Reporting Form (provided as Attachment 6 of this HASP). All other accidents/incidents must be reported by telephone to the 3M Field Manager at (256) 552-6631 and to the WESTON Project Manager at (610) 701-3761 within 8 hours of occurrence. The WESTON Project Manager will immediately notify the 3M Project Director of any incident/accident. The WESTON Project Manager also will notify the appropriate WESTON corporate health and safety personnel.

## 4.2  LOCAL REQUIREMENTS

Site activities will be conducted in accordance with applicable 3M requirements. Contractors will obtain permits in accordance with 3M regulations related to temporary construction facilities, the placing of temporary mobile offices, and temporary utility connections. Contractors must also follow 3M specifications for installation and use of same. Specific contractor safety requirements for the 3M Decatur facility are provided in Attachment 4. These site-specific requirements include general safety, permitting, and equipment and vehicle use, as well as safety procedures covering contractor related tasks.

## 4.3  WESTON SUBCONTRACTOR CONTROL

All WESTON subcontracted work performed at the site will be conducted under the expressed direction of the Field Team Leader. In this manner, all subcontractor personnel will adhere to the same strict safety provisions enforced for all on-site personnel. In addition, all site personnel (including subcontractors) will receive a complete introduction to the safety procedures established for site activities. This training is further outlined in Section 5.

## 4.4  TEMPORARY FACILITIES

Existing temporary construction facilities (offices, sanitary, etc.) have been laid out in accordance with good housekeeping and construction practices (FLD 12). Subcontractor plans will be reviewed and approved by the Field Team Manager prior to implementation.

## 4.5  TRAINING

Initial health and safety indoctrination, visitor health and safety training, and any additional training will be the responsibility of the Site Health and Safety Coordinator. The Site Health and Safety Coordinator will maintain a record of training attendance in the Field Logbook. Specific training requirements are included in Section 5.

## 4.6   TRAFFIC CONTROL

Vehicular traffic will be directed when necessary to avoid entering operational areas or to avoid posing a danger to site personnel. Traffic-control items (i.e., signs, cones, and barricades) will be of standard design and placed in a manner that will not cause confusion. On-site personnel will obey all road signs and posted speed limits (FLDs 11, 20, and 22).

## 4.7  MAINTENANCE/SITE HOUSEKEEPING

Good housekeeping will be maintained on-site at all times to ensure safe access to all site areas, as well as safe egress from the site. The Site Health and Safety Coordinator will assign individuals to the task of housekeeping to ensure cleanup at the end of each work shift (FLD 12).

## 4.8  EMERGENCIES

Section 11 of this HASP details the procedure for handling all fires and emergencies that the Site Health and Safety Coordinator decides cannot be handled safely by site personnel. Emergency telephone numbers for assistance will be posted by each telephone and can also be found in Section 11 of this HASP.

## 4.9  JOB SITE INSPECTION

A job site inspection will be the responsibility of the Site Health and Safety Coordinator. The inspection will be conducted regularly and will ensure that site conditions are in compliance with the HASP. Appendix C contains the checklist to be used during an inspection. The Site Health and Safety Coordinator will maintain a record of the inspection and findings in the Field Logbook.

## 4.10  ACCIDENT INVESTIGATION

All minor accidents (i.e., small fires, injuries, and small spills), and especially near-misses, will be investigated by the Site Health and Safety Coordinator. Accidents requiring hospitalization will be investigated by the Field Team Manager/Project Health and Safety Manager.

An accident investigation will consist of reviewing the accident/incident report, questioning the employee(s) involved, as well as questioning all other personnel witnessing the occurrence, identifying all contributing acts and conditions, determining underlying reasons for their existence or occurrence, and implementing corrective actions. A report documenting the investigation will be written by the Site Health and Safety Coordinator and reviewed by the Field Team Manager/Project Health and Safety Manager and WESTON Project Manager. Recommendations for accident prevention also will be made in the report and communicated to all site personnel during the periodic training sessions. A copy of an Incident Reporting Form is contained in Attachment 7.

In addition, all accidents will be reported to 3M's Fire Protection Division and Safety Office, the 3M Project Director, and the 3M Decatur Safety Officer. Accidents involving spills will be reported to 3M's Field Manager.

## 4.11  TEMPORARY POWER SYSTEMS

All temporary wiring will be secured overhead with adequate clearance to prevent accidental contact by personnel or equipment.

Temporary electrical distribution systems and devices will be checked and accepted for polarity, ground continuity, and ground resistance prior to initial use and prior to use after modification in accordance with OSHA 1926 Subpart K. All electrical systems will be equipped with GFCIs.

Extension cord sets will be of a type listed by Underwriters Laboratories (UL). Flexible cord sets used on construction sites will contain the number of conductors required for the service, plus an equipment ground wire.

Portable electric lighting used in hazardous locations will be operated at a maximum of 12 volts (V). Exposed empty light sockets and broken bulbs will not be permitted. In addition, all power systems must be approved by the 3M Field Manager (FLDs 34 and 35).

## 4.12   SAFE CLEARANCE PROCEDURES (LOCK-OUT/TAG-OUT)

Procedures for safe clearance that will be followed are taken from WESTON FLD 42, and are as follows:

- The safe clearance procedure will be followed in securing electrical systems, machinery, pressure systems, and rotating equipment. Power will be turned off, tagged, and locked in the open position at the master switch or main breaker. Gears, agitators, or transmissions will be mechanically locked out or disconnected. Padlocks will be used wherever possible, with the person working on the equipment in possession of the key.

- A safe clearance procedure will be required on all systems and equipment if unauthorized removal or return to service could result in injury, damage, loss of content, loss of protection, or loss of operating capability.

In addition, the requirements of OSHA's lock-out/tag-out standard (29 CFR 1910.147) will be met. All persons performing or affected by lock-out/tag-out must be properly trained. Where the two documents are inconsistent, the requirements of the more stringent will be followed.

## 4.13   OFFICE TRAILER ANCHORING SYSTEM

All trailers or other temporary structures used as field offices or to house personnel will be anchored with rods and cables to provide a stable, safe working environment.

## 4.14  WEATHER-RELATED CONTINGENCY PLAN

Weather will be considered in safety planning. The Site Health and Safety Coordinator will decide on the continuation or discontinuation of work based on current and pending weather conditions. Electrical storms, tornado warnings, extreme heat, ice storms, or strong winds are examples of conditions that would call for the discontinuance of work. A telephone will be available on-site to enable easy access to weather service information (FLD 02).

## 4.15  ACTIVITY HAZARDS ANALYSIS

Section 3 of this HASP presents an activity hazard analysis for each task of the Phase 2 characterization program activities.

## 4.16  HAZARD COMMUNICATION

The primary requirements of the project hazard communication program are the accumulation and availability of MSDSs, container labeling, and employee training.

MSDSs will be brought on-site for each hazardous material used during the completion of this project. The MSDSs will be provided in the site HASP under the custodianship of the Site Health and Safety Coordinator. MSDSs also will be provided to the 3M Field Manager.

This HASP for site operations serves the purpose of the MSDSs for contaminants present in each work area. The purpose of this procedure is to ensure that WESTON and subcontractor personnel working with hazardous materials are made aware of the hazards associated with the materials and to conform with the Hazard Communication Standard (29 CFR 1910.1200).

All containers of hazardous materials subject to 29 CFR 1910.1200 must be labeled in accordance with the standard. Manufacturer's, importer's, or distributor's existing labels may be used, provided the information is correct and sufficient.

Labels affixed to or close to containers of hazardous materials must accomplish the following:

- Identify the material using a name with which workers are familiar.

3M Decatur Plant
Revision: 00
Date: July 2004
Section: HASP

- Identify the hazards associated with the material, including toxicity information, which indicates symptoms and target organs.

- Contain the name, address, and telephone number of the manufacturer, importer, or distributor where more information may be obtained.

Labels must not conflict with Hazardous Materials Transportation Act (HMTA) labeling requirements and must meet the requirements of OSHA substance-specific health standards if such regulated substances are present.

Labels are not required on portable containers filled from a correctly labeled container if only the worker filling the container uses the material from that container immediately.

Required labels on containers must never be defaced or removed unless immediately replaced by an appropriate correctly prepared label.

Subcontractors will be formally notified of the presence of any hazardous substances used on this project site. Subcontractors must also provide proof of a Hazard Communication Program and must inform WESTON of any hazardous substances used in their work for WESTON, have appropriate MSDSs on-site, and have containers correctly labeled.

If necessary, the Field Team Leader/Site Health and Safety Coordinator will also be responsible for ensuring that 3M provides hazard communication information to WESTON and subcontractor employees when working where exposure to hazardous substances subject to this section are present.

Training requirements are discussed in Section 5.

**SECTION 5**

**TRAINING**

On-site personnel engaged in the Phase 2 characterization program activities will be trained in accordance with the requirements of 29 CFR 1910.120 (Hazardous Waste Operations and Emergency Response [HAZWOPER]) and 29 CFR 1910.1200 (Hazard Communication) because these requirements pertain to their role, function, and activities on-site. Personnel will provide written certification to the Project Health and Safety Manager that the required training has been received prior to engaging in on-site activities. Documentation of training (i.e., 40-hour, 8-hour, respiratory fit testing, cardiopulmonary resuscitation [CPR]/first aid, etc.) will be maintained on-site and managed by the Site Health and Safety Coordinator. Specific training requirements are discussed in the following subsections.

## 5.1  PREASSIGNMENT TRAINING

### 5.1.1  Off-Site Training

All personnel assigned to, or regularly entering, areas of the site other than the support zone for the purpose of performing or supervising work; for health, safety, security, or administrative purposes; for maintenance; or for any other site-related function, will be trained in compliance with the health and safety training requirements of 29 CFR 1910.120(e). Prior to beginning work on-site, the training will be consistent with their job functions and responsibilities.

Training will consist of a minimum of 40 hours of initial instruction covering the specific subjects outlined in 29 CFR 1910.120(e). All personnel will receive a minimum of 8 additional hours of off-site refresher training each year, which will include bloodborne pathogens training. In addition, supervisory personnel will have a minimum of 8 hours of additional specialized training on managing hazardous waste operations. The Site Health and Safety Coordinator will have a minimum of 8 hours of initial medical first aid training (first aid/CPR) and an additional 4 hours (minimum) of such training every 2 years.

### 5.1.2  Site-Specific Training

All personnel assigned to the site will complete one site-specific training session. The Site Health and Safety Coordinator will verify that they are capable of, and familiar with, the use and care of safety, respiratory, and protective equipment, and with site control, decontamination, emergency, safety, security procedures, and hazard communication required for this site. The HASP will be discussed during this training conducted by the Site Health and Safety Coordinator.

### 5.2  PERIODIC TRAINING

Daily safety briefings, including discussion of operational problems and compliance with the site-specific HASP, will be conducted by the Site Health and Safety Coordinator for all personnel assigned to work at the site. If an operational change affecting on-site field work is made a meeting prior to implementation of the change will be convened to explain health and safety procedures.

### 5.3  VISITORS

Visitors to the site will receive a briefing on site safety issues. These visitors will not be permitted in the exclusion zone unless they have been trained in accordance with Subsection 5.1.1 of this HASP, have been fit-tested (if required), have been medically approved, and can provide written certification to the Site Health and Safety Coordinator.

**SECTION 6**

**PERSONAL PROTECTIVE EQUIPMENT**

**6.1  REQUIRED LEVELS OF PROTECTION AND ACTION LEVELS**

Levels of protection (LOPs), as defined by EPA Standard Operating Safety Guides, have been designated on a task-by-task basis. The initial LOP for each task will be as specified in Table 3-2 or as specified by the Site Health and Safety Coordinator. The required PPE for each LOP is presented in Attachment 8. These LOPs may be downgraded or upgraded by the Site Health and Safety Coordinator after consulting with the Project Health and Safety Manager and will be based on the measurement of organic vapor levels with a portable photoionization detector (PID) (an organic vapor monitor [OVM], or HNu®) as specified for each task in Tables 4-1 (see Section 4 of the Phase 2 Work Plan) and 3-2 (see Section 3 of this plan). All air monitoring will be conducted in breathing zone locations. Because the PID devices are not compound-specific, action levels (ALs) for upgrading and downgrading protective equipment have been developed based on chemical contaminant exposure guidelines and instrument responses. The ALs are presented in Table 6-1. The general concepts of the air-monitoring program, including the determination of background levels, are provided in Section 8 of this HASP.

In addition to the use of PPE, site control measures designed to minimize contamination of personnel, including an exclusion zone (EZ) and support zone (SZ), will be utilized to protect personnel during performance of the Phase 2 characterization program. The site control measures are presented in Section 9 of this HASP.

Based on the trace concentrations of contaminants of concerns presented in Table 3-1 and the nature and location of the Phase 2 characterization field activities, Level D/Modified Level D protection can be worn during the initiation of each site activity as specified in Table 3-2. However, field observations (visual and/or olfactory indicators) assessed with an air monitoring instruments (discussed above) may indicate that an upgrade to a higher LOP is warranted.

In the LOI well locations where benzene has been found at low concentrations (maximum concentration of 0.52 ppb in soil at depth of 29 to 31 feet below ground surface (bgs) and 0.021

3M Decatur Plant
Revision: 00
Date: July 2004
Section: HASP

ppb in groundwater), the following guidelines will be used as a strategy for air monitoring and upgrading LOPs. Based on historical data, the source of benzene, if any is detected, is expected to be from gasoline or fuel oil. The ALs listed in Table 6-1 will be utilized to make the LOP decisions. Level D/Modified Level D protection is acceptable if OVM instrument levels do not exceed 5 units above the background level. Background level measurement guidance is provided in Section 8 of this HASP. If the OVM reading exceeds and sustains a level of 5 units over background, the field team will evacuate the EZ and allow the area to ventilate. The team will re-enter the EZ with a detector tube (e.g., Dräeger, MSA) to determine if benzene is present. The colorimetric detector tube must be sensitive to 0.5 ppm of benzene. The team will re-enter the EZ from the upwind direction, taking measurements in the breathing zone with the OVM and detector tube.

If benzene is not detected above 0.5 ppm with the detector tube, then work can proceed in Level D protection. However, if benzene is detected at a concentration exceeding 0.5 ppm, the sampling team will upgrade to Level C and begin to monitor the air with the colorimetric tubes on a regular schedule. Readings will be taken, and documented in the Field Logbook, at 30-minute intervals (or more frequently) during periods of employee exposure. Once levels decrease to consistent readings below 0.5 ppm, a downgrade back to Level D/Modified Level D can be made by the Site Health and Safety Coordinator, or his designee. For Level C operations, a full-face, air-purifying respirator will be used. Cartridges will be changed at the end of the service life (as designated by the manufacturer), not to exceed 4-hour periods. Based on historical data, Level C or B protection is not expected to be required for Phase 2 characterization program field work as a result of benzene exposure. Additionally, based on historical information, benzene is not a potential concern in the former sludge application area.

In areas where solvents are a potential contaminant of concern, the following guidelines will be used as a strategy for air monitoring and upgrading LOPs. The ALs listed in Table 6-1 will be utilized to make the LOP decisions. Similar to areas where benzene is a potential concern, Level D/Modified Level D protection is acceptable if OVM instrument levels do not exceed 5 units above the background level. If the OVM reading exceeds and sustains a level of 5 units over background, the field team will evacuate the EZ and allow the area to ventilate. The team will re-

enter the EZ with a detector tube (e.g., Dräeger, MSA) to determine if vinyl chloride or 1,1-DCE is present. The colorimetric detector tube must be sensitive to 0.5 ppm of vinyl chloride (this tube is sensitive to 1,1-DCE also). The team will re-enter the EZ from the upwind direction taking measurements in the breathing zone with the OVM and detector tube.

If the vinyl chloride detector tubes do not exceed 0.5 ppm, then work can proceed in Level D protection. However, if the detector measures a concentration exceeding 0.5 ppm, the sampling team will upgrade to Level C and begin to monitor the air with the colorimetric tubes on a regular schedule. Readings will be taken, and documented in the Field Logbook, at 30-minute intervals (or more frequently) during periods of employee exposure. Once levels decrease to consistent readings below 0.5 ppm, a downgrade back to Level D/Modified Level D can be made by the Site Health and Safety Coordinator, or his designee. Based on historical data, Level C or B protection is not expected to be required for Phase 2 characterization program field work as a result of solvent exposure. Additionally, based on historical information, benzene is not a potential concern in the former sludge application area.

The direct solvent OVM AL is based on 1,1-DCE, which has a permissible exposure limit (PEL) of 5 ppm. The AL listed in Table 6-1 (>5 units above background) will be used for upgrading to Level C based directly on the OVM readings and not through the use of detector tubes.

Determining the ALs by this method provides a conservative and protective approach to PPE LOP upgrades and downgrades. WESTON will implement a conservative approach to setting PPE requirements and ALs for PPE upgrades and downgrades based on breathing zone conditions. A worker's breathing zone for this project will be the lowest vertical space where personnel are breathing. This approach is in accordance with industry standards and will account for unanticipated compounds (stressors) that may be encountered during intrusive activities.

## 6.2  PROTECTIVE EQUIPMENT

The use of PPE will be in compliance with 29 CFR 1910 Subpart I. Personnel using respirators will have written certification of medical fitness and proof of training prior to initiating site operations.

Modified Level D or Level D protection is cited for the beginning of each task as specified in Table 3-2. Where airborne concentrations of contaminants indicate the need for an upgrade in the LOP to Level C, employees will use a NIOSH-approved, full-face, air-purifying respirator and other equipment cited in Attachment 1 of this HASP. The respirators will be supplied with NIOSH-approved combination cartridges for organic vapors, dusts, and fumes. For areas where vinyl chloride requires an upgrade in the LOP, NIOSH-approved cartridges for vinyl chloride will be used.

As indicated in Table 6-1, based on the conditions, the LOP may be upgraded to Level C or Level B. The criteria for the change from Level C to Level B will be the concentrations of contaminants and the type of respiratory protection required. Specifically, while the protective clothing (i.e., gloves and boots) is the same for Levels C and B, Level B requires the use of a self-contained breathing apparatus (SCBA).

## 6.3  WORK PRACTICES

As required by 29 CFR 1910 Subpart I, the use of a respirator by personnel with facial hair that obstructs the seal between the respirator and the face will not be permitted. Personnel who must use respirators will report to the site with clean-shaven faces.

Good hygiene will be practiced by all site personnel. This includes the following:

- Eating, drinking, and smoking in the EZ will not be permitted.
- Changing from work clothes into street clothes at the end of the workday.

In general, work practices will be in accordance with the EPA Standard Operating Safety Guides and all 3M health and safety contractor requirements as provided in Attachment 4.

## 6.4  SAFETY MEETINGS

The Site Health and Safety Coordinator will conduct a safety meeting prior to initiating the scheduled activities and at the beginning of each day. The safety meeting will, at a minimum, include topics such as the following:

- Evacuation routes.
- Warning signals.
- Maintaining line-of-sight and communications.
- Rehearsal of the scheduled activities.
- Hospital routes.
- Locations of safety equipment.
- Previous violations of the safety plan.
- Cold stress and heat stress provisions.
- Work zones.
- Site conditions.

All safety meetings will be documented in the Field Logbook. Meeting participants will be required to sign an attendance sheet.

In the event air quality readings indicate that upgraded respiratory protection is warranted, the Site Health and Safety Coordinator will conduct a safety briefing regarding the upgrade. The Site Health and Safety Coordinator also will conduct safety briefings daily if repeated violations of this plan are observed.

## 6.5   RESPIRATORY FIT TESTING

Site participants qualified for respirator use will demonstrate to the Site Health and Safety Coordinator that they have been fit-tested in the past year. Fit-testing will be performed in accordance with OSHA's Respiratory Protection Standard provided in 29 CFR 1910.134.

## 6.6   MODIFICATIONS TO LOPs

Designated LOPs will be upgraded as described in Subsection 6.1. Whenever the Site Health and Safety Coordinator implements an upgrade, the WESTON Field Team Manager/Project Health and Safety Manager, WESTON Project Manager, and 3M Field Manager/Safety Officer will be notified.

Modifications to the LOP will be recorded in the Field Logbook. A memorandum explaining the upgrade will be prepared by the Site Health and Safety Coordinator for inclusion in the project files and provided to the 3M Project Director for review.

3M Decatur Plant
Revision: 00
Date: July 2004
Section: HASP

**Table 6-1**

**Action Levels,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL**

| Direct-Reading Instrument | Instrument Readings (Breathing Zone) (units)[a] | Action/Levels of PPE |
|---|---|---|
| **PID/OVM** (solvent/benzene areas specified in Tables 3-1 and 3-2) | <5 units above background[b] | D |
| | >5 units above background | Use detector tubes |
| | >5 units above background | C |
| **Detector tubes: Benzene** (tasks specified in Tables 4-1 and 3-2) | < 0.5 ppm | D |
| | >0.5 ppm | C |
| **Detector tubes: Vinyl chloride; 1,1-dichloroethylene** (tasks specified in Tables 4-1 and 3-2) | <0.5 ppm | D |
| | >0.5 ppm | C |

[a]  Actual concentrations for the OVM are measured as "instrument response units." This instrument only measures in units of ppm if its response to a material's airborne concentration is 100%. The detector tube units are in ppm as noted.

[b]  If the OVM levels exceed 5 units above background, detector tubes are to be used to measure for vinyl chloride, 1,1-DCE, and benzene. If these compounds are detected above 0.5 ppm in the breathing zone, Level C will be used.

# SECTION 7

## MEDICAL SURVEILLANCE

On-site personnel will participate in a medical surveillance program equivalent to the requirements specified in 29 CFR 1910.120(f) and American National Standards Institute (ANSI) Z-88.3. The examination will include the following:

- Complete medical and work histories.
- Physical examination.
- Pulmonary function tests (FVC and FEV1).
- Chest X-ray (every 2 years) with a "B" reading.
- Visual acuity.
- Audiometry.
- Urinalysis.
- Blood chemistry, including hematology and serum analyses.

The examination protocols and the evaluation of results will be overseen by a licensed physician certified in occupational medicine by the American Board of Preventive Medicine or a licensed physician who, by required training and experience, is board-eligible. Records of the examinations will be retained by the employer for at least 30 years after the end of the employment period.

Personnel and visitors entering the EZ will be required to provide written documentation to the Site Health and Safety Coordinator that the required medical examinations have been performed (baseline and annual). This documentation will be maintained in the project files in the field office trailer.

A medical examination will be given to any individual who experiences any illness or injury while on the job. Tests will be administered at the discretion of the attending physician. This examination will take place as soon as possible after the illness or injury, and in no case will personnel be allowed to start work at the site without first obtaining clearance to return to full work duties from the examining physician.

3M Decatur Plant
Revision: 00
Date: July 2004
Section: HASP

**SECTION 8**

**AIR MONITORING**

This section explains the general concepts of an air monitoring and sampling program and specifies the surveillance activities to be performed during the Phase 2 characterization program tasks.

The purpose of air monitoring is to identify and quantify airborne contaminants in order to determine and verify the level of worker protection needed (Section 6), and to document the level of airborne contaminants at the site. Two principal approaches are available for identifying and quantifying concentrations of airborne contaminants:

- The use of direct-reading instruments ("monitoring").
- The collection of samples followed by laboratory analysis ("sampling").

The collection of samples for laboratory analysis is not warranted in support of the Phase 2 characterization activities.

## 8.1  DIRECT-READING INSTRUMENT MEASUREMENTS

Monitoring will be conducted using the following direct-reading instruments as specified for particular tasks/contaminants of concern specified in Tables 3-1 and 3-2:

- OVM with a 10.6-electron volt (eV) lamp for VOCs.

The OVM has been selected because of the instrument's ability to detect a wide range of VOCs with ionization potentials (IPs) equal to or less than the IP of the source lamp.

The results obtained with the OVM will be compared to the ALs described in Section 6 of this HASP and the appropriate measures will be taken. Personnel performing monitoring will be trained in the use of air-monitoring equipment as part of the off-site training.

The direct-reading instruments will be calibrated according to manufacturer's instructions prior to field use. Recalibration of the instruments will be performed pre- and post-sampling each day that the instrument is used. The initial calibration will be recorded in the instrument logbook. Daily calibration checks, areas where used, instrument settings, and readings obtained will be recorded in

the Field Logbook. The battery in each unit will be recharged after use to maintain a good charge. Specific calibration procedures are provided by the manufacturer with the instrument.

Because background VOC levels at the 3M Decatur, AL, facility can range from nondetectable to 5.0 ppm, background VOC data will be obtained with an OVM, as described in Section 3.

At a minimum, daily background readings will be made upwind from each sampling location/area of investigation and recorded in the project Field Logbook. However, more frequent monitoring for background levels may be required. Several independent and uncontrollable variables, most notably temperature and weather conditions, can affect the concentrations of airborne compounds. Other variables include wind speed, rainfall, moisture, vapor emissions, and work activities (mechanical disturbance of materials). These factors must be considered when measuring background levels. If changes in these variables are observed in the field, background readings will be retaken to ensure that the proper upgrades/downgrades in LOPs are made.

After valid background data are obtained, reliable decisions can be made regarding upgrades and downgrades in worker PPE.

During performance of applicable tasks, as discussed in Section 3, the levels of organic vapors will be measured in employees' breathing zones several times during the shift using the direct-reading instrument (OVM). The specific frequency of the monitoring will vary, with monitoring performed more frequently during operations having a greater potential for exposure.

The results of this air monitoring will be compared to the ALs in Table 6-1, and a decision on changing the LOP will be made by the Site Health and Safety Coordinator, or his designee. All changes in LOP will be made in accordance with the requirements presented in Section 6 of this HASP.

As indicated, measurements of airborne total dust concentrations will not be performed. As discussed in Section 3, dust generation is not expected to pose a health and safety concern, and can be readily addressed with conventional measures.

## SECTION 9

## SITE CONTROL

Personnel will be knowledgeable in site control measures designed to minimize contamination of personnel and the spread of contamination outside the EZ. These measures are designed to control contamination through defining the work zones and establishing decontamination procedures. The following discussion defines the different work zones in general and describes their purpose:

- Exclusion zone (EZ)—The area known or suspected of being contaminated or containing uncontrolled hazardous materials.

- Support zone (SZ)—The area outside the EZ used for project management and coordination, and for storage of equipment and vehicles.

The EZ will be established to include the field investigation location, including any areas where soil or sediment sampling may occur. Access to the EZ will be restricted to the authorized field team and support personnel. Equipment, sampling devices, and other field gear will be decontaminated prior to removal from the EZ.

The SZ will be located near, but upwind of, the work site to minimize potential exposures to site-associated contaminants. It will be positioned and sized to provide adequate space for the staging and support activities.

Communications will be established and maintained during site activities. A telephone or cellular telephone will be easily accessible to site personnel.

3M provides normal security 24 hours/day for the plant, including access roads and active plant areas. During working hours, WESTON will control access to the work locations to restrict unauthorized access. If unauthorized (i.e., untrained and not medically qualified) individuals enter a work area, operations will be halted until the person has been escorted from the work area and informed of the work area hazards.

**SECTION 10**

**PERSONNEL AND EQUIPMENT DECONTAMINATION**

Personnel will be aware of the procedures used to decontaminate EZ personnel, equipment, and sampling containers. Disposable PPE and other items will be placed in heavy-duty plastic bags and properly disposed of. Specific decontamination procedures are presented in the following subsections.

## 10.1  PERSONNEL PROCEDURES

### 10.1.1  Level C Personnel Decontamination

- Step 1: Equipment drop (if any is used).
- Step 2: Remove boot covers; place in disposables container.
- Step 3: Remove outer gloves; place in disposables container.
- Step 4: Remove protective clothing; place in disposables container.
- Step 5: Wash inner surgical gloves.
- Step 6: Remove respirator; sanitize prior to reuse.
- Step 7: Remove inner gloves; place in disposables container.
- Step 8: Wash and rinse hands.

### 10.1.2  Level D and Modified Level D Personnel Decontamination

- Step 1: Equipment drop (if any is used).
- Step 2: Remove boot covers (if worn); place in disposables container.
- Step 3: Remove outer gloves; place in disposables container.
- Step 4: Remove coverall (if worn); place in disposables container.
- Step 5: Remove inner gloves (if worn); place in disposables container.
- Step 6: Wash and rinse hands.

## 10.2  EQUIPMENT DECONTAMINATION

Because equipment and vehicle (i.e., drilling) decontamination is difficult, unnecessary equipment and vehicles will not be brought into the EZ and dedicated and disposable sampling equipment will be used to the extent practicable.

A standard operating procedure which will be employed at the site regarding decontamination of equipment potential exposed to PFOA is provided in Appendix C of the *Phase 2 Work Plan*.

## 10.3  SAMPLE CONTAINER DECONTAMINATION

Sample containers will be laboratory-prepared, precleaned containers. Following sample collection and closure of the container, the outside of the container will be wiped clean. The sample containers will then be placed into shipping containers and sealed for shipment. A notation to laboratory personnel of potential container contents will be included with the chain-of-custody (COC) sheets.

## SECTION 11

## FIRST AID AND EMERGENCY RESPONSE EQUIPMENT AND PROCEDURES

Although accidents can be minimized through safe work practices, there is always the potential for their occurrence. Site personnel will be familiar with the various contingency measures should an accident occur. At least one person will be CPR/first-aid trained and on-site at all times for activities covered by this HASP. This section presents a list of emergency telephone numbers, directions to the local hospital, and Emergency Response Plan (ERP) conforming to the requirements of 29 CFR 1910.120. The provisions of the Emergency Response Plan are primarily applicable to large-scale emergencies that cannot be handled safely by the contractor procedures and work practices discussed in previous sections of this HASP. This section has been prepared using the 3M Decatur RCRA Emergency/Contingency Plan (3M, 1998), which is included in its entirety as Attachment 6.

### 11.1  EMERGENCY TELEPHONE NUMBERS

Table 11-1 lists important emergency telephone numbers. These numbers will be posted near telephones close to the site.

### 11.2  ROUTE TO HOSPITAL

Injured personnel will be taken to Parkway Medical Center located at 1874 Beltline Road, Decatur, AL. The hospital is approximately 7 miles away with a travel time of 15 minutes. Directions to the hospital are as follows:

- Exit facility to Joe Wheeler Highway (Highway 20/Alternate 72).
- Head east, make left onto Beltline Road (Highway 67).
- Go south approximately 3.5 miles.
- The hospital is on the left near McDonald's.

A map showing the route to the hospital can be found in Attachment 9 of this HASP.

## 11.3  EMERGENCY RESPONSE PLAN

### 11.3.1  Pre-Emergency Planning and Coordination with Outside Parties

Prior to beginning the site investigation activities, the following individuals/groups will be made aware of site activities:

- 3M Field Manager/Safety Officer: Phillip Wirey, (256) 552-6631.
- 3M Security (24 hours): (612) 733-6100.
- 3M Emergency Response Personnel: 6111.

The 3M Field Manager will be provided with a copy of the HASP and a schedule of activities, and 3M security and emergency response personnel will be briefed on the work scope. This action will ensure that 3M Decatur emergency response mechanisms are aware of the investigation activities and are ready to respond if conditions warrant.

Site personnel will be made fully aware of the provisions of the Emergency Response Plan. This awareness training will be conducted by the Site Health and Safety Coordinator prior to the commencement of site activities during the site-specific training. Emergency telephone numbers will be posted at all of the telephone locations surrounding the areas of investigation. A list of emergency telephone numbers is included in Table 11-1, and will be included with all project cellular phones.

### 11.3.2  Personnel Roles, Lines of Authority, and Communication

Personnel witnessing an accident become the first step in the emergency response cascade. These individuals will find the nearest telephone, and dial 6111 (dial 911 if off-site). Once contact is made, witnessing personnel will remain on the telephone line to provide the responding 3M Decatur elements with additional data. In no case will witnessing personnel attempt to fight a major fire, conduct a rescue in an unsafe environment, or conduct a cleanup of a major spill.

### 11.3.3   Emergency Recognition and Prevention

Recognition and prevention of emergency conditions are duties of every individual on-site. While the objective of the HASP is to provide site personnel with the necessary information to prevent emergencies from arising, the basic principles of emergency recognition will be initially covered during the 40-hour training required by 29 CFR 1910.120 and reviewed during the off-site training, site-specific training, and follow-up training.

### 11.3.4   Safe Distances and Places of Refuge

Prior to the commencement of each site activity, the Site Health and Safety Coordinator will select a location, at an appropriate distance from the activity, where personnel can gather in the event of an emergency evacuation of a site. This location will be pointed out to site personnel during the site-specific training. This refuge may change depending on weather and the job activity. The Site Health and Safety Coordinator will ensure that all personnel are made aware of any changes.

During accidents involving a fire or spill of potentially explosive materials, site personnel will turn off any operating equipment and evacuate a site by the nearest means of egress. Because in emergency situations speed is often of the greatest importance, personnel in the EZ need not go through a formal decontamination. Once they arrive at a safe location, a formal decontamination can be undertaken. The Site Health and Safety Coordinator also is responsible for notifying other contractors in the event of an accident or spill that may impact them.

### 11.3.5   Site Security and Control

In the event of a fire, explosion, or major chemical spill, site security and control functions will be assumed by 3M Decatur's responding elements, and assisted by WESTON, as necessary.

### 11.3.6   Evacuation Routes and Procedures

As discussed in Subsection 11.1, personnel will exit a site by the nearest means of egress during accidents requiring evacuation. Once off-site, personnel will assemble at a location designated by the Site Health and Safety Coordinator and be counted. Any missing personnel will be brought to the attention of the responding 3M Decatur entities.

### 11.3.7  Decontamination Procedures

During accidents involving injury to personnel inside the EZ, a decision will be made by the Site Health and Safety Coordinator as to whether or not an individual's injury allows for formal decontamination, as outlined in Section 10. If the injury is minor, the individual will undergo formal decontamination. If the injury is major or life-threatening, the individual will be transported to the hospital. Hospital and ambulance personnel will be informed that the individual may be potentially contaminated so that appropriate measures can be taken to prevent cross-contamination.

### 11.3.8  Emergency Medical Treatment and First Aid

During site activities, at least one individual certified in first aid/CPR will be present at all times. During an accident involving an injury to site personnel, this individual will not attempt emergency medical procedures other than first aid/CPR unless specifically directed by a licensed physician.

### 11.3.9  Emergency Alerting and Response Procedures

As discussed in Subsection 11.1, emergency telephone numbers will be located at a telephone near the investigation areas. In the event of an emergency, witnessing personnel will contact the appropriate 3M Decatur responding element. 3M Decatur responding elements will then assume control of the incident and institute response procedures. In no case will site personnel attempt to assist in the response by fighting a major fire, conducting a rescue in an unsafe environment, or conducting a cleanup of a major spill. Site personnel will provide assistance to responding entities as necessary.

### 11.3.10  Critique of Response and Followup

Following an accident involving an injury to site personnel, the Site Health and Safety Coordinator will prepare an incident report using the Notification of Incident Form included in Attachment 7. The report will be submitted to the WESTON Project Manager, WESTON Regional Safety Officer, 3M Project Director, 3M Field Manager/Safety Officer, and the WESTON Field Team Manager/Project Health and Safety Manager for review. A copy will be kept in the project file.

**Table 11-1**

**Emergency Telephone Numbers,
Phase 2 Characterization Program, 3M Decatur Facility,
Decatur, AL**

| Incident | Contact | Telephone Number |
|---|---|---|
| All Emergencies: | Plant Emergency Number (on-site) | 6111 |
| | Emergency System Activation (off-site) | 911 |
| | 3M Corporate Security (24 hours) | (612) 733-6100 |

| Additional Phone Numbers | | |
|---|---|---|
| **Organization/Position** | **Contact** | **Telephone Number** |
| **3M:** | | |
| On-site Field Manager/Safety Officer | Primary: Phillip Wirey | Plant: (256) 552-6631 Home: (256) 351-0629 |
| | Secondary: Don Swanner | Plant: (256) 552-6060 Home: (256) 773-5512 |
| Project Director | Michael Santoro | (651) 733-6374 |
| **WESTON:** | | |
| Project Manager | Jaisimha Kesari | (610) 701-3761 |
| Field Team Manager/Project Health and Safety Manager (PHSM) | Timothy Frinak | (334) 887-0653 |
| Site Health and Safety Coordinator (SHSC) | Charles T. Young | (610) 701-3787 |
| **MISCELLANEOUS:** | | |
| Decatur Fire Department | NA | (256) 353-4141 |
| Decatur General Hospital | NA | (256) 340-5140 |
| Decatur Police Department | NA | (256) 353-2515 |
| Morgan County Sheriff | NA | (256) 778-6100 |
| Morgan County EMA | NA | (256) 351-4620 |
| Poison Control | NA | (800) 292-6678 |
| Suburban Ambulance | NA | (256) 355-3844 |
| Alabama Emergency Response Commission | NA | (800) 843-0699 |
| U.S. Coast Guard, National Response Center | NA | (800) 424-8802 |

Notes:
Plant Name:     3M Decatur Plant
Plant Address:  State Docks Road
                P.O. Box 2206
                Decatur, AL 35609-2206
EPA ID No.      ALDOO4023164

*All fires, spills, and other emergencies will be reported to the Decatur Plant emergency phone number, 6111, and then to 3M Corporate Security for assistance (if needed). 3M personnel will then notify appropriate staff groups (Environmental Technologies [ET&S], Safety, Transportation, Industrial Hygiene, Toxicology, etc.) for assistance. ET&S or site personnel will notify state and federal agencies and contact outside contractors for cleanup, if needed, according to 3M procedures.

# SECTION 12

# STANDARD OPERATING PROCEDURES, ENGINEERING CONTROLS, AND WORK PRACTICES

Personnel will be aware of the proper procedures and work practices to follow in order to protect themselves from the specific chemical, safety, and biological hazards associated with the site activities. Specific "safe-work" procedures are discussed in the following subsections.

## 12.1  BUDDY SYSTEM

The "buddy system" ensures that no individual may enter the EZ without another individual being present. The logic behind the buddy system is that should one individual have an accident, another individual is always present to render assistance or obtain emergency assistance. During Level C and D activities, the minimum number of personnel in the EZ will be two. One of these individuals will be the Site Health and Safety Coordinator.

## 12.2  EATING, DRINKING, AND SMOKING PRECAUTIONS

Because ingestion is a potential contaminant exposure pathway, eating, drinking, and smoking will be prohibited in the EZ. Site personnel working in the EZ will complete the required personnel decontamination upon exiting and prior to eating, drinking, or smoking. Smoking is permitted only in designated areas at the site, as established by 3M.

## 12.3  IGNITION SOURCES

Fires and explosions require fuel, air (oxygen), and an ignition source (heat). The first two are not easily controlled. Consequently, while working on-site where a fire hazard may be present, potential ignition sources must be kept out of the area.

Open flames, lit cigarettes, hot surfaces, or other potential ignition sources will be excluded from the EZ. Equipment used to handle waste containers and to clean up spills will be constructed of nonsparking materials. Portable fire extinguishers (20 lb ABC-type) will be readily accessible to extinguish small fires and will be placed on each vehicle. For fires, 3M Decatur emergency response personnel will be contacted (FLDs 31 and 32).

Prior to initiating activities involving potential ignition sources (i.e., welding or operating a forklift, etc.), personnel will request a "hot-work" permit from the Site Health and Safety Coordinator and the 3M Field Manager. The Site Health and Safety Coordinator will issue such a permit only after it has been verified that conditions are safe for such activities to commence (i.e., no explosive or flammable conditions exist). All work will be done in accordance with WESTON FLD 09.

## 12.4  EXPLOSIVE ATMOSPHERES

Potentially explosive atmospheres are not expected to be encountered at the site because all work is in the open air, which will provide adequate dilution ventilation. CGI measurements also will be taken prior to initiating any "hot work" (i.e., welding, forklift operation, etc.) as part of the hot-work permit, and at any time potentially explosive atmospheres or conditions are identified.

## 12.5  EYEWASH

Existing eyewash stations meeting the requirements of ANSI Z358.1 will be readily accessible to site personnel. Personnel will be made aware of the locations of these stations and will be instructed by the Site Health and Safety Coordinator on how to properly use the eyewash.

## 12.6  FIRE EXTINGUISHERS

Portable fire extinguishers (20 lb ABC-type), which will be given an initial inspection and approval by the 3M Decatur Field Manager, will be placed on each vehicle and will be readily accessible to site personnel. The Site Health and Safety Coordinator will train the site personnel in their proper use. Daily inspections of the fire extinguishers will be conducted by the Site Health and Safety Coordinator to ensure that they are adequately charged. A record of the inspection will be kept in the site Field Logbook.

## 12.7  WATER AND SANITATION

An adequate supply of potable water will be provided on-site in the SZ through the existing facility water supply system. Any portable container used to dispense drinking water will be capable of being tightly capped, clearly marked as to its contents, and will not be used for any other purpose. Single-service cups will be supplied with a receptacle for disposing of used cups.

## 12.8  ROUTINE SAFETY INSPECTIONS

The Site Health and Safety Coordinator will conduct routine safety inspections of the site. Hazardous conditions will be noted, the information transmitted to all site personnel, and mitigated, if possible. A record of the safety inspection will be documented in the site Field Logbook.

## 12.9  CONTROL OF MINOR SPILLS

Minor spills will be controlled by initially surveying the scene to ensure that it is safe to act, using the appropriate PPE to stop the leak, and cleaning up the spilled material. Minor leaks can often be stopped by positioning the container with the leak at the highest elevation. Spilled material may then be absorbed and disposed of using an inert, commercially available absorbent (i.e., kitty litter). Care will be exercised to prevent transit of spilled material to sewer or stormwater drains.

Cleanup of large spills will not be conducted by site personnel. Where site personnel can safely contain the spill, initial measures to isolate and contain the material will be attempted. The Site Health and Safety Coordinator will be consulted immediately to determine whether or not cleanup of a spill will be attempted. Refer to Section 11 for large spill procedures. Regardless of the size of the spill, however, the contractor will be responsible for proper containerization, storage, labeling, removal, treatment, and disposal of the spill residue.

In addition, all spills (except minor leaks) will be reported to the 3M Decatur Field Manager.

**SECTION 13**

**LOGS, REPORTS, AND RECORDKEEPING**

Recordkeeping is an important part of maintaining an accurate account of site activities. Recordkeeping will be a regular and orderly process. The types of recordkeeping to be maintained during closure activities are discussed in the following subsections. Documentation will be maintained on-site during field activities for 29 CFR 1910.120 requirements, medical surveillance program, CPR/first aid, and respirator fit testing.

## 13.1  HEALTH AND SAFETY LOGBOOK

The Site Health and Safety Coordinator will maintain a Field Logbook into which health and safety notations will be made. All monitoring data collected for health and safety purposes also will be included. At the completion of the site investigation (SI) activities, the Field Logbook and health and safety monitoring records will be placed into the project file to become part of the project record.

## 13.2  MEDICAL MONITORING

Copies of personnel medical fitness certifications will be retained in the project files. Any injury reports, monthly personal exposure records, and results of job-termination physicals will be retained in the project file and the personnel file.

## 13.3  VISITOR LOG

All visitors to the site will be required to sign an attendance sheet maintained by the Site Health and Safety Coordinator in the front of the HASP (field copy). The attendance sheets will be retained in the project file.

## 13.4  INCIDENT REPORTS

Incident reports will be prepared by the Site Health and Safety Coordinator using the WESTON Incident Reporting Forms contained in Attachment 7. Additional pages of supporting information may be submitted along with the standard forms. The originals will be submitted to the WESTON

Project Manager and Field Team Manager for review and/or action. Copies also will be included in the project file.

## 13.5  3M ACCESS

3M will have access to the project records, including those pertaining to site health and safety, during normal working hours.

# ATTACHMENT 1 – CHEMICAL HAZARD DATA SHEETS

To Be Provided In Field Copy

# ATTACHMENT 2 – OPERATING PROCEDURES (WESTON FIELD OPERATING PROCEDURES

3M Decatur Plant
Revision: 00
Date: April 2004
Section: HASP

# LIST OF FIELD OPERATING PROCEDURES

| Number | Title |
|--------|-------|
| FLD 01 | **NOISE PROTECTION** |
| FLD 02 | **INCLEMENT WEATHER** |
| FLD 05 | **HEAT STRESS PREVENTION AND MONITORING** |
| FLD 06 | **COLD STRESS** |
| FLD 07 | **WET FEET** |
| FLD 09 | **HOT WORK** |
| FLD 10 | **MANUAL LIFTING AND HANDLING OF HEAVY OBJECTS** |
| FLD 11 | **ROUGH TERRAIN** |
| FLD 12 | **HOUSEKEEPING** |
| FLD 13 | **STRUCTURAL INTEGRITY** |
| FLD 14 | **SITE SECURITY** |
| FLD 15 | **REMOTE AREAS** |
| FLD 18 | **OPERATION AND USE OF BOATS** |
| FLD 19 | **WORKING OVER OR NEAR WATER** |
| FLD 20 | **TRAFFIC** |
| FLD 22 | **HEAVY EQUIPMENT OPERATION** |
| FLD 28 | **EXCAVATING/TRENCHING** |
| FLD 29 | **MATERIALS HANDLING** |
| FLD 30 | **HAZARDOUS MATERIALS USE AND STORAGE** |
| FLD 31 | **FIRE PREVENTION/PROTECTION/RESPONSE PLANS** |
| FLD 32 | **FIRE EXTINGUISHERS REQUIRED AND REQUIREMENTS** |
| FLD 34 | **UTILITIESℂGENERAL** |
| FLD 35 | **ELECTRICAL SAFETY** |
| FLD 36 | **WELDING/CUTTING/BURNING** |

## LIST OF FIELD OPERATING PROCEDURES
## (Continued)

| Number | Title |
|--------|-------|
| **FLD 37** | **PRESSURE WASHING** |
| **FLD 38** | **HAND AND POWER HAND TOOLS** |
| **FLD 39** | **ILLUMINATION** |
| **FLD 41** | **STANDARD HAND AND EMERGENCY SIGNALS** |
| **FLD 43** | **BIOLOGICAL HAZARDS** |
| **FLD 44** | **BLOODBORNE PATHOGENS** |
| **FLD 45** | **HAZARDOUS WASTES BLOODBORNE PATHOGENS PLAN** |
| **FLD 46** | **CONTROL OF EXPOSURE TO LEAD** |
| **FLD 47** | **DRILLING SAFETY GUIDE** |
| **FLD 48** | **WESTON HAZARD COMMUNICATIONS PROGRAM** |

**FLD 01        OCCUPATIONAL NOISE AND HEARING CONSERVATION**

(Final revision 11/8/1999)

**GENERAL**

Noise is defined as unwanted sound.  Noise can cause sudden traumatic temporary or permanent hearing loss, long term slowly occurring sensory-neural and irreversible hearing loss, disruption of communication, and masking of warning devices and alarms. Increased stress levels and effects on the cardiovascular and nervous systems have been documented as additional concerns.

The goal of this operating practice is to reduce and potentially eliminate hazardous levels of noise exposure.

**REFERENCES**

29 CFR 1910.95

**RESPONSIBILITIES**

Project Manager or Supervisor: The Project Manager or employee's supervisor shall ensure that WESTON and subcontract personnel under their control comply with the requirements of this procedure and have the necessary resources to assure compliance.  The Project Manager or Supervisor will ensure that hazard assessment, monitoring and control procedures have been implemented.

Safety Officer: The safety officer (site, project or region) shall assist the Project Manager or Supervisor in understanding the technical requirements of this practice.

The Corporate Health and Safety (CHS) Director: The CHS Director or his designees (e.g., safety professionals, safety officers, division safety managers, or operations health and safety group) will provide assistance with interpretations of this practice.  The CHS Director will ensure periodic evaluation of this operating practice through practice review and inspections.

Occupational Medical Provider (OMP): WESTON's OMP will assist in compliance with this practice through evaluation of clinics, verification of baseline exams and annual employee audiogram evaluation.  The OMP will advise the Safety Officer and, if necessary, the CHS Director of any problems associated with medical compliance or occupationally related hearing loss in workers.

Employees:  All affected employees are responsible for complying with the requirements of this practice.  Any concerns or questions regarding compliance is to be brought the attention of the Safety Officer, the Project Manager, or the Supervisor.

Revised 11/1999

## Recognition and Risk Assessment

Employee noise exposure is expressed as an eight-hour time-weighted average (full shift exposure) in decibels (dB) on the "A-scale" (dBA). This number is to be compared to the Occupational Safety and Health Administration's Permissible Exposure Limit (PEL) which is an 8-hour time-weighted average (TWA) of 90 dBA, and the OSHA Action Level (AL) which is 85 dBA. Table G-16 in 29 CFR 1910.95 provides information regarding time-equivalent PELs.

The PEL is a limit which should not be exceeded, and the AL is a noise level threshold which when exceeded obligates the employer to establish a Hearing Conservation Program (HCP). The HCP includes baseline and annual hearing tests, and hearing conservation training. Whenever there is a reasonable possibility of employee noise exposure over 85 decibels, the affected employee is enrolled in the HCP.

The need for noise monitoring equipment, noise dosimeters or hearing protection devices must be addressed in the planning stages of a project. WESTON personnel and WESTON subcontractors are to wear hearing protection devices when required and where signs are posted requiring their use.

Some of the sources of noise at hazardous materials sites, demolition operations, construction and industrial sites which can cause hearing damage are: compressor motors, drill rig engines, hammer blows (such as from a split spoon), compressor motors, compressed air, and heavy equipment. Examples of approximate noise levels from various activities are as follows:

- Rock Drilling:          up to 115 dBA
- Chain Saws:             up to 125 dBA
- Abrasive Blasting:      up to 110 dBA
- Heavy Equipment:        95 to 110 dBA
- Demolition:             up to 117 dBA
- Needle Guns:            up to 112 dBA
- Riveter/Chipper:        up to 120 dBA
- Noisy Factory:          up to 90  dBA
- Noisy Office:           70 to 80 dBA
- Conversational Speech:  60 dBA

## Noise Evaluation and Surveillance Procedures

Noise exposure assessment is performed only by qualified personnel with properly calibrated and functional noise measuring equipment. If the HASP or the Safety Officer indicate that the site, or activity, requires an instrumentation survey then the area will be screened with an A-weighted sound level meter (Area Monitoring). If deemed necessary a more in depth evaluation utilizing a noise dosimeter may be performed (Personnel Monitoring). Both types of monitoring, if needed, will be accomplished in accordance with requirements established in 29 CFR 1910.95(d).

Revised 11/1999

Long-term work efforts at fixed locations (e.g., water treatment plants, incinerators, etc.) will require an evaluation of noise levels utilizing instrumentation. Re-monitoring may be necessary when changes in equipment, processes or activities result in modification of the noise level.

If impact noise is present, the peak noise levels and the frequency of the impacts should be determined. Both OSHA and the American Conference of Governmental Industrial Hygienists (AGCIH) recommend certain limits to impact noise which depend on the noise intensity and frequency of the impacts. These resources and/or qualified personnel should be consulted if questions arise regarding impact or impulse noise.

**Noise Control Methods**

Engineering Controls

The primary means of reducing or eliminating personnel exposure to hazardous noise is through engineering controls. Engineering controls are defined as any modification or replacement of equipment, or related physical change at the noise source or along the sound transmission path that will reduce the noise level to the employees ear. Engineering controls include items such as; mufflers on heavy equipment or motors, sound baffles, and enclosures.

Administrative Controls

Administrative controls are defined as changes in the work schedule or operations which reduce noise exposure. These controls include increasing worker distance from the noise source and rotation of jobs so that time limits of exposure are reduced.

Administrative time control is not a preferable method for preventing noise exposure since extreme noise for a short duration can cause severe, permanent hearing loss. Administrative controls may be utilized in accordance with the TWA Tables (see 29 CFR 1910.95, Table G-16). Administrative controls may not be utilized for exposures greater than 115 dBA, regardless of the exposure time.

Hearing Protection

Hearing protection devices are utilized whenever engineering controls prove to be infeasible or cost prohibitive. Various types of ear muffs and ear plugs are available. Hearing protector attenuation is intended to reduce employee exposures below 85 dBA for employees with standard threshold shifts and below 90 dBA for all other employees.

Hearing protection devices are strongly recommended in any noisy environment, but are mandatory in the following situations:

- The eight hour average may equal or exceed 90 decibels.

- Any employee exposed to greater than or equal to 85 decibels and who have experienced a standard threshold shift (STS) in their hearing.

- Any noise equal to greater than 115 decibels impact, continuous or intermittent.

- Anywhere a "HEARING PROTECTION REQUIRED" sign is posted. These signs are to be posted in all mandatory situations listed above.

Revised 11/1999

In the absence of sound level measuring instrumentation, any noise preventing normal vocal discussion between two individuals at arms length distance ("arms-length rule") will dictate the need for hearing protection. WESTON guidelines require the use of hearing protection on an immediate basis under the "arms-length rule". Exceptions may be granted based upon task and duration.

Not all hearing protection devices have the same noise reduction rating (NRR). Verification of all NNR values must be made by referring to the manufacturers' specifications.

The proper hearing protection is selected using results from a properly calibrated sound level meter in the following manner. The NRR of the device chosen is reduced by subtracting. Then this resulting number is subtracted from the noise level in dBA (for example: if the noise reading is 100 dBA, and the ear plugs selected have a NRR of 27. Subtracting 7 from 27 equals 20. Subtracting 20 from 100 equals 80. The attenuated sound level to the wearer is 80). Appendix B of 29 CFR 1910.95 provides information on attenuation adequacy using other monitoring devices or scales.

Hearing protection must attenuate employee exposure to an 8-hour TWA of 90 dBA or less. WESTON will strive to accomplish an attenuation of 85 dBA or less. For any employee diagnosed with a standard threshold shift, the attenuation must be 85 dBA or less.

Additional information regarding the selection, use, maintenance, and control of hearing protection devices is provided in the WESTON Personnel Protective Equipment Program.

**Medical Surveillance**

Compliance with the Hearing Conservation Program (HCP) component of 29 CFR 1910.95 is required whenever an employee's exposure to noise in excess of 85 dBA occurs. As such, field employees whose job descriptions require work with drill rigs, heavy construction equipment or noisy client operations would be candidates for the HCP and medical surveillance requirements thereof. Supervisors of any employees not meeting the categories above (e.g., treatment plant operations, print shop, maintenance personnel) are required to determine the need for those employees to participate in the HCP by performing noise surveys, and advise their safety officer who will in turn notify the Occupational Medical Provider.

WESTON's Occupational Medical Provider will make the final determination of employee involvement in the medical surveillance component of the HCP.

Audiometric testing is performed annually to evaluate the hearing of all individuals who are routinely exposed to 8 hour TWA exposures of 85 dBA or greater (including compliance with the "arms-length rule"). By evaluating the hearing of these individuals, the overall effectiveness of the Occupational Noise and Hearing Conservation Program can be systematically monitored. WESTON's Occupational Medical Provider is responsible for assuring local clinic compliance with the audiometric testing component of the standard.

Revised 11/1999

**Training**

Initial and annual training shall be given to each employee included in the Hearing Conservation Program. Training will address the following:

The effects of noise on hearing.

- The purpose of hearing protection, advantages, disadvantages, attenuation of various types, and the selection, fitting, use, and care of protectors.

- The purpose of audiometric tests and explanation of test procedures.

- Recognition of hazardous noise.

WESTON's initial and refresher courses under 29 CFR 1910.120 (Hazwoper) are utilized to deliver these training obligations. Alternative training will be given to employees who are included in the HCP but who are not trained in accordance with Hazwoper requirements,.

**Program Evaluation**

Periodic program evaluations will be conducted to assess compliance with 29 CFR 1910.95 and this operating practice. The CHS Director (or his designee) is responsible for reviewing this practice on an annual basis. WESTON's Occupational Medical Provider is responsible for assisting in this evaluation by providing information relative to employee exposure and medical surveillance data.

**Recordkeeping**

Employee exposure measurements are retained for a minimum of two years and audiometric test records are retained for the duration of the employee's employment, plus thirty years.

Revised 11/1999

**FLD 02          INCLEMENT  WEATHER**
**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD05 – Heat Stress Prevention and Monitoring*
*FLD06 – Cold Stress*
*FLD25 – Working at Elevations*
*FLD26 – Ladders*
*FLD27 – Scaffolds*

**PROCEDURE**

Hot weather (ambient temperatures over 70°F), cold weather (ambient temperatures below 40°F), rain, snow, ice, and lightning are examples of inclement weather that may be hazardous or add risk to work activities.  Heat stress and cold stress are covered under separate operating procedures.

Extremes of heat, cold, and humidity, as well as rain, snow, and ice, can adversely affect monitoring instrument response and reliability, respiratory protection performance, and chemical protective clothing materials.

**Heat**

Additional examples and protection from heat stress are addressed in WESTON Safety Procedure FLD05. Hot, dry weather increases risk of soil drying, erosion, and dust dispersion, which may present or increase risk of exposure and environmental impact from toxic hazards.  Hot weather will increase pressure on closed containers and the rate of volatilization, thereby potentially increasing the risk of exposure to toxic, flammable, or explosive atmospheres.

**Rain, Wet Weather, and High Humidity**

Rain and wet conditions increase slipping and tripping hazards, braking distances of vehicles, and the potential for slippage or handling difficulties for devices such as augers and drills.  Rain fills holes, obscures trip and fall hazards, and increases risk of electrical shock when working with electrical equipment.  Changes in soil conditions caused by rain can impact trenching and excavating activities, creating the potential for quicksand formation, wall collapse, and cave-in.  Vehicles become stuck in mud, and tools and personnel can slip on wet surfaces.

Rain and wet conditions may decrease visibility (especially for personnel wearing respiratory protection) and limit the effectiveness of certain direct-reading instruments (e.g., photoionization detectors [PIDs]).

Revised 11/1999

**Cold, Snow, and Ice**

In addition to cold stress, which is covered in WESTON field procedure FLD06, cold weather affects vehicle operation by increasing difficulty in starting and braking. Ice, frost, and snow can accumulate on windows and reduce vision.

Cold, wet weather can cause icing of roadways, driveways, parking areas, general work places, ladders, stairs, and platforms. Ice is not always as obvious to see as snow or rain, and requires special attention, especially when driving or walking.

Snow and ice increase the risk of accidents such as slipping when walking, climbing steps and ladders, or working at elevation, and the risk of accidents when driving vehicles or operating heavy equipment. Heavy snow and ice storms may cause electric lines to sag or break, and the use of electrical equipment in snow increases the risk of electric shock. Snow can hide potholes and mud, which can result in vehicles getting stuck or persons falling when stepping into hidden holes. Snow also may cover water, drums or other containers, sharp metal objects, debris, or other objects that can cause falls or punctures.

Personnel performing activities that require working over ice should be aware of minimal ice thickness safety guidelines as follows:

- 4-inch minimum: activities such as walking or skating.

- 6-inch minimum: activities such as snowmobiling or the use of equipment with the same weight and cross-sectional area as a snowmobile.

Personnel should always be aware that these measurements are under ideal conditions and that snow cover, conditions on rivers, ponds, or lakes with active currents, and other environmental factor impact the safety of working on ice. Clear ice typically is the strongest, while ice that appears cloudy or honeycombed is not as structurally strong. Measurements made by drilling or cutting through the ice should be made every few feet to verify safe conditions. Under no circumstances should WESTON personnel operate motor vehicles such as cars or trucks on ice.

Provisions for rescue (e.g., ladders or long poles and effective communications) must be available at the work site.

**Lightning**

Lightning represents a hazard of electrical shock that is increased when working in flat open spaces, elevated work places, or near tall structures or equipment such as stacks, radio towers, and drill rigs. Lightning has caused chemical storage tank fires and grass or forest fires. Static charges associated with nearby electrical storms can increase risk of fire or explosion when working around flammable materials, and can adversely affect monitoring instruments.

Revised 11/1999

**Recognition and Risk Assessment**

Few Occupational Safety and Health Administration (OSHA) regulations apply to the conditions covered in this procedure; however, under specific standards (e.g., Construction Industry, Subpart P, Excavations) and the OSHA General Duty Clause, inclement weather hazards must be addressed in safety programs.

Heat, rain, cold, snow, ice, and lightning are natural phenomena that complicate work activities, and add or increase risk. The potential for physical hazards must be considered for tasks that expose personnel to inclement weather. Risk assessment can be accomplished during the planning stages of a project by developing a task risk analysis for the most likely inclement weather conditions that may be encountered, i.e., rain and lightning in late spring, summer, and early fall, or lightning prone areas; cold, snow, and ice in winter. The SHSC must make decisions on the proper safety procedure and recommend them to the site manager. Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards. Any site worker may stop work if safety procedures are not followed or the risk is too great.

A pre-site activity risk assessment must be completed when inclement weather occurs. Weather conditions that affect instruments and PPE function must be conveyed to site workers. All personnel should monitor function and integrity of PPE and be alert to changing weather conditions. A decision must be made on the proper safety procedures to use if work must continue, or to stop work if the risk is too great. The Appropriate Safety Professional **must be notified of all instances of the need to stop work for safety reasons, including inclement weather**.

**Prevention and Protection Programs**

Procedures applicable to inclement weather include the following:

Monitoring equipment and PPE must be maintained in proper working order and used according to manufacturers' instructions.

Walkways, stairs, ladders, elevated workplaces, and scaffold platforms must be kept free of mud, ice, and snow.

Vehicles used in rain or cold weather must have windshield wipers and defrosters, and windows must be kept clear of obstruction.

Employees must be protected from airborne contaminants using engineering controls such as wetting dry soil to prevent particle dispersion, and providing local ventilation to reduce volatile air contaminants to safe levels, or if engineering controls are infeasible, using prescribed personal protective equipment (PPE).

Required conformance with traffic laws, including maintaining speed within limits safe for weather conditions, and wearing seat belts at all times.

Using a walking stick or probe to test footing ahead of persons walking where there is standing water, snow, or ice to protect the walker against stepping into potholes or onto puncture hazards, buried containers, or other potential structurally unsound surfaces.

Revised 11/1999

Prior to using vehicles or equipment in off-road work, walking the work area or intended travelway when puddles or snow may obscure potholes, puncture hazards, or buried containers, or other potential structurally unsound surfaces.

Arranging to have winches, come-alongs, or other mechanical assistance available when vehicles are used in areas where there is increased risk of getting stuck. Cable or rope and mechanical equipment used for pulling stuck vehicles must be designed for the purpose, of sufficient capacity for the load, and be inspected regularly and before use to ensure safety. **Manually pushing stuck vehicles is to be avoided**.

Monitoring wind shifts and velocity where change may result in dispersion of airborne contaminants into work area.

Prior to working in areas or beginning projects during times when there is an increased likelihood of lightning or the potential for lightning striking personnel, steps must be taken to predict the occurrence of lightning strikes, including:

a) Checking with client management to determine if there is any pattern or noted conditions that predict lightning or if there are structures that are prone to lightning strikes. Arrange for client notification when there is increased potential for lightning activities. Ensure that clients include WESTON workers in lightning contingency plans.

b) Monitoring weather reports.

c) Noting weather changes and conditions that produce lightning.

d) Stopping work in open areas, around drill rigs or other structures that may attract lightning, on or in water and in elevated work places when lightning strikes are sighted or thunder is heard near a work site.

e) Ensuring all personnel are provided with safe areas of refuge. Keep personnel from standing in open areas, under lone trees, or under drill rigs.

Revised 11/1999

**FLD 05          HEAT STRESS PREVENTION AND MONITORING**

Return to top

**GENERAL**

Heat stress may occur at any time work is performed at elevated temperatures.  Wearing chemical protective clothing often decreases natural body heat loss and increases the risk of heat stress.

If the body's physiological processes fail to maintain a normal body temperature because of excessive heat, a number of physical reactions can occur, with symptoms ranging from mild (such as fatigue, irritability, anxiety, and decreased concentration or dexterity) to fatal.  Because heat stress is one of the most common and potentially serious illnesses at hazardous waste sites, regular monitoring and other preventive measures are vital to ensure worker safety.

Employees who are taking prescription or over-the-counter medications should consult with their personal physician prior to working in high-temperature environments.

**REFERENCES**

OSHA 29 CFR 1910 and 1926

Related FLD OPS:

*FLD02 – Inclement Weather*
*FLD03 – Hot Processes – Steam*
*FLD08 – Confined Space Entry*
*FLD36 – Welding, Cutting and Burning*
*FLD37 – Pressure Washing*

**APPENDICES**

A Common Heat Stress Disorders and Their Prevention and Treatment

**PROCEDURE**

<u>**Recognition and Risk Assessment**</u>

In the planning stages of a project, the potential for heat stress disorders must be considered as a physical hazard in the site-specific Health and Safety Plan (HASP).  Risk assessment can be accomplished in the development stages of a project by listing in the HASP the most likely heat stress disorders that may occur.

Revised 11/1999

The SHSC must make decisions on the proper safety procedures and recommend them to the site manager. Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards. Any site worker may stop work if safety procedures are not followed or the risk is too great. In addition, all site personnel must be aware of these symptoms in both themselves and their co-workers.

Four common heat stress disorders and their associated prevention and treatment methods are provided in Appendix A.

## Prevention and Protection Programs

Heat stress is affected by several interacting factors including, but not limited to, age, obesity, physical condition, substance abuse, level of personal protective equipment worn, and environmental conditions (temperature, shade, and humidity). Site workers must learn to recognize and treat the various forms of heat stress. The best approach is preventive heat stress management such as the examples given below.

Have workers drink 16 ounces of water before beginning work, at established breaks, and in the morning or after lunch. The body's normal thirst mechanism is not sensitive enough to ensure body fluid replacement, therefore, pre- and post-work fluid intake is necessary. Under heavy work and heat conditions, the body may lose up to 2 gallons of fluids per day. In order to prevent heat stress symptoms, the individual must ensure replacement of this moisture.

Provide disposable cups that hold about 4 ounces, and water that is maintained at 50 to 60°F. Have workers drink 16 ounces of water before beginning work, and a cup or two at each break period. Provide a shaded area for rest breaks. Discourage the intake of caffeinated drinks during working hours. Monitor for signs of heat stress.

Encourage workers to maintain a good diet during these periods. In most cases, a balanced diet and lightly salted foods should help maintain the body's electrolyte balance. Bananas are especially good for maintaining the body's potassium level. The most important measure to prevent heat-related illness is adequate fluid intake. Workers should drink 1/2 to 1 quarts of liquids per hour in high heat conditions. Most of this liquid should be water.

If utilizing commercial electrolyte mixes, double the amount of water called for in the package directions. Indications are that "full-strength" preparations taken under high heat stress conditions may actually decrease the body's electrolytes.

Acclimate workers to site work conditions by slowly increasing workloads, i.e., do not begin work activities with extremely demanding tasks. Rotate shifts of workers who are required to wear impervious clothing in hot weather. In extremely hot weather, conduct field activities in the early morning and evening.

Revised 11/1999

Provide cooling devices to aid natural body heat regulation. These devices, however, add weight and their use should be balanced against worker efficiency. An example of a cooling aid is long cotton underwear, which acts as a wick to absorb moisture and protect the skin from direct contact with heat-absorbing protective clothing.

Ensure that adequate shelter is available to protect personnel against heat and direct sunlight, which can decrease physical efficiency and increase the probability of heat stress. If possible, set up the command post in the shade.

Good hygienic standards must be maintained by frequent showering and changes of clothing. Clothing should be permitted to dry during rest periods. Persons who notice skin problems should immediately consult medical personnel.

## Heat Stress Monitoring and Work Cycle Management

When strenuous field activities are part of on-going site work conducted in hot weather, the following guidelines should be used to monitor the body's physiological response to heat, and to manage the work cycle, even if workers are not wearing impervious clothing. These procedures should be instituted when the temperature exceeds 70°F and the tasks/risk analysis indicates an increased risk of heat stress problems. Consult the HASP and a safety professional (e.g., Division safety manager, safety officer) if questions arise as to the need for specific heat stress monitoring. In all cases, the site personnel must be aware of the signs and symptoms of heat stress and provide adequate rest breaks and proper aid as necessary.

Measure Heart Rate – Heart rate should be measured by the radial pulse for 30 seconds as early as possible in the rest period. The heart rate at the beginning of the rest period should not exceed 110 beats per minute. If the heart rate is higher, the next work period should be shortened by 33%, while the length of the rest period stays the same. If the pulse rate still exceeds 110 beats per minute at the beginning of the next rest period, the following work cycle should be further shortened by 33%. The procedure is continued until the rate is maintained below 110 beats per minute.

Measure Body Temperature – When ambient temperatures are over 90°F, body temperatures should be measured with a clinical thermometer as early as possible in the rest period. If the oral temperature exceeds 99.6°F (or 1 degree change from baseline) at the beginning of the rest period, the following work cycle should be shortened by 33%. The procedure is continued until the body temperature is maintained below 99.6°F (or 1 degree change from baseline). Under no circumstances should a worker be allowed to work if their oral temperature exceeds 100.6°F.

Measure Body Water Loss – Body water loss greater than 1.5% of total body weight is indicative of a heat stress condition. Body weight is measured before personal protective equipment (PPE) is donned and after the PPE is removed following a work cycle. Body water loss can be measured with an ordinary bathroom scale, however, the scale must be sensitive to one-half pounds increments. A worker is required to drink additional fluids and rest if their body water loss is greater than 1.5%.

Revised 11/1999

Note:  For purposes of this operating practice, a break is defined as a 15-minute period and/or until an individual's vital signs are within prescribed guidelines.

A physiological monitoring schedule is determined by following the steps below:

> Measure the air temperature with a standard thermometer.

> Estimate the fraction of sunshine by judging what percent the sun is out (refer to Table 1).

> Calculate the adjusted temperature based on the following formula:

> Adjusted Temperature = Actual Temperature + 13 X
> (fraction of the percent sunshine factor)

> Using Table 2, determine the physiological monitoring schedule for fit and acclimated workers.

The length of work period is governed by frequency of physiological monitoring (Table 2).  The length of the rest period is governed by physiological parameters (heart rate and oral temperature).  For example, site personnel anticipate wearing level C (impermeable clothing) during site activities.

The air temperature is 80°F and there are no clouds in the sky (100% sunshine).  The adjusted temperature is calculated in the following manner:

> Adjusted Temperature (Adj T °F) = Actual Temperature (Amb T °F) + (13 x fraction of the percent sunshine factor).
> Adj T °F = 80°F + (13 x 1.0)
> Adj T °F = 93°F

Using Table 2, the pulse rate, oral temperature and body water loss monitoring would be conducted after each 60 minutes of work.  The adjusted temperature may need to be redetermined if the percent sunshine and ambient temperature changes drastically during site work.

If an individual's heart rate exceeds 110 beats per minute at the beginning of the rest period, that individual will continue to rest until his or her heart rate drops to baseline; the next work period is then decreased by 33%.

Revised 11/1999

**TABLE 1**

**PERCENT SUNSHINE FACTORS**
**HEAT STRESS PREVENTION AND MONITORING**

| Percent Sunshine (%) | Cloud Cover | Sunshine fraction |
|---|---|---|
| 100 | No cloud cover | 1.0 |
| 50 | 50% cloud cover | 0.5 |
| 0 | Full cloud cover | 0.0 |

**TABLE 2**

**PHYSIOLOGICAL MONITORING SCHEDULE**
**HEAT STRESS PREVENTION AND MONITORING**

| Adjusted Temperature | Level D (Permeable clothing) | Level C, B, or A (Nonpermeable clothing) |
|---|---|---|
| $90^O$F ($32.2^O$C) or above | After each 45 minutes of work | After each 15 minutes of work |
| $87.5^O$F ($30.8^O$-$32.2^O$C) | After each 60 minutes of work | After each 30 minutes of work |
| $82.5^O$-$87.5^O$F ($28.1^O$-$32.2^O$C) | After each 90 minutes of work | After each 60 minutes of work |
| $77.5^O$-$82.5^O$F ($25.3^O$-$28.1^O$C) | After each 120 minutes of work | After each 90 minutes of work |
| $72.5^O$-$77.5^O$F ($22.5^O$-$25.3^O$C) | After each 150 minutes of work | After each 120 minutes of work |

Revised 11/1999

## APPENDIX A

## COMMON HEAT STRESS DISORDERS AND THEIR PREVENTION AND TREATMENT

**Heat Rash**

Heat rash is caused by continuous exposure to heat and humidity, and is aggravated by chafing clothes. The condition decreases an individual's ability to tolerate heat and can be extremely uncomfortable.

<u>Symptoms</u> – Mild red rash, especially in areas of the body that come into contact with protective gear.

<u>Treatment</u> – Decrease amount of time spent working in protective gear and provide body powder to help absorb moisture and decrease chafing.

**Heat Cramps**

Heat cramps are caused by inadequate electrolyte intake. The individual may be receiving adequate water, however, if not combined with an adequate supply of electrolytes, the blood can thin to the point where it seeps into the active muscle tissue, causing cramping.

<u>Symptoms</u> – Acute painful spasms of voluntary muscles, most notably the abdomen and extremities.

<u>Treatment</u> – Move the victim to a cool area and loosen clothing. Have the victim drink 1 to 2 cups of lightly salted water or diluted commercial electrolyte solution immediately, and then every 20 minutes thereafter until symptoms subside. Electrolyte supplements can enhance recovery (e.g., Gatorade, Quench) however, it is best to double the amount of water required by the dry mix package directions or add water to the liquid form.

**Heat Exhaustion**

Heat exhaustion is a state of very definite weakness or exhaustion caused by the loss of fluids from the body. The condition is much less dangerous than heat stroke, but it nonetheless must be treated.
<u>Symptoms</u> – Pale, clammy, and moist skin, profuse perspiration, and extreme weakness. Body temperature is normal, pulse is weak and rapid, and breathing is shallow. The person may have a headache, may vomit, and may feel dizzy.

<u>Treatment</u> – Move the victim to a cool, air-conditioned or temperature-controlled area, loosen clothing, place in a position with the head lower than the feet (shock prevention), and allow the victim to rest. Consult a physician, especially in severe cases. Have the victim drink 1 to 2 cups of water immediately, and every 20 minutes thereafter until symptoms subside.

Revised 11/1999

**Heat Stroke**

Heat stroke is an acute and dangerous reaction to heat stress caused by a failure of the body's heat regulating mechanisms, i.e., the individual's temperature control system (sweating) stops working correctly.  Body temperature rises so high that brain damage and death may result if the person is not cooled quickly.

Symptoms – Red, hot, dry skin (although the person may have been sweating earlier); nausea, dizziness, confusion, extremely high body temperature, rapid respiratory and pulse rate, unconsciousness or coma.

Treatment – Remove the victim from the source of heat and cool the victim quickly.  If the body temperature is not brought down quickly, permanent brain damage or death may result.  Soak the victim in cool (not cold) water, sponge the body with cool water, or pour water on the body to reduce the temperature to a safe level (less than 102°F).  Monitor the victim's vital signs and obtain immediate medical help.  Do not give the victim coffee, tea, or alcoholic beverages.

Revised 11/1999

**FLD 06          COLD STRESS**

Return to top

**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD02 – Inclement Weather*
*FLD07 – Wet Feet*
*FLD15 – Remote Areas*
*FLD17 – Diving*
*FLD18 – Using Boats*
*FLD19 – Working Over Water*
*FLD25 – Working at Elevations*

**PROCEDURE**

Persons working outdoors in low temperatures (below 40°F), and especially at or below freezing, are subject to cold stress. Exposure to extreme cold for a short time can cause severe injury to the surface of the body, or result in profound generalized cooling which, unchecked, could ultimately cause death. Areas of the body that have high surface-area-to-volume ratios, such as fingers, toes, and ears, are the most susceptible.

Chemical protective clothing generally does not afford protection against cold stress. In many instances, it increases susceptibility. Chemical hazard site workers must learn to dress carefully to provide both chemical protection and thermal insulation while not dressing so warmly that exercise or strenuous activity will result in cold stress.

Body heat is conserved through the constriction of surface blood vessels. This constriction reduces circulation at the skin layers and keeps blood nearer the body core.

Loss of body heat can occur through:

1.  Respiration – In extreme cold, cover the mouth and nose with wool or fur to "pre-warm" the air you breath.

2.  Evaporation – Wear layered clothing, and remove outer layers prior to overheating to avoid soaking clothing with perspiration. Replace layers prior to becoming chilled. Wear clothing that will "breath" or allow water vapor to escape to reduce the cooling effect of evaporation.

3.  Conduction – Sitting on snow, touching cold equipment, and working in the rain are examples of how heat can be lost by conduction. A great deal of body heat is lost rapidly when a person becomes wet. Hypothermia from immersion in water has resulted in death at temperatures of 40°F or lower. Perspiration or rain should never be allowed to saturate clothing; such soaking will seriously reduce the insulative properties of the clothing, in
    addition to increasing heat loss. Most clothing loses approximately 90 percent of its insulating properties when wet.

Revised 11/1999

4.  Radiation – The greatest amount of body heat is lost from uncovered surfaces of the body, especially the head, neck, and hands.  Covering these areas is, therefore, extremely important.

5.  Convection – The body continually heats a thin layer of air next to the skin.  As long as this warm air is retained next to the body, it will remain warm.  If this warm air is removed by air currents (wind), the body will be cooled attempting to rewarm the surface air.  The primary function of clothing is to retain this warm surface layer of air while allowing water vapor to pass through.  Ensure that clothing remains secure around the body, especially at the neck and waist.  Wind chill or equivalent chill temperature indices describe the chilling effect of moving air in combination with low temperature.

Two major factors that influence the potential of cold injury are ambient temperature and wind velocity.  The term wind chill is used to describe the chilling effect of moving air in combination with low temperature.  Additionally, water conducts heat 240 times faster than air; thus, the body cools suddenly when protective equipment is removed if the clothing underneath is perspiration-soaked.

Tables 1 and 2 should be consulted to adjust working schedules for wind chill conditions.  These tables are meant as guides only; ambient temperatures and wind conditions should be monitored frequently and work schedules adjusted as required.  Workers' physical symptoms or condition will also be an indicator of the need to modify work schedule.

### Recognition and Risk Assessment

In the planning stages of a project and safety plan, the potential for cold stress disorders must be considered as physical hazards in the site-specific Health and Safety Plan (HASP).  Risk assessment can be accomplished in the development stages of a project by listing in the HASP the most likely cold stress disorders which may occur.  The SHSC must make decisions on the proper safety procedures and recommend them to the site manager.  Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards.  Any site worker may stop work if safety procedures are not followed or the risk is too great.  Two common cold stress disorders and treatment methods are identified below.

### Frostbite

Local injury resulting from cold is included in the generic term frostbite.  By definition, frostbite is the freezing of tissue, however, several stages are recognized, based on the degree of injury.

Frostbite most commonly affects the toes, fingers, and face, and occurs when an extremity loses heat faster than it can be replaced by the circulating blood.  Frostbite may also result from direct exposure to extreme cold or high wind, as happens with the nose, ears, and hands.  Feet may freeze because of the conduction of heat away from the skin's surface caused by damp socks and shoes.

Revised 11/1999

Frostbite of the extremities can occur in three forms:

- Frost nip or incipient frostbite is characterized by sudden blanching or whitening of skin.

- Superficial frostbite is characterized by skin with a waxy or white appearance that is firm to the touch, but the tissue beneath is resilient.

- Deep frostbite is characterized by tissues that are cold, pale or darkened, and solid.

Treatment for frostbite:

- Move the victim indoors and/or away from additional exposure to cold, wet, and wind.

- Superficially frostbitten areas are best warmed by placing them next to warm skin. The basic tenant to rewarming frostbitten areas is to not raise the temperature much above that of the body. The abdomen and the armpit are body areas that can be used to rewarm frostbitten areas. Water at 99° to 104°F can be used. Avoid the use of fires, hot water, or external heaters to warm frostbitten areas.

- Give a warm drink (water or juices, **not** coffee, tea or alcohol). Do not allow the victim to smoke.

- If using water to rewarm the affected areas, keep the frozen parts in warm water until all paleness has turned to pink or burgundy red, but no longer. Remember, the tissue will be very painful as it thaws.

- After rewarming, elevate the area and protect it from further injury.

- Do not break blisters.

- Use sterile, soft, dry material to cover the injured areas.

- Keep victim warm and obtain medical care as necessary.

- Do **not** rub the frostbitten part (this may cause gangrene).

- Do **not** use ice, snow, gasoline or anything cold on the frostbitten area.

- Do **not** use heat lamps or hot water bottles to rewarm the frostbitten area.

- Do **not** place the frostbitten area near a hot stove.

**Hypothermia**

Systemic hypothermia occurs when body heat loss exceeds body heat gain and the body core temperature falls below the normal 99°F. While many hypothermia cases are caused by extremely cold temperatures, most cases develop in air temperatures between 30° and 50°F, especially when compounded with water immersion or soaking, and windy conditions.

Revised 11/1999

Remember that the victim of hypothermia may not know, or refuse to admit, that he or she is experiencing hypothermia. All personnel must be observant for these signs for themselves and for other team members. Hypothermia can include one or more of the following symptoms.

- Uncontrollable shivering.
- Vague, slow, slurred speech.
- Irrational actions.
- Memory lapses.
- Incoherence.
- Fumbling hands, frequent stumbling, lurching gait.
- Apathy, listlessness, and sleepiness' inability to get up after resting.
- Unconsciousness, glassy stare, slow pulse and slow respiration.
- Death.

Below the critical body core temperature of 95°F, the body cannot produce enough heat by itself to recover. At this point, emergency measures must be taken to reverse the drop in core temperature. The victim may slip into hypothermia in a matter of minutes and can die in less than 2 hours after the first signs of hypothermia are detected. Treatment and medical assistance are critical.

Treatment for hypothermia:

- Prevent further heat loss by moving the person to a warmer location out of the wind, wet, and cold.

- Remove cold, wet clothing. If necessary, based upon the victim's condition, external sources of heat (e.g., warm blankets, warm water baths, or body contact) may be necessary to rewarm the victim.

- If the victim is conscious, provide warm liquids, candy, or sweetened foods. Carbohydrates are the food most quickly transformed into heat and energy. Do not give alcohol or caffeine.

- Keep the victim awake, monitor ABCs, perform first aid as appropriate, and obtain medical assistance soon as possible.

## Prevention and Protection Programs

Site workers must learn to recognize and treat the various forms of cold stress. The best approach is preventive cold stress management, such as the following:

- Wear loose, layered clothing, masks, woolen scarves, and hats in extreme cold weather.

- Keep clothes dry by wearing water and wind resistant clothing and footwear.

- Eat well-balanced meals, ensure adequate intake of liquids and avoid alcoholic beverages. Dehydration increases risk of cold stress.

- Have warm shelter available and implement work-rest schedules.

- Monitor yourself and others for changes in physical and mental condition.

Revised 11/1999

- If wearing a face protector, remove it periodically to check for frostbite.

- Never touch cold metal with bare hands.

The following guidelines should be used when working in air temperatures below 40°F.

- When cold surfaces below –7°C (19.4°F) are within reach, a warning should be given to each worker by the SHSC to prevent inadvertent contact by bare skin.

- If the air temperature is –17.5°C (0°F) or less, the hands should be protected by mittens. Machine controls and tools for use in cold conditions should be designed so that they can be handled without removing the mittens.

Provisions for additional total body protection are required if work is performed in an environment at or below 4°C (39.2°F). Workers should wear cold-protective clothing appropriate for the level of cold and physical activity:

- If the air velocity at the job site is increased by wind, draft, or artificial ventilation, the cooling effect of the wind should be reduced by shielding the work area or by wearing an easily removable windbreak garment.

- If only light work is involved and if the worker's clothing may become wet on the job site, the outer layer of the clothing in use may be of a type impermeable to water. With more severe work under such conditions, the outer layer should be water repellent, and the outerwear should be changed as it becomes wetted. The outer garments should include provisions for easy ventilation to prevent wetting of inner layers by sweat. If work is done at normal temperatures or in a hot environment before entering the cold area, the employee should make sure that clothing is not wet as a consequence of sweating. If clothing is wet, the employee should change into dry clothes before entering the cold. Workers should change socks and any removable felt insoles at regular daily intervals, or use vapor barrier boots. The optimal frequency of change should be determined empirically and will vary individually and according to the type of shoe worn and how much the individual's feet sweat.

- If the available clothing does not give adequate protection to prevent hypothermia or frostbite, work should be modified or suspended until adequate clothing is made available or until weather conditions improve.

- Workers handling evaporative liquid (gasoline, alcohol, or cleaning fluids) at air temperatures below 4°C (39.2°F) should take special precautions to avoid soaking clothing or gloves with the liquid because of the added danger of cold injury due to evaporative cooling.

**Work/Warming Regimen**

If work is performed continuously in the cold at an equivalent chill temperature (ECT) or below –7°C (19.4°F), heated warming shelters, tents, cabins, and break rooms should be made available nearby. Workers should be encouraged to use these shelters at regular intervals, frequency depending on the severity of the environmental exposure. The onset of heavy shivering, frostnip, the feeling of excessive fatigue, drowsiness, irritability, or euphoria are indications for immediate return to the shelter. When

entering the heated shelter, the outer layer of clothing should be removed and the remainder of the clothing loosened to permit sweat evaporation, or the worker should change into dry clothing to avoid returning to work in wet clothing. Dehydration, or the loss of body fluids, occurs insidiously in a cold environment and may increase the susceptibility of workers to cold injury due to a significant change in blood flow to the extremities. Warm sweet drinks and soups should be provided at the work site to provide caloric intake and fluid replacement. The intake of caffeinated drinks should be limited because of the diuretic and circulatory effects.

For work practices at or below –12°C (10.4°F) ECT, the following should apply:

- The worker should be under constant protective observation (buddy system or supervision).

- The work rate should not be so high as to cause heavy sweating that will result in wet clothing. If heavy work must be done, rest periods must be taken in heated shelters and opportunities to change into dry clothing should be provided.

- New employees should not be required to work full-time in the cold during the first days of employment until they become accustomed to the working conditions and the use of required protective clothing.

- The weight and bulkiness of clothing should be included in estimating the required work performance and weights to be lifted by the worker.

- The work should be arranged in such a way that sitting or standing still for long periods is minimized. The worker should be protected from drafts to the greatest extent possible.

- The workers should be instructed in safety and health procedures. The training program should include, as a minimum, instruction in:

  – Proper rewarming procedures and appropriate first aid treatment.

  – Proper use of clothing.

  – Proper eating and drinking habits.

  – Recognition of signs and symptoms of impending hypothermia or excessive cooling of the body, even when shivering does not occur.

  – Safe work practices.

Revised 11/1999

**Table 1**

**Cooling Power of Wind on Exposed Flesh Expressed as Equivalent Temperature***

| Estimated Wind Speed (mph) | Actual Temperature Reading (°F) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 | -50 | -60 |
| | Equivalent Chill Temperature (°F) | | | | | | | | | | | |
| Calm | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 | -50 | -60 |
| 5 | 48 | 37 | 27 | 16 | 6 | -5 | -15 | -26 | -36 | -47 | -57 | -68 |
| 10 | 40 | 28 | 16 | 4 | -9 | -24 | -33 | -46 | -58 | -70 | -83 | -95 |
| 15 | 36 | 22 | 9 | -5 | -18 | -32 | -45 | -58 | -72 | -85 | -99 | -112 |
| 20 | 32 | 18 | 4 | -10 | -25 | -39 | -53 | -67 | -82 | -96 | -110 | -121 |
| 25 | 30 | 16 | 0 | -15 | -29 | -44 | -59 | -74 | -88 | -104 | -118 | -133 |
| 30 | 28 | 13 | -2 | -18 | -33 | -48 | -63 | -79 | -94 | -109 | -125 | -140 |
| 35 | 27 | 11 | -4 | -20 | -35 | -51 | -67 | -82 | -98 | -113 | -129 | -145 |
| 40 | 26 | 10 | -6 | -21 | -37 | -53 | -69 | -85 | -100 | -116 | -132 | -148 |

| (Wind speeds greater than 40 mph have little additional effect.) | LITTLE DANGER<br><br>In <1 hour with dry skin.<br>Maximum danger of false sense of security. | INCREASING DANGER<br><br>Danger from freezing of exposed flesh within 1 minute. | GREAT DANGER<br><br>Flesh may freeze within 30 seconds. |
|---|---|---|---|
| | Trenchfoot and immersion foot may occur at any point on this chart. | | |

* Developed by U.S. Army Research Institute of Environmental Medicine, Natick, MA.

Revised 11/1999

C:\My Documents\H&S\FieldManRev8200.doc

**Table 2**

**Cold Work/Warmup Schedule for 4-Hour Shifts,**

| EQUIVALENT CHILL TEMPERATURE | MAXIMUM WORK PERIOD | NO. OF BREAKS |
|---|---|---|
| ≥-24°F | Normal | 1 |
| -25° to –30°F | 75 minutes | 2 |
| -31° to –35°F | 55 minutes | 3 |
| -36° to –40°F | 40 minutes | 4 |
| -41° to –45°F | 30 minutes | 5 |
| ≤-46°F | Stop work | Stop work |

Revised 11/1999

**FLD 07        WET FEET**

Return to top

**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD05 – Heat Stress Prevention and Monitoring*
*FLD06 – Cold Stress*

**PROCEDURE**

Under both hot and cold stress conditions, feet that become wet and are allowed to remain wet can lead to serious problems.  Trench foot, paddy foot, and immersion foot are terms associated with foot ailments resulting from feet being wet for long periods of time. All have similar symptoms and effects.  Initial symptoms include edema (swelling), tingling, itching, and severe pain.  These may be followed by more severe symptoms including blistering, death of skin tissue, and ulceration.

<u>**Recognition and Risk Assessment**</u>

In the planning stages of a project and safety plan, the potential for wet feet must be considered as a physical hazard.  Risk assessment can be accomplished in part in the development stages of a project by listing in the Health and Safety Plan (HASP), the most likely task where wet feet may occur.  These tasks could include extended work in chemical protective clothing and wading during biological assessments. The SHSC must make decisions on the proper safety procedures and recommend them to the site manager.  Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards.  Any site worker may stop work if safety procedures are not followed or the risk is too great.

<u>**Prevention and Protection Program**</u>

Prevention methods are required when work is performed in wet conditions or when conditions result in sweating, causing the feet to become and remain wet.  Proper hygiene is critical.  Workers must dry their feet and change socks regularly to avoid conditions associated with wet feet.  Use of foot talc or powder can additionally assist in prevention of this type of condition.

Revised 11/1999

**FLD 07        WET FEET**

Return to top

**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD05 – Heat Stress Prevention and Monitoring*
*FLD06 – Cold Stress*

**PROCEDURE**

Under both hot and cold stress conditions, feet that become wet and are allowed to remain wet can lead to serious problems.  Trench foot, paddy foot, and immersion foot are terms associated with foot ailments resulting from feet being wet for long periods of time. All have similar symptoms and effects.  Initial symptoms include edema (swelling), tingling, itching, and severe pain.  These may be followed by more severe symptoms including blistering, death of skin tissue, and ulceration.

<u>**Recognition and Risk Assessment**</u>

In the planning stages of a project and safety plan, the potential for wet feet must be considered as a physical hazard.  Risk assessment can be accomplished in part in the development stages of a project by listing in the Health and Safety Plan (HASP), the most likely task where wet feet may occur.  These tasks could include extended work in chemical protective clothing and wading during biological assessments. The SHSC must make decisions on the proper safety procedures and recommend them to the site manager.  Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards.  Any site worker may stop work if safety procedures are not followed or the risk is too great.

<u>**Prevention and Protection Program**</u>

Prevention methods are required when work is performed in wet conditions or when conditions result in sweating, causing the feet to become and remain wet.  Proper hygiene is critical.  Workers must dry their feet and change socks regularly to avoid conditions associated with wet feet.  Use of foot talc or powder can additionally assist in prevention of this type of condition.

Revised 11/1999

**FLD 09       HOT WORK**

**GENERAL**

Tasks that produce heat, sparks, or energy sufficient to serve as an ignition source (i.e., hot work) may not begin in any work location that could potentially have ignitable atmospheres until a Hot Work Protection Procedure has been instituted and a Hot Work Permit has been issued. Examples of hot work include welding, cutting, burning, soldering, grinding, use of power tools, and use of internal combustion engines.

**PROCEDURE**

Many operating facilities or clients will have their own internal hot work permitting practices. WESTON will use whichever is more conservative.  The Site Manager and the Site Health and Safety Coordinator (SHSC) must approve the use of a client's hot work permitting procedures.

The Site Health and Safety Coordinator is responsible for issuing hot work permits.  Permits must be reissued at the beginning of each day, or each work shift.  Expired hot work permits must be submitted to the Site Manager for his review prior to being retained as part of the site or project file.  The Site Manager will note any incidents or near-incidents involving hot work during his review of the expired permits, and contact the corporate Health and Safety Director with recommendations for modifications of this procedure, if necessary.

The Site Manager is responsible for inspecting the site, determining the need for a Hot Work Permit Procedure, and ensuring that workers at the site are notified and instructed of the requirement for, need for, and procedures for obtaining hot work permits.

A fire-watch is required for every activity where hot work could result in other than a minor fire due to ignition of combustibles.  Fire extinguishing equipment commensurate with the ignitable material and training level of the fire-watch must be immediately available at the hot work location.

A combustible gas meter must be used to survey the hot work location and then must be left to constantly monitor the air between the flammable material and the immediate vicinity of the hot work. A survey of the area to identify any atmospheric conditions that may be toxic or that could be decomposed by the hot work.

Welding or cutting on closed systems such as tanks and pipelines must be specifically approved by the appropriate safety professional.

Revised 11/1999

# HOT WORK PERMIT

The Site Manager and the Site Health and Safety Coordinator have surveyed the site and found the following Hot Work conditions exist and will require permitting at _____

| CONDITION | YES | NO | CONDITION | YES | NO |
|-----------|-----|-----|-----------|-----|-----|
| Welding | | | Electrical equipment, fixed | | |
| Cutting | | | Electrical equipment, portable | | |
| Use of power tools | | | Electrical equipment, hand-held | | |
| Space heaters | | | Others | | |

| PRE-WORK CHECKLIST<br>All items must be completed for Permit to be valid | YES | NO | N/A |
|---|---|---|---|
| Work area inspected by SSO prior to hot work beginning? | | | |
| Fire-watch established?  Name: _____ | | | |
| Fire extinguisher appropriate for media/readily accessible? | | | |
| Work area clear of all trash and combustible debris/equipment properly grounded? | | | |
| Area in which hot work is to be performed has been monitored for combustible atmosphere? | | | |
| Will combustible gas indicator(s) be used constantly during hot work? | | | |
| If no, why?: | | | |
| List additional personal protective equipment worn: | | | |
| Welding or cutting on closed systems prohibited? | | | |
| Closed system cutting procedures? | | | |

Date ____/____/____        Time ____:____        Permit Expiration Time ____:

Certification of SHSC that hot work may commence        **Yes** ☐ No ☐ N/A ☐

Signature: _____

Revised 11/1999

| HOT WORK TEAM SIGN-OFF | | |
|---|---|---|
| I/we have read and understand the terms of the above **Hot Work Permit**. | | |
| NAME (PLEASE PRINT CLEARLY) | SIGNATURE | DATE/TIME (24 HR.) |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

CERTIFICATION OF SHSC THAT THE HOT WORK AREA HAS BEEN SHUT DOWN AND THAT NO IGNITION POTENTIAL EXISTS: _____

Time: _____. Must be reinspected and signed **no earlier** than 30 minutes **after** all hot work has been completed.

Revised 11/1999

**FLD 10          MANUAL LIFTING AND HANDLING OF HEAVY OBJECTS**

**GENERAL**

**PROCEDURE**

Improper lifting can result in cuts, pinches, crushing, and serious injury to back, abdomen, arm and leg muscles, and joints.  Even relatively light objects, lifted improperly, can contribute to injury.

**Cuts, Pinching, and Crushing**

Splinters, slivers, and sharp edges on objects to be lifted can result in cuts.  Heavy objects can pinch or crush fingers, toes, arms, and legs between the object and nearby objects (e.g., walls, tables, counters, or railings).

**Muscle and Joint Injuries**

Muscle and joint injuries occur when objects to be lifted are too heavy or awkward, are lifted improperly, or in areas where access is restricted.

Lifting tasks which are awkward and repetitive, even if involving only light objects, can lead to nerve and joint damage.

**Recognition and Hazard Assessment**

The need for manual lifting must be identified as a physical hazard when project tasks specifically require manual handling or use of heavy equipment, and the following safe lifting techniques must be instituted:

- Plan any lifting task, noting:

  - **Contact hazards**.  Check each object before lifting for presence of splinters, slivers, sharp edges or parts, cracks and loose joints, signs of biological hazards, and chemical or radioactive material contamination.

  - **Weight of object**.  Unless involved in weight training, recommended safe lifting weights for an average man or woman are 50 and 35 pounds, respectively.

  - **Size and shape of object**.  Large and oddly shaped objects are more difficult to lift, even within safe weight limits, due to imbalanced center of gravity.

  - **Area in which lifting is to be done.**  Check for pinch points such as other objects close by and ensure there is room for safe lifting.

  - **Conditions under which lifting is to be accomplished.**  Check for wet or slippery surfaces. Also consider level of protection to be used.  Level B or A protection may add up to 40 lbs. To be lifted, as well as restricting range of motion and adding to area restriction by increasing bulk.

<div align="right">Revised 11/1999</div>

    – **Route to be traveled, if lifting includes carrying.** Check walking and working surfaces for slip and trip hazards, note ramps, changes in level of elevation, and ladders or stairways that need to be negotiated.

## Prevention and Protection Programs

- Before lifting, identify the potential for contact hazards on objects to be lifted. Check each object before lifting, remove any noted hazards as feasible, and wear gloves (cotton, at a minimum, or leather, kevlar, or chemical resistant material, depending on the nature of the hazard).

- Avoid contact with, or cover cracks or loose joints to reduce hazards of pinching.

- Workers must know their lifting limitations, plan before lifting, keep themselves in good physical condition, and get help if uncertain that they can lift safely. Managers must plan and allow for safe lifting.

- When lifting an object from the floor:

  – Determine that the object is within the safe weight limit.

  – Check for contact hazards.

  – Walk the intended route of travel to identify and remove slip and fall hazards.

  – Identify changes in elevation, steps, ramps, stairs and ladders that must be negotiated.

- To lift square or rectangular objects:

  – Avoid reaching as you lift.

  – Set feet firmly, placing one foot alongside the load and the other slightly behind the load.

  – Keep objects close to the body.

  – Squat in front of the load.

  – Grasp one of the top corners away from the body and the opposite bottom corner closest to the body.

  – Tilt the object slightly away from the body, tilt forward at the hips, keep the back straight and tuck in the chin.

  – Straighten the legs, keeping the spine straight, pull the object into the body and stand up slowly and evenly without jerking or twisting.

  – If turning or change of direction is required, turn with feet without twisting the torso and step in the direction of travel

Revised 11/1999

- To set an object down, reverse the sequence, being sure not to trap the bottom hand between the object and the surface on which the object is set.

Workers must be trained and have the opportunity to use the above steps with lighter objects before performing heavy lifting. **For odd-shaped objects, the only modification needed should be hand-hold position**. When two or more persons are lifting, have a plan and a set of signals so lifting occurs simultaneously.

Do not carry objects in a manner which obstructs vision in the line of travel.
Carry objects so one hand is free to hold the handrail on stairs and that there is an unobstructed view of footing. Carry objects in a manner to permit use of both hands while climbing a ladder.

## Manual Handling of Heavy Objects

### Hazard

Manual maneuvering or handling of heavy objects without actually lifting is often required for hazardous materials and on Resource Conservation and Recovery Act (RCRA) facilities and construction sites. Manual handling of heavy objects, even when not actually lifting, can pose the same hazards as lifting including cuts, pinches, bruises, crushing, muscle and joint strain, and contact with hazardous materials and biological hazards.

### Recognition and Risk Assessment

The need for manual handling of heavy objects must be addressed in the planning stages of a project Health and Safety Plan (HASP). Drums and other containers which must be maneuvered for access to information or sampling locations, that are inaccessible to mechanical handling equipment, require manual handling and special precautions. When handling of heavy objects does not actually involve lifting, workers can handle heavier objects, even those weighing several hundred pounds, safely if proper techniques are used. In many instances, the procedures involve balancing and taking advantage of the shape of the object.

### Prevention and Protection Programs

Prior to performing manual handling, it must be determined that it can be done safely and that mechanical assistance is infeasible.

Mechanical equipment or assistance such as dollies, carts, come-alongs or rollers are to be used whenever possible. Mechanical assistance must be of proper size, have wheels sized for the terrain, and be designed to prevent pinching or undue stress on wrists. Objects to be moved must be secured to prevent falling and properly balanced to prevent tipping.

The minimum protection for manual handling is heavy cotton or leather gloves, safety boots, and coveralls. Metatarsal guards, chemical protective clothing, and metal mesh or kevlar gloves must be used as risk increases of heavy items falling, hazardous materials contact and sharp edges, splinters or slivers.

Workers must be aware of and work within their weight-handling capabilities.

Revised 11/1999

Objects to be manually handled must be checked for contact hazards prior to beginning movement, and to ensure handling will not trap hands, arms, legs, or feet between the object and other objects, walls, or railings.

Properly trained personnel may roll heavy objects with a round base such as 55 gallon drums or compressed gas cylinders, if rolling will not damage the structural integrity. Rolling must be controlled by chutes, tag-lines, or other means of limiting acceleration. Use of the legs for pushing and tag-line control of rolled objects must be stressed.

Only properly trained personnel may move cylindrical objects which must remain upright by hand. Cylindrical objects, such as drums that must remain upright, are handled manually by slightly tilting the object, using the legs for control, and balancing the object on the bottom edge. The handler then walks beside the object, with the object tilted toward the body, positioning the hands on the top edge away from the body and moving so they do not cross, thus maintaining balance and a steady controlled forward motion.

Prior to moving cylindrical objects in this way, the route of travel must be walked to identify any changes of elevation, pot holes, or other obstructions that could cause the object to snag, tip, or get out of control.

Flat, square, or rectangular objects are most easily handled using make-shift rollers or skids to break the friction with the resting surface and pushing, using the legs.

Revised 11/1999

FLD10-4

**FLD 11          ROUGH TERRAIN**

**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD02 – Inclement Weather*
*FLD05-Heat Stress*
*FLD06-Cold Stress*
*FLD15 – Remote Areas*
*FLD22-Heavy Equipment Operation*
*FLD47-Clearing and Grubbing*

<u>**Hazard**</u>

Physical hazards associated with rough terrain include vehicle accidents, heavy equipment incidents, falling, slipping, and tripping.  Driving vehicles on uneven surfaces creates a possibility of the vehicle rolling, getting stuck in mud or ditches, or of an accident due to flat tires or striking obstacles and other vehicles. Heavy or downed vegetation can hide holes or breaks in the terrain, which increase risk of slips, trips, and falls or vehicle accidents.

<u>**Recognition and Risk Assessment**</u>

Rough terrain complicates work activities and adds or increases risk.  In the planning stages of a project, rough terrain must be considered as a physical hazard.  Risk assessment is usually accomplished from site history information (i.e., site topography) and onsite by the Site Health and Safety Coordinator (SHSC).

<u>**Hazard Prevention and Protection Programs**</u>

Hazard prevention can be achieved by ensuring regular maintenance is performed on vehicles.  In order to minimize accidents, site surveillance on foot may be required to ensure clear driving paths.  The site crew should be alert and observe terrain while walking to minimize slips, trips, and falls.  Boots that are ankle high or higher should be worn to provide additional support and stability.  Vehicle drivers and passengers should wear seatbelts at all times.   4 wheel drive vehicles should be used if terrain conditions are wet, frozen, broken, or otherwise deemed unsafe for 2 wheel drive vehicles by the SHSC.

When clearing and grubbing activities are being conducted, the equipment operator is to protected by a fully enclosed cab.  Chainsaw operators are to wear chaps, hardhat, face/ear and eye protection. Ground personnel should always be alert for snakes and wild animals.

Personnel should maintain a high level of physical conditioning due to increased body stress and exertion. Emergency communications such as a cell phone or two-way radio should be carried at all times. Personnel should be aware of potential hazards and ensure the availability of first aid supplies and knowledge of the location of the nearest medical assistance.

.

**FLD 12          HOUSEKEEPING**

**GENERAL**

Hazards associated with poor housekeeping include slips, trips, falls, punctures, cuts, and fires.

**REFERENCES**

Related FLD OPS:

*FLD29 – Material Handling*
*FLD33 – Demolition*
*FLD39 – Illumination*

**PROCEDURE**

**Recognition and Risk Assessment**

Good housekeeping is an important element of accident prevention.  Good housekeeping should be planned at the beginning of the job and carefully supervised and monitored through to the final clean-up.

Housekeeping requirements must be addressed in the planning stages of a project and safety plan.  Risk assessment can be accomplished in the development stages of a project by listing in the site-specific Health and Safety Plan (HASP), good housekeeping requirements and the hazards associated with poor housekeeping (e.g., slips, trips and falls).    The SHSC must make decisions on the proper safety procedures and recommend them to the site manager.  Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards.  Any site worker may stop work if safety procedures are not followed or the risk is too great.

**Prevention and Protection Programs**

Poor housekeeping can be prevented by following the three steps described below:

1.  Plan ahead.  A materials storage area which has been planned is more orderly than one which has developed haphazardly.

2.  Assign responsibilities.  If the size of the job and work force merit, a person should be assigned specific responsibility for clean up.  Ideally, each individual should pick up his or her work area and help keep the site neat.

3.  Implement the program.  Housekeeping must be part of the daily routine, with clean-up being a continuous procedure.

Accidents caused by poor housekeeping can be prevented by adherence to the following rules.

Lunch areas should be kept clear of empty bottles, containers, and papers.  Trash disposal cans should be provided.  An effective means of preventing litter is the provision of suitable receptacles for hazardous waste, as well as nonhazardous waste.

Revised 11/1999

Accumulation of flammable and combustible liquids on floors, walls, and other areas, is prohibited. All spills of flammable and combustible liquids must be cleaned up immediately. Combustible waste such as soiled rags and paper is to be stored in a safe place (such as a covered metal container) and disposed of regularly.

WESTON project managers and WESTON subcontractors should provide sufficient personnel and equipment to ensure compliance with all housekeeping requirements.

Work will not be allowed in areas that do not comply with the requirements of this section.

The SHSC and WESTON subcontractors will inspect the work area daily for adequate housekeeping and record unsatisfactory findings on the daily inspection report.

If applicable, the decontamination line must be keep neat and free of debris.

Adequate lighting should be provided in or around all work areas, passageways, stairs, ladders, and other areas used by personnel.

All stairways, passageways, gangways, and accessways shall be kept free of materials, supplies, and obstructions at all times.

Loose or light material should not be stored or left on roofs or floors that are not enclosed, unless it is safely secured.

Tools, materials, extension cords, hoses, or debris are to be used, disposed of, and stored so as not to cause a tripping or other hazard.

Tools, materials, and equipment subject to displacement or falling should be adequately secured.

Empty bags that contained lime, cement, and other dust-producing materials should be removed periodically, as specified by the designated authority.

Protruding nails in scrap boards, planks, and timbers should be removed, hammered in, or bent over flush with the wood, unless placed in containers or trucks for removal.

Walkways, runways, and sidewalks should be kept clear of excavated material or other obstructions and no sidewalls should be undermined unless shored to carry a minimum live load of 125 pounds per square foot.

Containers should be provided for storing or carrying rivets, bolts, and drift pins, and secured against accidental displacement when aloft.

When rivet heads are knocked off or backed out, they should be prevented from falling.

Form and scrap lumber and debris should be cleared from work areas, passageways, and stairs in and around building storage yards and other structures.

All storage and construction sites should be kept free of the accumulation of combustible materials.

Revised 11/1999

All materials should be maintained in neat stockpiles for ease of access.  Aisles and walkways should be kept clear of loose materials and tools.

Areas prone to weeds and grass should be kept mowed.  A standard procedure should be established for cleanup of such areas, as specified by the SHSC.

Rubbish, brush, long grass, or other combustible material must be kept from areas where flammable and combustible liquids are stored, handled, or processed.

**FLD 13        STRUCTURAL INTEGRITY**

**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD02 – Inclement Weather*
*FLD23 – Cranes/Lifting Equipment*
*FLD24 – Aerial Lifts/Manlifts*
*FLD26 – Ladders*
*FLD27 – Scaffolding*
*FLD28 – Excavating/Trenching*

Related Programs:

**PPE Program (See Section 1 – General Requirements):**

Section 1.4, page 23 – Eye and Face Protection
Section 1.4, page 24 – Head Protection
Section 1.4, page 24 – Foot Protection

**PROCEDURE**

Structural integrity hazards include those hazards associated with deteriorated conditions of containers (such as drums or tanks) and buildings (including appliances such as both fixed and portable ladders), scaffolding, and excavations or trenches. The failure of structures can cause significant injury or death to personnel.

**<u>Recognition and Risk Assessment</u>**

In the planning stages of a project and safety plan, the potential for injury due to structural integrity must be considered as a physical hazard in the site-specific Health and Safety Plan (HASP). Risk assessment can be accomplished in the development stages of a project by listing in the HASP the most likely hazards which may occur associated with structural integrity. The SHSC must make decisions on the proper safety procedures and recommend them to the site manager. Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards. Any site worker may stop work if safety procedures are not followed or the risk is too great.

Prior to entering any building, an assessment of structural integrity must be made. Buildings on inactive sites or facilities, unused buildings, and buildings which are to be demolished require special attention. This assessment must ensure, through observation and experience, that entering and/or task activities will not expose personnel to unusual risk of falling debris, loose materials that could be dislodged by touching or walking nearby, or walking on surfaces that cannot bear the weight of personnel.

Revised 11/1999

Prior to demolition operations, Occupational Safety and Health Administration (OSHA) 29 CFR 1926 Subpart T requires that an engineering survey be made by a competent person. The engineering survey must be in writing.

The structure must be assessed to determine the condition of the framing, floors, and walls, and the possibility of any unplanned collapse of any portion of the structure.  Any adjacent structures where employees may be exposed must also be inspected.

In buildings with several levels, floors, stairs, and fixed ladders must be similarly assessed.

Signs indicating the lack of structural integrity include loose, hanging, or sagging materials, water stains on floors where there is uncertainty as to the underlying support, loose handrails, protruding nails and fasteners, cracked concrete, masonry, or plaster, and evidence of structural failure, such as debris.

**Prevention and Protection Programs**

Personnel should wear appropriate personal protective equipment (PPE) such as hard hats, safety shoes, safety glasses, and gloves in all structures to minimize hazards.  If there is doubt of the structural integrity of buildings, entry should be delayed until a competent person can make assessment.

Revised 11/1999

**FLD 14          SITE SECURITY**

**GENERAL**

**REFERENCES**

Related FLD OPS:

*FLD15 – Remote Areas*
*FLD39 – Illumination*

**PROCEDURE**

When WESTON's responsibilities include site control or security as in WESTON Office locations, one aspect of the Site Health and Safety Plans and Business Continuity Plan Emergency Action Plans to be addressed is security, or maintaining control of access to the site.  Contingency plans are required to deal with unauthorized entry.  Inquisitive and/or hostile persons may interfere with the site activities or work effort, jeopardizing their safety, as well as the safety of the field team.

<u>**Recognition and Risk Assessment**</u>

In the planning stages of a project and safety plan, the potential for security problems must be considered as physical hazards in the site-specific Health and Safety Plan (HASP).  Risk assessment can be accomplished in the development stages of a project by listing in the HASP the most likely security problems that may be encountered.  The Site Health and Safety Coordinator (SHSC) must make decisions on the proper safety procedures and recommend them to the site manager.  Each worker must evaluate the risk associated with his or her work and be actively alert to these hazards.  Any site worker may stop work if safety procedures are not followed or the risk is too great.

Entry to a site by unauthorized persons presents risks to the persons entering and to WESTON personnel who may have to interact with such individuals.  In many cases, the unauthorized entry is accidental or unintentional; however, contingency plans must also include procedures for instances when unauthorized entry is deliberate or for purposes which could pose a threat to site personnel.

During the assessment of risk for each site, security problems must be identified.  The contingency plan should identify ways to prevent and respond to security problems.

Security problems may arise from the site neighborhood due to:

- Socio-economic factors
- Client/neighbor relations
- Client/labor relations
- Poor lighting
- Remoteness and size of site
- Value of equipment and materials
- Sampling equipment tampering

**<u>Prevention and Protection Program</u>**

Prevention programs are an integral portion of a Security Plan for Business Continuity and Emergency Action Plans or Contingency Plans for Site Health and Safety Plans. An effective preventative measure is to inform all interested parties of the site activities. An attempt should be made to notify state and local police, the fire department, and any local/state government officials of the project's purpose and scope. This will allow those authorities to answer questions posed to them by local residents and the media by preparing statements on the project's purpose or by informing the public where to call for further information. This will alleviate the problem of work stoppage due to field personnel answering questions.

One must ensure that the client understands and approves of any information released. In most cases, the liaison should be between the client and the public.

The Security Contingency Plan must:

- Identify the person responsible for implementing the Contingency Plan

- State as the first priority the safety of WESTON personnel

- Be designed to minimize the potential for confrontation and to obtain security assistance as quickly as possible

- Assign the enforcement of security functions to properly trained and authorized or bonded agencies

- Establish a communication procedure for obtaining assistance

- Be communicated to site personnel

Security Problem Prevention measures include:

- Community relations programs
- Visible security precautions (e.g., fences, "keep out" signs)
- Locking doors that are unattended during working hours and all doors during non-working hours
- Carefully defined rules/requirements for authorizing site access
- Clearly delineated access points and barriers around work area
- Vigilance by all site personnel
- Adequate lighting
- Working in pairs or teams in sensitive areas
- Locking and storing equipment securely
- Using discretion in discussions and conversations when off-site
- Working to avoid confrontation

In short, security prevention includes not advertising activities or inviting intrusion. Telephone numbers and instructions for obtaining security assistance must be clearly posted onsite.

Personnel onsite must always have access to communications.   These communications may be to additional onsite personnel or, in certain situations, communications by team members to outside response agencies may be necessary.

**Workplace Violence**

Workplace violence has become an unfortunate concern for any employer and employee. Workplace violence has proven to have  little regard for location or status of the workplace. The information provided in Appendix A is considered guidance for developing awareness and violence prevention programs.  The key to preventing workplace violence is to develop an objective awareness of all aspects of our work environment including the people within it.

Terrorism

Terrorist events in recent years have added the need to ensure Emergency Action Plans.address Bomb threats and precautions to reduce the potential for terrorist activities.

Bomb Threats

WESTON's association with environmental issues have led to past experiences where local elements have identified WESTON with regulators and have threatened violence against WESTON   personnel or property.

Precautions to be taken include those listed above under general site security and the following:

- Ensure that site and office personnel are made aware when WESTON activities increase the potential for work place violence,

- Use care in discussing involvement in Department of Defense, Department of Energy or other politically or socially sensitive issues out side of work,

- Train persons receiving and handling mail and deliveries in what to look for as potential for inflicting violence on a WESTON person or workplace. Examples include:

    - Misspelled words
    - Hand written addresses
    - Mail from foreign countries
    - Excessive tape or postage
    - Restrictive markings (e.g., Confidential)
    - No return address

Emergency Action Plans must identify procedures to be taken if suspicious packages are received.